CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel:  520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney Pro Se for Plaintiff Charles Carreon

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES CARREON<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW INMAN, INDIEGOGO, INC.,<br>NATIONAL WILDLIFE FEDERATION,<br>AND AMERICAN CANCER SOCIETY,<br>and Does 1 – 100,<br><br>Defendants,<br><br>and<br><br>KAMALA HARRIS, Attorney General of the<br>State of California,<br><br>A Person To Be Joined If<br>Feasible Under F.R.Civ.P. 19. | Case No.: CV-12-3112-EMC<br><br>FIRST AMENDED COMPLAINT FOR<br>INJUNCTIVE RELIEF TO IMPOSE<br>CONSTRUCTIVE CHARITABLE TRUST<br>AND REQUIRE ACCOUNTING. FOR<br>DAMAGES FOR TRADEMARK<br>INFRINGEMENT AND<br>CYBERVANDALISM, AND FOR<br>INJUNCTIVE RELIEF TO ENJOIN<br>FURTHER INFRINGEMENT AND<br>CYBERVANDALISM<br><br>JURY DEMAND |

For his first amended complaint against defendants Matthew Inman ("Inman") and Indiegogo, Inc. ("Indiegogo"), jointly referred to sometimes herein as the "Fundraising Defendants," and the National Wildlife Federation ("NWF") and the American Cancer Society ("ACS"), jointly referred to sometimes herein as the "Charitable Organization defendants", Does 1 – 100, in which Kamala Harris, Attorney General of the State of California (sometimes referred to herein as the "AG," is named for purposes of joinder under F.R.Civ.P. 19 as a person to be joined if feasible, plaintiff Charles Carreon ("Plaintiff"), alleges:

1

**JURISDICTION**

1.      This is an action for infringement of a federally registered trademark pursuant to

15 USC §1114, unfair competition under California Business & Professions Code § 17200, *et.*

*seq.*, and violations of the Supervision of Trustees and Fundraisers for Charitable Purposes Act

as amended by the Nonprofit Integrity Act California Government Code §§ 12580, *et seq.* and

the Charitable Solicitation Disclosure Law, California Business & Professions Code §§ 17510, *et*

*seq.*

2.      This Court has jurisdiction over this action pursuant to: 28 USC §§ 1331 and 1338(a) and

(b), and 15 USC §1121, as an action for violations of the Lanham Act, 15 USC §§ 1051, *et seq.*,

28 USC § 1332(a)(1), and has pendent, supplemental and ancillary jurisdiction pursuant to 28

U.S.C. § 1367 of state law claims arising from a common nucleus of operative fact joined with a

substantial and related claim under the trademark laws of the United States, 15 USC §§ 1051, *et*

*seq.*  Further, this Court has diversity jurisdiction as the amount in controversy exceeds $75,000

and the plaintiffs and defendants are diverse.  Further, this Court has jurisdiction under the

United States Declaratory Judgment Act, 28 USC §§2201 and 2202.

3.      Venue is proper under 28 USC § 1391(b)(2) because a substantial part of the events or

omissions giving rise to the claim occurred at the premises of Indiegogo, and all of the property

that is the subject of the action is situated within the Northern District of California at 301 8th

Street, San Francisco, California 94117.

**INTRADISTRICT ASSIGNMENT**

4.      Pursuant to L.R. 3-2(c), intradistrict assignment of this Intellectual Property Action is made

on a District-wide basis.

# PARTIES

5.     Plaintiff is an individual residing in Tucson, Arizona, and a member of the California State Bar Association with an Internet website at www.charlescarreon.com and a Twitter account at @charlescarreon.  Defendant Inman is an individual residing in the State of Washington who runs a comic website at www.TheOatmeal.com and various related enterprises.  Defendant Indiegogo is a corporation incorporated in the State of Delaware, registered to do business in the State of California pursuant to Cal. Corp. Code § 2105 as Entity No. C3054414 in the State of California, doing business in the State of California.

6.     Kamala Harris is the Attorney General for the State of California, named as a party that should be joined if feasible under F.R.Civ.P. 19 because pursuant to Cal. Gov. Code § 12591, her presence is necessary, not for the establishment of a charitable trust as prayed herein, but for its termination, that will be necessary in order to conclude the action by final judgment.  Section 12591 provides:

> "Nothing in this article shall impair or restrict the jurisdiction of any court with respect to any of the matters covered by it, except that no court shall have jurisdiction to modify or terminate any trust of property for charitable purposes unless the Attorney General is a party to the proceedings."

7.     This Court has general personal jurisdiction over Indiegogo, that markets itself as "the world's funding platform," based on its corporate presence in California, its operation of the transactional Internet website at www.indiegogo.com (the "Indiegogo Site") in California, and its pervasive business activity in California.  This Court has general jurisdiction over Inman due to his pervasive marketing of Internet digital products through various websites, including but not limited to www.theoatmeal.com ("Inman's Sites") that are purposefully directed to California consumers, and earn many thousands of dollars in transactions with California residents.  The Court has specific personal jurisdiction over Inman, because in order to accumulate the property

that is the subject of this action, Inman contracted with Indiegogo as further alleged *infra*, and specifically directed an Internet fund-raising campaign linked to the California-based Indiegogo Site at http://www.indiegogo.com/bearlovegood (the "Bear Love" campaign) toward California consumers, and to Internet users nationwide, through the communicational instrumentalities of interstate commerce within this judicial District.  The Charitable Organization defendants are registered with the Attorney General of the State of California as charitable organizations, and purposefully direct their fundraising activities at the residents of the State, taking advantages of the privilege of doing business within the jurisdiction.  Wherefore all of the named defendants, and each of them, have purposely availed themselves of the laws of the State of California operative within this judicial District.

8.   The contract entered into between Inman and Indiegogo is a clickwrap online agreement, the full text of which appears online at http://www.indiegogo.com/about/terms (the "Indiegogo Contract"), attached as **Exhibit A**.  Pursuant to the Indiegogo Contract, Inman and Indiegogo each became the agents of the other, in an exchange of consideration that benefited both. Paragraphs 3 – 5 of the Indiegogo Contract set forth the financial details of the agency, in which Inman is designated as the "Project Entity" that will receive all of the "Contributions" elicited through Indiegogo's "crowdfunding" mechanism, minus "a 9% marketplace processing fee retained by Indiegogo," of which 5% will be rebated back to Inman when he reaches the funding goal, for a net take of 96%:

> 3. To receive Contributions, your Project Entity must establish an account (a "Funding Account") with the payment processor designated by Indiegogo at the time you post your Project (the "Processor"). You understand and agree that your Funding Account will be governed by your agreement with the Processor, and that Indiegogo shall have no liability for your Funding Account or your transactions or interactions with the Processor.
>
> 4. All Contributions made to a Project will be directed to the Project Entity's Funding Account, less a 9% marketplace processing fee retained by Indiegogo. All Contributions paid to a Project Entity will constitute

"Project Funding," and the Indiegogo fee and all other Project Funding requirements will apply. Indiegogo is not responsible for any error or omission in the Funding Account information you provide. Unless automated by the Processor, Project Funding less 3rd party processing fees will be disbursed from the Funding Account to the Project Entity's bank account according to the Project's disbursement details (set in the Funding section of the Project Profile). All necessary fund transfers will be initiated within 5 business days of the campaign end date. It can then take up to 5 business days for the disbursed funds to arrive in your account.

 5. When you reach your Campaign Deadline, your Funding Request will automatically close and no more Contributions will be accepted for your Project. You may make a new Funding Request any time after the end of your last Funding Request closes. If you reach your Campaign Goal by your Campaign Deadline, Indiegogo will pay you a 5% rebate on all funds raised during the campaign. Payments will be included in a funds transfer that will be initiated within 5 business days of the campaign end date. It can then take up to 5 business days for the disbursed funds to arrive in your account.

9.    Pusuant to the Indiegogo Contract, Indiegogo provided Inman with access to its "worldwide crowdfunding system," that includes Internet software that gave Inman "Global Exposure," and "one-click social media integration, direct email and announcement features" that "make it easy to spread the word, raise awareness and increase funding."

10.   In keeping with its do-gooder image, the Indiegogo Contract purports to impose the following limitations on Inman's commercial speech:

> **You agree not to post User Content that**: (i) **may create a risk of harm, loss, physical or mental injury, emotional distress**, death, disability, disfigurement, or physical or mental illness to you, to any other person, or to any animal; (ii) **may create a risk of any other loss or damage to any person or property**; (iii) <u>may</u> **constitute or contribute to a crime or tort**; (iv) **contains any information or content that we deem** to be unlawful, harmful, **abusive**, racially or ethnically offensive, defamatory, infringing, invasive of personal privacy or publicity rights, **harassing, humiliating to other people (publicly or otherwise)**, **libelous, threatening, or otherwise objectionable; ….**

11.   Indiegogo has acquiesced in Inman's breach of the foregoing provision, all to the detriment of the Plaintiff and the public, as alleged further herein.

12.   Inman is an expert in the use of Internet mass-communication tools, and has mastered these tools as instruments of commercial profit, harnessing the global reach and scope of Internet

communications to reach vast audiences with messages that, as alleged *infra*, are unsuitable vehicles for marketing charitable campaigns.

13.   Indiegogo, as set forth in the article on the Indiegogo website, "8 Ways to Drive Traffic to Your Campaign With Social Media," leveraged Inman's use of mass-communication tools, who utilized them in a reciprocal agency relationship pursuant to which each was fully responsible and liable for the nature and effect of the communications that Inman formulated and Indiegogo distributed:

      **a.**  Direct Email from Indiegogo
      **b.**  Facebook
      **c.**  Google+
      **d.**  Twitter
      **e.**  LinkedIn
      **f.**  Flickr
      **g.**  Indiegogo widgets that add campaign banners to Inman's websites

14.   Indiegogo also provided Inman with Analytics tools to track the Bear Love campaign statistics.

15.   Pursuant to the Indiegogo Contract, Inman agreed to indemnify Indiegogo for any breaches of the Indiegogo Contract, agreed that Indiegogo's services are solely based in California, and agreed that any claim or dispute arising out of the Indiegogo Contract would be decided under California law and in California.

16.   The full extent of the facts linking the fictitiously named defendants Does 1 through 100 with the matters alleged herein, and/or the true names or capacities, whether individual, corporate, partnership, associate, member or otherwise of said fictitiously named defendants, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as Doe 1 through 100 negligently, wantonly, recklessly, tortiously and unlawfully committed the acts that

proximately caused injury and damages to Plaintiff as alleged herein.  Plaintiff will hereafter

seek leave of court to amend this complaint to allege said defendants' true names and capacities

when the same have been ascertained.

17.   Plaintiff alleges, on information and belief, that each defendant named herein, including

those named as Does, is and at all relevant times mentioned was, the agent, servant,

co-conspirator, advertiser, and/or employee of each of the other Defendants and, in doing the

things alleged herein, was acting in the course and scope and with the knowledge of each of the

other named Defendants.  Plaintiff further alleges on information and belief that each Defendant

named herein aided and abetted the others by authorizing and/or ratifying the acts herein alleged.

## CALIFORNIA LAW GOVERNING CHARITABLE CONTRIBUTIONS

18.   In 1959, California enacted the "Supervision of Trustees and Fundraisers for

Charitable Purposes Act." Calif. Government Code Sections 12580 *et seq*., (the "Act"), modified

by the Nonprofit Integrity Act of 2004 (the "NIA").  In 1972, the California legislature decided

the best protection against solicitation fraud was to require substantial, comprehensive

registration and disclosure procedures. To promote public education about charitable solicitation

costs through disclosure to the donor, California passed the "Charitable Solicitation Disclosure

Law." Calif. Business & Professions Code Sections 17510 *et seq*. (the "CSDL").

19.   The Act requires all charitable organizations to "establish and exercise control" over their

own fundraising activities, and over all fundraising activities conducted by others for their

benefit.  Charitable organizations operating in California must approve all written contracts for

fundraising on their behalf.  Cal. Govt. Code § 12599.6(b).

20.   Cal. Govt. Code § 12599(a) defines commercial fundraisers:

"Commercial fundraiser for charitable purposes" means any individual, corporation, unincorporated association, or other legal entity who for compensation does any of the following:

 (1) Solicits funds, assets, or property in this state for charitable purposes.
 (2) As a result of a solicitation of funds, assets, or property in this state for charitable purposes, receives or controls the funds, assets, or property solicited for charitable purposes.
 (3) Employs, procures, or engages any compensated person to solicit, receive, or control funds, assets, or property for charitable purposes."

21.   Subsection (b) of Section 12599 provides in relevant part:  "*A commercial fundraiser for charitable purposes shall, prior to soliciting any funds, assets, or property … in California for charitable purposes, or prior to receiving and controlling any funds, assets, or property, including salvageable personal property, as a result of a solicitation in this state for charitable purposes, register with the Attorney General's Registry of Charitable Trusts on a registration form provided by the Attorney General.*"  Subsection (c) requires commercial fundraisers to file yearly accountings pursuant to subsection (d) that disclose (1) total yearly revenue, (2) the fee or commissions charged, (3) salaries paid to their officers and employees, (4) fundraising expenses, (5) distributions to the identified charitable organization or purpose, and (6) the names and addresses of any director, officer, or employee who are of charitable fundraisers that also serve as directors, officers or employees of charitable organizations.

22.   Section 12599(f) provides in relevant part:

"*Failure to comply with these registration or annual renewal and financial reporting requirements shall be grounds for injunction* against solicitation in this state for charitable purposes *and other civil remedies provided by law.*"  (Emphasis added.)

23.   Section 12599(m) provides:

"A commercial fundraiser for charitable purposes shall not solicit in the state on behalf of a charitable organization unless that

---

charitable organization is registered or is exempt from registration
with the Attorney General's Registry of Charitable Trusts."

24.   Section 12599(f) specifically prohibits charitable fundraisers from conducting solicitation

campaigns in violation of the Act, committing unfair and deceptive acts, engaging in fraudulent

conduct, using any name that implies a contribution is for a particular charitable organization,

falsely telling donors that a contribution is for a charitable organization, or will be used for a

charitable purpose, or misrepresenting a person as having endorsements that they do not have.

25.   Pursuant to Section 12599(h), ***"[n]ot less than ten (10) days prior to  the initiation of a***

***solicitation campaign … a commercial fundraiser for charitable purposes shall file with the***

***Attorney General's Registry of Charitable Trusts a notice"*** on a prescribed form, setting forth

the following:

> "(1) The name, address, and telephone number of the commercial
> fundraiser for charitable purposes.
>  (2) The name, address, and telephone number of the charitable
> organization with whom the commercial fundraiser has contracted.
>  (3) The fundraising methods to be used.
>  (4) The projected dates when performance under the contract will
> commence and terminate.
>  (5) The name, address, and telephone number of the person
> responsible for directing and supervising the work of the
> commercial fundraiser under the contract."

26.   Section 12599(i) requires "a commercial fundraiser for charitable purposes and a charitable

organization" to enter into a written contract that shall be available for inspection by the

Attorney General "***for each solicitation campaign, event, or service, that shall be signed by the***

***authorized contracting officer for the commercial fundraiser, and by an official of the***

***charitable organization who is authorized to sign by the organization's governing body.***"  The

requirements of such a written contract include provisions that give the charitable organization

important rights of control over any campaign, including, in subsection (i)(12)(c), the right to

cancel campaigns that "conduct fundraising activities in a manner that causes or ***could cause***

***public disparagement of the charitable organization's good name or good will***."  (Emphasis

added.)

**INMAN AND INDIEGOGO ARE NOT REGISTERED WITH THE AG TO SOLICIT ON BEHALF OF THE NATIONAL WILFLIFE FEDERATION, THE AMERICAN CANCER SOCIETY, OR ANY CHARITABLE ORGANIZATION, IN CALIFORNIA**

27.   Inman and Indiegogo are commercial fundraisers for charitable purposes within the

meaning of Cal. Govt. Code § 12599(a).

28.   Inman and Indiegogo are not registered with the Attorney General's Registry of Charitable

Trusts pursuant to § 12599(b).

29.   Inman and Indiegogo have not filed the disclosures required by § 12599(c).

30.   Inman and Indiegogo have not filed the annual reports required by § 12599(d).

31.   Inman and Indiegogo are not exempt from registration, and therefore pursuant to subsection

§ 12599(m), they are prohibited from soliciting "in the state on behalf of a charitable

organization."

32.   Inman and Indiegogo did not enter into the written contract with the NWF and/or the ACS,

required by § 12599(i).

33.   Inman and Indiegogo did not provide the ten-day notice to the Attorney General required by

§ 12599(h).

**INMAN'S CONDUCT DISPARAGES THE IMAGE OF THE CHARITABLE DEFENDANTS AND DAMAGES CHARITABLE FUNDRAISING**

34.   Inman is not a fit person to design and administer charity fundraising, and Indiegogo acted

unlawfully in making him its agent for the promotion of the Bear Love campaign.  Inman

described how he provokes his fans into sending him "massive traffic" in an online interview

published January 6, 2011:

Inman: I work for myself and really no one can control what I say. So usually I tell them that I slept with their mom or I say the most vile, awful thing I can think of. ***If you read my Twitter account, it is like Hitler's port-a-potty. It's the worst thing that you've ever seen, just this awful stuff that I say to my critics on there. Just to troll them, mostly. So that's usually how I respond to it. Like a drunk 15 year old, I think, is the best way to put it....***

Interviewer: What about in the beginning when you were going into Digg and ***you knew that if you won this group of people over, they'd send you massive traffic*** and if you turned them into haters, they'd bury you and you wouldn't get anything from them. At that point, weren't you nervous?

Inman: Yeah. At that point, I wouldn't have gotten on Digg and been like, "Hey, your mom and I made love under the stars. Ha ha ha. I liked it." That probably wouldn't go over so well. But now I'm kind of at this comfortable level. And part of my writing style and ***the persona that I have online is sort of this crass, bloated, obese, drunk monster.*** (Emphasis added.)

http://mixergy.com/matthew-inman-oatmeal-interview/

35.   Inman has announced his vindictive response to his real and imagined enemies by posting, within the source code of all of the webpages on his main website, www.theoatmeal.com, the following image and text, depicting himself as a pterodactyl that will "ptero-you a new asshole."



1
2
3
4
5
6
7
8

36.   Following the link to http://pterodactyl.me leads the Internet user to a page on TheOatmeal.com where a video created by Inman and Sarah Donner depicts Inman, in his character as a carnivorous, prehistoric flying reptile that first rips the intestines out of a man's anus, then flogs him with his entrails, then steals a pineapple from a boy, tears his head off, flings it at a girl and knocks her head off, then grinds the girl's head up in a wood-chipper, blends it with the pineapple, and drinks the grisly cocktail:

  

  

  

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Inman's followers are by and large technologically savvy young people eager to follow the latest trend, who embrace Inman's brutal ideology of "tearing you a new asshole," and believe that people who "don't get the Internet" are properly fair game for the acts of cybervandalism alleged in the Second and Third Claims for Relief alleged hereinbelow.  In addition to being an unsuitable person to run a charitable fundraising campaign, Inman is not an IRS-approved 501(c)(3) charitable organization, and thus could not utilize the Indiegogo system for issuing tax receipts to donors for donations.  Thus, when Indiegogo and Inman launched the Bear Love campaign, naming the NWF and ACS as beneficiaries, they knew or should have known that reasonable consumers/donors would be mislead into thinking that their donations would be tax-deductible, when in fact, they both knew that donations to the Bear Love campaign would not be tax-deductible.

### THE "BEAR LOVE" CAMPAIGN

37.   On June 11, 2012, Defendants published the webpage now appearing at http://www.indiegogo.com/bearlovegood, as shown in **Exhibit B** attached hereto (the "Bear Love campaign webpage").

38.   The Bear Love campaign webpage states as follows:

> "I run a comedy website called The Oatmeal.
> Last year I wrote a blog post about another website called
> FunnyJunk which stole a bunch of my comics and hosted them on
> their website without giving me credit.  They apparently didn't like
> my blog post and recently FunnyJunk sent me a letter stating that

unless I pay them $20,000 in damages they're going to file a
federal lawsuit against me. You can view the letter along with my
response here.
Instead of mailing the owner of FunnyJunk the money, I'm going
to send the above drawing of his mother. ***I'm going to try and
raise $20,000 and instead send it to the National Wildlife
Federation and the American Cancer Society.***
***I'm hoping that philanthropy trumps douchebaggery and greed.***
More information here."  (Emphasis added.)

39.   By making the foregoing bolded statement, Inman and Indiegogo jointly misappropriated

the popularity of the NWF and ACS as reputable charitable organizations, lead donors to believe

that donations to the Bear Love campaign would go exclusively to the NWF and ACS, and lead

donors to believe that donations to the Bear Love campaign would be tax-deductible.

40.   In order to accomplish the true purpose of the campaign, which was to initiate a hate

campaign against Plaintiff, and induce donors to make donations to the NWF and ACS to

express in approval of Inman's hate campaign against Plaintiff, Inman drew and Indiegogo

published a misogynistic cartoon depicting an obese female dressed in her underwear, with

pendulous breasts popping out of her brassiere, an enormous posterior distended by an

overstretched thong, rouged cheeks, and a crudely-lipsticked mouth, calling out to an apparently

disinterested brown bear half her size, "COME HURR AND LOVE MEEEE!"  He described it

as a ***"drawing of your mom seducing a Kodiak bear."***  A true copy of the webpage is attached

as **Exhibit B**.

41.   Collecting funds to donate to the National Wildlife Foundation and the American Cancer

Society was not Inman's true purpose in launching the Bear Love campaign.  Rather, the Bear

Love campaign was launched to utilize Indiegogo's Internet mass-communication tools to revile

Inman's legal adversaries, Plaintiff and his client, and initiate a campaign of "trolling" and

cybervandalism against them which has borne abundant toxic results, including criminal

misconduct by Inman's Internet followers against Plaintiff in the form of repeated events of

computer hacking and false personation in violation of Cal. Penal Code § 529, all while pulling

in lots and lots of "donations."

42.   Inman made clear his intention to utilize the Charitable Organization defendants as a

"human shield" for his assault on Plaintiff and his client when he summed up his attack with the

following unequivocal statement:

Consider this my philanthropic, kind-spirited way of saying:

Fuck off.

43.   Inman's insult is much more than a profane witticism.  It is a frank declaration of his

wrongful, uncharitable motive.  It is a non-sequitur that underscores his intent to create a toxic

hybrid of malicious intent and "philanthropy."  There is no such thing as a "philanthropic, kind-

spirited way" to say "F*ck off."  There is only one way to say it, and one purpose for saying it,

and that purpose cannot be lawfully associated with tax-exempt charitable solicitation in the

State of California.

44.   A day after Inman and Indiegogo launched the Bear Love campaign, on June 12, 2012, at

around 7:38 a.m., the campaign had already far exceeded its funding goal of $20,000, raising

$104,029, and Plaintiff requested that Indiegogo suspend the campaign on the grounds that it

violated its terms of service, sending an email through the Indiegogo website, citing the fact that

Inman was violating the provisions of the Indiegogo contract quoted at paragraph 10 above.

Venality triumphed over discretion and decency, however, and Indiegogo did nothing to alter the

tone or manner of the campaign.  Indeed, as news of Plaintiff's efforts to "block charity" hit the

Internet, the negative spin went wild, and Plaintiff was excoriated as the latest Internet victim to self-immolate due to his lack of understanding of "the ways of the Internet."

45.   The Charitable Organization defendants are both registered charitable organizations with the Office of the Attorney General who appear in the Charitable Registry.  Neither NWF nor ACS have entered in the written contracts statutorily mandated by Section 12599(i) with Inman or Indiegogo, that would secure their rights to: exercise control over the Bear Love campaign; receive a pre-agreed amount of revenue from the campaign; and assure that the campaign is not conducted in a manner that could cause public disparagement of the Charitable Organization defendants's good name and good will.

46.   Although the Charitable Organization defendants were notified by Plaintiff in writing about the fact that the "Bear Love" campaign alleged *infra* is being conducted by Inman and Indiegogo in violation of the Act, and that the campaign is being conducted in a manner that could cause public disparagement of the Charitable Organization defendants's good name and good will, neither the ACS or the NWF have acted to disavow their association with the Bear Love campaign, thus lending their tacit approval to the use of their names to the Bear Love campaign.

**47.**   As of the date of this filing, neither the ACS nor the NWF have communicated with Plaintiff.  Nor have either of the Charitable Organization defendants made any public statement; wherefore, the defendants, the general public, and the media have accepted the silence of the Charitable Organization defendants as tacit approval of the Bear Love campaign.  On information and belief, Inman has stated that the Charitable Organization defendants approve of the Bear Love campaign, which further brings the ACS and the NWF into disrepute in the minds of right-thinking prospective donors.

48.  *As of June 24, 2012, Indiegogo,* that receives contributions using credit card payments or PayPal, *was reporting the full amount of the funds collected by the Bear Love campaign as $213,308, from over 14,136 donors, as recorded in Exhibit B.*  The Bear Love campaign is scheduled to continue until 11:59 p.m. on Monday, June 25, 2012, so the full amount of the funds that will be raised by the Bear Love campaign is an unascertained number well in excess of this Court's jurisdictional requirement, hereinafter referred to as the "Charitable Fund."

49.  The purpose and effect of the actions initiated by Inman and published by Indiegogo as above-alleged has been to cloak a hate campaign in charitable appearance for purposes inimical to and inconsistent with charitable purposes by:

   a.  *Falsely representing to donors that they had the endorsement of the Charitable Organization defendants for the Bear Love campaign*;

   b.  *Inducing the Charitable Organization defendants to grant post-hoc approval of the Bear Love campaign tacitly by public silence and privately by express encouragement of the Fundraising Defendants; and thereby*

   c.  *Bribing the Charitable Organization defendants to endorse a fundraising campaign to which neither would have lent its name if given prior notice of the purpose and manner of the campaign, and that both would have cancelled pursuant to Cal. Gov. Code § 12599(i) for operating "in a manner that causes or could cause public disparagement of the charitable organization's good name or good will," but for the inducement of receiving tainted money from the Charitable Fund.*

50.  The particular danger of Inman's tactics is that they are wildly successful.  The Bear Love campaign is on track to exceed Inman's $20,000 goals by more than a factor of ten.  Fueled with irrational hatred, it pushed into six figures in the first 48 hours, while many legitimate campaigns on Indiegogo, such as those to meet private health care needs -- raise modest four-figure sums over a much longer time period.  See **Exhibit D**, a campaign for "My Kidney Transplant Fund" that has raised $3,570 in three weeks.  If Inman's deceptive methods, sanctioned by Indiegogo

and tolerated by the Charitable Organization defendants, are given the green light simply because they get the fundraising job done, they will corrupt an already vulnerable industry.  All manner of unregistered fundraisers will adopt Inman's tactics.  Needy charitable organizations will first be backed into fundraising campaigns without their knowledge, then bribed into winking at whatever bizarre, malevolent campaign will fill their treasury with spite donations.  In place of legitimate charitable fundraising, unscrupulous, unregistered fundraisers like Inman will prosper as kingmakers who call the tune, inducing charitable organizations to dance to whatever grotesque melody they choose to play.  Inman's methods of fundraising will make true generosity an antiquated, outmoded reason for giving, and donating to satisfy spiteful motives, fueled by venomous Internet postings, will supplant the wholesome impulse to benefit others.

## FIRST CLAIM FOR RELIEF
**FOR IMPOSITION OF A CHARITABLE TRUST UPON
THE PROCEEDS OF THE BEAR LOVE CAMPAIGN
SOLICITED BY VIOLATIONS OF THE ACT AND FALSE
ADVERTISING IN VIOLATION OF B. & P. Code § 17500
Against Defendants Inman and Indiegogo**

51.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth herein as if set forth in full hereat.

52.   The Bear Love campaign was conceived and operated in violation of California Business & Professions Code § 17500, that makes it unlawful for:

> "[A]ny person … with intent directly or indirectly to dispose of … personal property or to perform services … of any nature whatsoever or to induce the public to enter into any obligation … *to make or disseminate … over the Internet, any statement* … connected with the proposed performance … *which … by the exercise of reasonable care should be known, to be untrue or misleading* ... as part of a plan or scheme *with the intent not to sell … those services … as so advertised*."

53.   Indiegogo and Inman are a for-profit entity and an individual operating a for-profit Internet business enterprise, acting as agents of each other.  Indiegogo provided "global crowdfunding"

services to Inman, in exchange for the effective 4% take set forth in paragraphs 3 – 5 of

**Exhibit A,** with the remaining 96% to be paid directly to Inman's "Funding Account." Inman

and Indiegogo jointly represented to donors that he was raising funds for the NWF and the ACS.

In order to raise funds for the NWF and ACS, California state law required that Inman and

Indiegogo be registered fundraisers, have prior authorization from NWF and ACS to conduct the

fundraiser, have written contracts with the NWF and ACS, and comply with all reporting

requirements, including having given the 10-day notice to the Attorney General before launching

the campaign. Donors were entitled to believe, and did believe, that all Indiegogo donations

were conducted lawfully. Donors therefore were likely to believe and believed that the Bear

Love Campaign, with its slogan, "Bear Love Good – Cancer Bad," was endorsed by the NWF

and ACS. Indiegogo and Inman knew or should have known that the foregoing statement would

mislead donors, and made the misleading statement with the intent to motivate donors to donate

to the Bear Love campaign.

54.   In order to induce donors to donate to the Bear Love campaign, Inman and Indiegogo,

acting as each other's agents, represented to all prospective donors that the NWF and the ACS

would be the recipients of the Charitable Fund. This statement was a misrepresentation in

violation of Section 12599(f), that Indiegogo and Inman had endorsements from the NWF and

the ACS that they did not have.

55.   Inman and Indiegogo knew or should have know that donors would reasonably infer from

the misrepresentation that the campaign had the endorsement of the Charitable Defendants, that

their donations to the Bear Love campaign would be tax-deductible. However, because Inman

was the founder and operator of the Bear Love campaign, donations to the Bear Love campaign

could not be, and were not processed through Indiegogo's "non-profit PayPal system." Thus,

without a court order imposing a charitable trust upon the Charitable Fund, thus making them the property of the Charitable Organization defendants, donations to the Bear Love campaign will not be deemed tax deductible.  As a practical matter, the way the transaction has been structured by Indiegogo, if Inman donates all of the funds to tax deductible charities, the entire benefit of the tax deduction will go to him, which would result in unjust enrichment, and deprive the donors of their fair share of the tax deductions they reasonably expected to receive when they donated to the Bear Love campaign.

56.   When Inman and Indiegogo initially launched the Bear Love campaign*, they identified only the NWF and the ACS as the beneficiaries of the campaign.*  This reasonably lead the public to believe that NWF and ACS would be the only beneficiaries of the campaign.

*57.   On or about June 13, 2012, Inman and Indiegogo disclosed* on the "Updates" tab of the Indiegogo webpage of the Bear Love campaign that he had changed his mind and would direct some of the Charitable Fund to other charities:  *"I'm going to add 2 more charities to the list, in addition to the ACS and the NWF."*  However, this subsequent "Update" was never announced on the main webpage for the Bear Love campaign, and indeed, was never seen by Plaintiff and other donors to the Bear Love campaign prior to their donation, as alleged infra.  (**Exhibit C.**)

58.   *Thus, the initial announcement by Inman and Indiegogo not only had the tendency to mislead, but actually did mislead Plaintiff and other donors into donating to the Charitable Fund for the benefit of the ACS and the NWF, notwithstanding that Inman and Indiegogo's contact permits Inman to dispose of the money in any manner he saw fit.*

59.   Plaintiff contributed to the Bear Love campaign with the intent to benefit the purposes of the NWF and the ACS, and did not intend to benefit any other unnamed charity, or to appoint

Inman the selector of what charities should benefit from his largesse.[1]  Plaintiff is acting on his own behalf and to protect the rights of all other contributors to the Bear Love campaign to fulfill their reasonable expectation of all donors that 100% of the money they contributed would go to the NWF and the ACS.

60.   Indiegogo has no right to receive any portion of the Charitable Fund, and Inman is not entitled to receive any portion of the Charitable Fund, because they were not registered as a commercial fundraiser, had no written contract with the Charitable Defendants, and failed to provide the statutory notice to the Attorney General prior to its initiation of the Bear Love campaign.  Further, Inman's use of vile, despicable insinuations of bestiality directed toward the mother of Plaintiff and/or his client were unfair solicitations prohibited by Section 12599(f) of the Act, fighting words, and commercial speech published to induce financial transactions, none of which are entitled to constitutional protection, and perverted the socially-uplifting purpose of public giving for the malicious, vindictive purpose of harassing and causing pecuniary damage to Plaintiff, as further alleged *infra*.

61.   The funds collected by Indiegogo under the Bear Love campaign are subject to a charitable trust for the sole benefit of NWF and ACS pursuant to Section 12599(f) of the Act.

62.   NFW and ACS have failed to perform their statutory duty to exercise authority over the Bear Love campaign.

63.   The Fundraising Defendants and the Charitable Organization defendants are all "persons" within the meaning of California's Business and Professions Code § 17201.

---

[1] Virtually all the campaigns on Indiegogo are legally-conducted for worthy causes, aside from Indiegogo's failure to register with the Attorney General.  Plaintiff contributed to two other campaigns that appear to be in compliance with law.  The Bear Love campaign is the exception.

64.   The acts of the Fundraising Defendants as alleged hereinabove are acts of false advertising made unlawful by California's Business and Professions Code § 17500, in that, through publication on Inman's Site and the Indiegogo site, donors to the Bear Love campaign were lead to believe that the Fundraising Defendants were authorized to solicit funds under California law for the Charitable Organization defendants, when in truth and in fact, in the exercise of reasonable care, the Fundraising Defendants should have known that this was untrue and misleading, and would tend to mislead a reasonable consumer.

65.   Plaintiff and the other Bear Love campaign donors have been cheated out of their reasonable expectation that their donations to the NWF and the ACS would be tax deductible.

66.   Inman has no lawful right, title or interest in the Charitable Fund, that has been gathered through violation of B. & P. Code § 17500, in defiance of the comprehensive regulatory scheme set forth at Cal. Gov. Code §§ 12580 – 12599.7, and in particular, the prophylactic strictures of Section 12599.

67.   Plaintiff has made demand upon Inman to relinquish all right, title and interest to the Charitable Fund, which he has failed and refused to do; wherefore, Plaintiff and his fellow-donors have no remedy at law.

68.   If not enjoined, Indiegogo will disburse the funds to Inman, who has no right, title or interest in the Charitable Fund, that was solicited in the names of the NWF and the ACS and is subject to a charitable constructive trust by operation of law.

69.   Plaintiff and all other Bear Love campaign donors are entitled to receive receipts for their donations to the NWF and the ACS so that they may obtain the charitable tax deduction for donations to IRS 501(c)(3) organizations, and the NWF and the ACS should be ordered to issue receipts to each of the more than 14,000 donors.

70.   After inducing donors to make donations to the Bear Love campaign, Inman induced donors to make purchases at TheOatmeal.com, exploiting the "halo effect" of his purported affiliation with the NWF and the ACS.  Those purchases were therefore ill-gotten gains, subject to disgorgement.

71.   Plaintiff and the other Bear Love campaign donors have no remedy at law; wherefore, injunctive relief pursuant to § 12599(f) of the Act, the imposition of a constructive trust pursuant to Cal. Gov. Code § 12599(g) and Cal. Civil Code § 2224, and Cal. Business & Professions Code § 17535 is required to secure a lawful disposition of the proceeds of the Bear Love campaign solely to the Charitable Defendants.  Plaintiff requests an award of attorneys fees pursuant to Cal. Code of Civil Procedure § 1021.5 as a public attorney general benefitting the public interest in enforcement of the Act.

**SECOND CLAIM FOR RELIEF**
**Use Of A False Designation In Violation Of Section 43(a)**
**of the Lanham Act, 15 U.S.C. § 1125(a)**
**Against Doe 1, aka "Modelista"**

72.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth herein as if set forth in full hereat.

73.   Plaintiff holds a trademark on his name, Charles Carreon, USPTO Registration No. 3,749,709 for use in the provision of Legal Services, in Class 45.

74.   Plaintiff has a Twitter account under the name "@charlescarreon."

75.   On June 14, 2012, Doe 1, an Internet user who goes by the name "Modelista" on the ArsTechnica.com website, registered the Twitter name "@Charles_Carreon," and began publishing fake "tweets" on Twitter that were immediately attributed to Plaintiff.  This was not only an act of trademark infringement, but also false personation in violation of California Penal Code § 529.

76.   The fake tweets from @Charles_Carreon were abrasive and provoking to other Twitter users, and engendered immediate negative responses, having the effect of intensifying public hostility toward Plaintiff, and causing him irreparable harm in the marketplace for legal services. Immediately upon signing up for the @Charles_Carreon Twitter account, Modelista began slinging insults that were immediately interpreted by other Twitter users as proof that Plaintiff is a stupid and malicious lawyer bent on self-destruction.

77.   On June 14, 2012, Plaintiff learned that he was being impersonated for malicious purposes when he received an email from a friendly Twitter user.  Attached as **Exhibit E** are screencaptures of various Twitter exchanges in which Doe 1, aka Modelista, povoked other Twitter users.  After receiving an authentication of identity letter from Plaintiff, on June 15, 2012, Twitter deactivated the fake Twitter account.

78.   These infringements of Plaintiff's trademark by Doe 1, aka Modelista, have actually caused confusion and mistake among consumers, have deceived consumers as to the affiliation, connection, or association of Doe 1 with Plaintiff, or alternatively and conjunctively, have confused, caused mistake among, and deceived consumers as to the affiliation, connection or association between Plaintiff and Doe 1.  Such false designations have also caused confusion as to the origin, sponsorship, or approval of "tweets" attributed to "Charles_Carreon" on Twitter, and are likely to cause such confusion, mistake and/or deception among consumers in the future. Some of the tweets made by "@Charles_Carreon" were intended to, and did inflame other Twitter users to deride Plaintiff, because they were provocatively phrased for that purpose, including the following:

     **a.**   @Charles_Carreon to @Samuaraikintter:  "I have backtraced the attack to Matt Inman's Internet Address.  He needs to stop the attack or I will need to escalate this."

**b.**   @ Charles_Carreon to @shellscape:  "This comparison makes complete sense.  Idiot."

**c.**   @ Charles_Carreon [responding to] @johnandrews: "You sir, are a dumbass.  I am doing what any sane individual would do.

Another fake tweet disclosed Plaintiff's private email address, so cybervandals could sign him up to random websites and send him hate-emails:

- @Charles_Carreon to all:  "The contact form has been disabled:  charlescarreon.com/temporarily-disabledun… Please contact me at chas@charlescarreon.com instead.

79.   Inman promptly took advantage of Modelista's fake tweets by himself tweeting:

**a.**   Matthew Inman @Oatmeal:  "It's interesting to watch a man with his dick in a hornet's nest try to solve the problem by tossing his balls in as well."

80.   After the Charles_Carreon account was disabled by Twitter, Doe 1, aka Modelista, by his or her own admission, willfully and with knowledge that the act was an infringement of Plaintiff's Charles Carreon® mark, registered another Twitter name, "@CharlesCarron," and continued publishing fake tweets that were intended to be attributed to Plaintiff, and were attributed to Plaintiff by other Twitter users.

81.   By reason of the actions of Doe 1 aka Modelista, alleged herein, Plaintiff is likely to suffer irreparable injury to his business, good will and property.  Plaintiff is entitled, pursuant to 15 U.S.C. § 1117, to recover from them the damages sustained and will sustain as a result of Defendants' wrongful conduct as alleged herein.

82.   On information and belief, the above-alleged acts of infringement have been willful and taken without regard to the established rights of the Plaintiff.

83.  Plaintiff is entitled pursuant to 15 U.S.C. § 1116, to an injunction restraining Inman and Doe 1, their officers, agents and employees, and all persons acting in concert with them, from engaging in any further acts of infringement in violation of the Lanham Act.

84.  Plaintiff has no adequate remedy at law.  Unless Defendants are enjoined from committing these unlawful acts as set forth above, Plaintiff will continue to suffer irreparable harm.

85.  This is an exceptional case; wherefore Plaintiff is entitled to an award of reasonable attorney's fees incurred in the prosecution of this action, pursuant to 15 U.S.C. § 1117.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**Cybervandalism In the Nature of**
**Trespass to Chattels, False Personation, and Identity Theft**
**Against Does 2 - 100**

</div>

86.  Plaintiff realleges and incorporates herein by reference each and every allegation set forth herein as if set forth fully hereat.

87.  Cybervandalism is the act of invading, trespassing upon, and damaging the personal digital property of another, invading a person's privacy, and entangling them involuntarily in embarrassing, harassing, commercial and social transactions without their consent that expose them to further damage and, as alleged hereinbelow, even the risk of criminal prosecution and imprisonment.  Cybervandalism is neither trivial nor innocent, and poses greater risks than ordinary vandalism, that usually stops with the destruction of personal or real property.

88.  On June 13, 2012, at 9:28 p.m., one or more of the persons named as Does 2 – 100 engaged in the act of trespass to chattels as made unlawful in *Thriftytel v. Bezenek,* 46 Cal.App. 4th 1559, 1566 (1996), cracking the password on Plaintiff's website at http://www.charlescarreon.com.

89.  Plaintiff discovered the trespass immediately after it occurred because he was sitting looking at his computer screen when he received an email from the website software system, and

1   was able to retain control of the website by immediately changing the password using the
2   hyperlink in the email.
3   90.   Plaintiff suffered damages due to the trespass in the form of expenses incurred as payments
4   to his System Administrator and webdesigner to secure all of the necessary computers, and to
5   migrate the http://www.charlescarreon.com website from its previous servers at Plaintiff's office
6   to a more secure facility off-site.
7
8   91.   As of the time of this filing, in part due to the Twitter posting, and in part due to other
9   postings of his email address on the Internet by Inman and or Does 2 – 100, Plaintiff has been
10  signed up to the following websites using the chas@charlescarreon.com email address by Does 1
11  – 100.  These signups are all without Plaintiff's consent or knowledge, and count is presumably
12  still rising.  By creating these fake accounts, Does 2 – 100 will have the ability to continue
13  infringing Plaintiff's name and engaging in identity theft by creating user profiles and ordering
14  goods and services for which third parties will hold Plaintiff responsible:
15
16          **a.**   Saboom.com (pornography website)
17
18          **b.**   Tube8.com (pornography site that spread malware including Trojan-
19          PSW.Win32launch, Hack Tool:Win32/Welevate.A, and Adware.Win32.Fraud)
20
21          **c.**   Dell.com (computer hardware website)
22          **d.**   IFWNewsletters.com (newsletter website)
23          **e.**   Baselinemag.com (newsletter website)
24          **f.**   Club Nintendo
25          **g.**   Crosswalk
26          **h.**   Olive Garden Newsletter
27          **i.**   Mormon.org, Church of Jesus Christ of the Latter Day Saints
28

**j.**   Ancestral Scotland

**k.**   Extratv-mail.com

92.   Plaintiff has received signup emails from all of the above companies, which are a nuisance. Plaintiff has also received a followup phone call from the Mormons, offering to personally deliver him a copy of the Book of Mormon.  Plaintiff has received very large numbers of hate emails, some wishing him death by cancer, and many more forecasting the complete destruction of his professional life.   Plaintiff has received voicemails from Dominos pizza wanting to confirm his ordering of pizzas that he in fact did not order.  Plaintiff never experienced any such invasions of his privacy and quiet enjoyment before the Bear Love campaign.

93.   Far more grave than the foregoing invasions of privacy, however, is the shadow of danger cast by the first two involuntary signups listed above.  These present the risk of genuine legal peril requiring disclosure of the identities of the anonymous perpetrators, and the issuance of injunctive relief to bar them from future such conduct.  These are the "Tube89.com" and "Saboom.com" signups.

94.   The Tube89.com and Saboom.com signups pose a particular hazard to Plaintiff, because they are online sex sites in which fake users, posing as Plaintiff, could manufacture evidence of criminal conduct and conduct that constitutes evidence of moral turpitude that could be devastating to Plaintiff's freedom and professional licensure.[2]

95.   For example, on Tube8.com, members are allowed to "upload" explicit sexual images and video.  Thus, Does 2 -100 have the ability to upload child pornography to Tube8.com, using Plaintiff's name, that could lead to his criminal prosecution.  Criminal prosecution for child

---

[2] As a former Oregon Deputy DA (Jackson County 1993-1995), and Federal Public Defender (CJA Panel, District of Oregon 1996 – 2000), Plaintiff has prosecuted and defended hundreds of criminal defendants, seen the inside of many Federal and State prisons, and is familiar with the draconian penalties attached to many cyber-crimes, so such perils are not at all speculative.

pornography is swift and devastating, often resulting in the seizure of a defendant's computers, the total destruction of their livelihood, long terms of imprisonment, and the total ruination of the defendant's life.  Indeed, filing this action is the only way to prove, conveniently and quickly to investigating law enforcement, that Plaintiff is not a Tube8.com user.

96.   Similarly, on Saboom.com, Does 2 - 100 have the power to involve Plaintiff's name with "Interactive porn – the ultimate sex game," to establish a "profile with your own news feed" in Plaintiff's name, and to "message other members & experience new adventures."  Plaintiff has been married to the same woman since 1974, has never signed up to a dating site, and does not want to have his name bandied about in an online forum peopled with "hot men and women."  Such a situation could result in serious embarrassment, legal entanglements and other cyber-nightmares.

97.   The full extent of Plaintiff's damage due to such conduct is unknown and will be subject to calculation as this action proceeds, and the complaint shall be supplemented to allege an amount susceptible of proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in its favor and against Defendants as follows:

A.      A permanent injunction:

1.      Imposing a constructive trust under Cal. Civil Code § 2224 upon the Charitable Fund as a res gathered by the Fundraiser Defendants by means of misrepresentation, mistake and false advertising made unlawful under Cal. B. & P. Code § 17500;

2.      Imposing a constructive trust under Cal. Gov. Code § 12599(g) upon the Charitable Fund as a res gathered by a the Fundraiser Defendants pursuant to solicitation for charitable purposes;

3.      Enjoining Inman and Indiegogo from disbursing any of the Charitable Fund for any purpose without prior order from this Court pursuant to Cal. B. & P. Code § 17535;

4.      Directing Indiegogo and Inman to pay the Charitable Fund into Court pursuant to Cal. B. & P. Code § 17535;

5.      Directing Indiegogo and Inman to file an accounting of all the moneys in the Charitable Fund with the Attorney General;

6.      Disbursing fifty-percent (50%) of the Charitable Fund to the National Wildlife Foundation;

7.      Disbursing fifty-percent (50%) of the Charitable Fund to the American Cancer Society;

8.      Ordering Indiegogo to halt all ongoing campaigns on the Indiegogo site currently operating in violation of California law and hold all funds in a charitable trust until Indiegogo registers with the California Attorney General as a charitable fundraiser and in all other ways complies with California law regulating charitable fundraising;

9.      Ordering Indiegogo to cease any charitable fundraising that is unlawful under California law;

10.     Ordering the National Wildlife Federation and the American Cancer Society to affirmatively require written contracts with all commercial fundraisers in the State of California, and to police the activities of fundraisers in order to prevent future abuses, false advertising, and unfair practices;

11.     Requiring the National Wildlife Federation and the American Cancer Society to issue donation receipts to all of the Bear Love donors for purposes of obtaining a tax write-off for the amount of their donations;

12.     Barring Inman from engaging in any activity as a charitable fundraiser in the State of California for a period of no less than three years;

13.     Barring Doe 1, aka Modelista, from falsely personating Charles Carreon or using the Charles Carreon registered mark alone or in combination with other words, symbols or designs in any manner;

14.     Barring Does 2 – 100, or so many of them as are discovered to be engaging in trespass to chattels, false personation, and identity theft, to cease and desist from such conduct, subjecting them to such civil penalties as may be warranted, and taking such other remedial action as the Court deems appropriate to remedy any harm caused;

B.     An award of actual damages against Does 1 – 100, as suffered by Plaintiff in such amount as shall be established by proof, for damages caused due to the conduct alleged against said fictitiously-named defendants in the Second and Third Claims for Relief;

C.     An accounting and disgorgement of Inman's ill-gotten gains from all sales to Bear Love donors on TheOatmeal.com during the time period when the Bear Love campaign was actively soliciting donations on the Indiegogo website and directing donors to TheOatmeal.com for commercial purposes;

D.     A finding that the infringements by Does 1 – 100 were willful, and/or that Plaintiff's recovery is inadequate based on Defendants' profits; wherefore treble damages are warranted pursuant to 15 U.S.C. § 1117(a);

E.    A finding that this is an exceptional case, and that an award to Plaintiff of its full costs and reasonable attorney's fees is therefore warranted pursuant to 15 U.S.C § 1117;

F.    An order pursuant to 15 U.S.C. § 1116(a), requiring Inman, Indiegogo, the NWF, and the ACS to file with the Court and serve on Plaintiff within thirty (30) days after service of an injunction order as requested herein, a report in writing, under oath, setting forth in detail the manner and form in which they have complied with the Court's Order;

G.    Punitive damages against Does 1 – 100 pursuant to California Civil Code § 3294; and,

H.    Such other and further relief that this Court may deem just and proper.

Dated:  June 25, 2012                    CHARLES CARREON, ESQ.



By: _____
CHARLES CARREON (127139)
Attorney Pro Se for Plaintiff

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial.

Dated:  June 25, 2012                          CHARLES CARREON, ESQ.


By: _____
CHARLES CARREON (127139)
Attorney for Pro Se for Plaintiff

# Exhibit A

 **indiegogo**    browse ▾   learn   create        Sign Up | Log In    search   ⏺

## Terms of Use

Indiegogo, Inc.

**Terms of Use Agreement**

This Agreement was last revised on May 6, 2010. Updates to this Agreement can be found here.

Welcome to Indiegogo.com, the website and online service of Indiegogo, Inc. ("Indiegogo" "we," or "us"). This page explains the terms by which you may use our service. By accessing or using the Indiegogo services, website and software provided through or in connection with the service ("Service"), you signify that you have read, understood, and agree to be bound by this Terms of Use Agreement ("Agreement"), whether or not you are a registered user of our Service.

We reserve the right to amend this Agreement at any time and without notice. If we do this, we will post the amended Agreement on this page and indicate at the top of the page the date the Agreement was last revised. Your continued use of the Service after any such changes constitutes your acceptance of the new Terms of Use. If you do not agree to any of these terms or any future Terms of Use, do not use or access (or continue to access) the Service.

### Use of Our Service

Indiegogo provides a place for the creative community to interact, share information, and support content creation. All visitors to Indiegogo.com, whether registered or not, are "Users." If you register with Indiegogo you become a "Member" and gain access to certain features, including the ability to post certain information about your creative project (a "Project" and "Project Posting") on the Service and interact with other Members about your Project.

Indiegogo grants you permission to use the Service as set forth in this Agreement, provided that: (i) you will not copy, distribute, or disclose any part of the Service in any medium; (ii) you will not alter or modify any part of the Service other than as may be reasonably necessary to use the Service for its intended purpose; and (iii) you will otherwise comply with the terms and conditions of this Agreement.

You do not have to register in order to visit Indiegogo. To access certain features of the Service, though, including posting, commenting on, following, or contributing to a Project, you will need to register with Indiegogo and create a Member account. Your account gives you access to the services and functionality that we may establish and maintain from time to time and in our sole discretion.

You may never use another Member's account without permission. When creating your account, you must provide accurate and complete information. You are solely responsible for the activity that occurs on your account, and you must keep your account password secure. You must notify Indiegogo immediately of any breach of security or unauthorized use of your account. Although Indiegogo will not be liable for your losses caused by any unauthorized use of your account, you shall be liable for the losses of Indiegogo or others due to such unauthorized use.

You may use your Settings to control your Member Profile and how other Members communicate with you. By providing Indiegogo your email address you consent to our using the email address to send you Service-related notices, including any notices required by law, in lieu of communication by postal mail. We may also use your email address to send you other messages, including changes to features of the Service and special offers.

You agree not to use or launch any automated system, including without limitation, "robots," "spiders," "offline readers," etc., that accesses the Service in a manner that sends more request messages to the Indiegogo servers than a human can reasonably produce in the same period of time by using a conventional on-line web browser. You agree not to collect or harvest any personally identifiable information, including account names, from the Service nor to use the communication systems provided by the Service for any commercial solicitation purposes.

Indiegogo may permanently or temporarily terminate, suspend, or otherwise refuse to permit your access to the Service without notice and liability, if, in Indiegogo's sole determination, you violate any of the Agreement, including the following prohibited actions: (i) attempting to interfere with, compromise the system integrity or security or decipher any transmissions to or from the servers running the Service; (ii) taking any action that imposes, or may impose at our sole discretion an unreasonable or disproportionately large load on our infrastructure; (iii) uploading invalid data, viruses, worms, or other software agents through the Service; (iv) impersonating another person or otherwise misrepresenting your affiliation with a person or entity, conducting fraud, hiding or attempting to hide your identity; (v) interfering with the proper working of the Service; or, (vi) bypassing the measures we may use to prevent or restrict access to the Service. Upon termination for any reason, you continue to be bound by this Agreement.

You may not use the Service for activities that: (i) violate any law, statute, ordinance or regulation; (ii) relate to sales of (a) narcotics, steroids, certain controlled substances or other products that present a risk to consumer safety, (b) drug paraphernalia, (c) items that encourage, promote, facilitate or instruct others to engage in illegal activity, (d) items that promote hate, violence, racial intolerance, or the financial exploitation of a crime, (e) items that are considered obscene, (f) items that infringe or violate any copyright, trademark, right of publicity or privacy or any other proprietary right under the laws of any jurisdiction, (g) certain sexually oriented materials or services, or (h) ammunition, firearms, or certain firearm parts or accessories, or (i) ,certain weapons or knives regulated under applicable law; (iii) relate to transactions that (a) show the personal information of third parties in violation of applicable law, (b) support pyramid or ponzi schemes, matrix programs, other "get rich quick" schemes or certain multi-level marketing programs, (c) are associated with purchases of real property, annuities or lottery contracts, lay-away systems, off-shore banking or transactions to finance or refinance debts funded by a credit card, (d) are for the sale of certain items before the seller has control or possession of the item, (e) are by payment processors to collect payments on behalf of merchants, (f), are associated with the following Money Service Business activities: the sale of traveler's checks or money orders, currency exchanges or check cashing,or (g) provide certain credit repair or debt settlement services; (iv) involve the sales of products or services identified by government agencies to have a high likelihood of being fraudulent; (v) violate applicable laws or industry regulations regarding the sale of (a) tobacco products, or (b) prescription drugs and devices; (vi) involve gambling, gaming and/or any other activity with an entry fee and a prize, including, but not limited to casino games, sports betting, horse or greyhound racing, lottery tickets, other ventures that facilitate gambling, games of skill (whether or not it is legally defined as a lottery) and

greyhound racing, lottery tickets, color ventures that facilitate gambling, games of skill (whether or not it is legally defined as a lottery) and sweepstakes unless the operator has obtained prior approval from Indiegogo and the operator and customers are located exclusively in jurisdictions where such activities are permitted by law.

## Posting a Project

Indiegogo may provide you the opportunity to post your Project on Indiegogo to showcase and share certain information about the Project and elicit feedback and financial contributions from other Members. Your Project Posting is User Content (as defined below), and is subject to all the terms and conditions relating to User Content in this Agreement. It is a breach of this Agreement to post a false or misleading Project or to post false or misleading information in your Project Profile. Members who post Projects are sometimes referred to in this Agreement as "Content Creators."

## Project Fundraising

Indiegogo may provide you the opportunity to fundraise for your Project by soliciting financial contributions to support the Project from Members ("Contributions"). The rules governing fundraising for your Project (the "Fundraising Rules") are as follows:

1. The first step in launching a fundraising campaign using the Service is to create a project profile page and post a "Funding Request." To post a Funding Request, set your goal for the total Contributions you wish to raise during your current campaign ("Campaign Goal") and the date by which you'd like to raise the funds ("Campaign Deadline") on your Project Profile page. The Campaign Deadline can be between 1 and 120 days out. (Note, if you reach your campaign goal, you can post a new project to launch a campaign to fund the next phase of your project. The number of projects you can create is unlimited.)
2. You will be required to designate the legal entity to which funds will be directed (the "Project Entity"). By providing the name of your Project Entity to Indiegogo, you represent and warrant that you are an authorized representative of the Project Entity with the authority to bind the Project Entity to the terms of this Agreement, that the Project Entity is the legal entity responsible for the Project and accountable for the use of any funds raised for it on Indiegogo, and that you accept this Agreement on the Project Entity's behalf.
3. To receive Contributions, your Project Entity must establish an account (a "Funding Account") with the payment processor designated by Indiegogo at the time you post your Project (the "Processor"). You understand and agree that your Funding Account will be governed by your agreement with the Processor, and that Indiegogo shall have no liability for your Funding Account or your transactions or interactions with the Processor.
4. All Contributions made to a Project will be directed to the Project Entity's Funding Account, less a 9% marketplace processing fee retained by Indiegogo. All Contributions paid to a Project Entity will constitute "Project Funding," and the Indiegogo fee and all other Project Funding requirements will apply. Indiegogo is not responsible for any error or omission in the Funding Account information you provide. Unless automated by the Processor, Project Funding less 3rd party processing fees will be disbursed from the Funding Account to the Project Entity's bank account according to the Project's disbursement details (set in the Funding section of the Project Profile). All necessary fund transfers will be initiated within 5 business days of the campaign end date. It can then take up to 5 business days for the disbursed funds to arrive in your account.
5. When you reach your Campaign Deadline, your Funding Request will automatically close and no more Contributions will be accepted for your Project. You may make a new Funding Request any time after the end of your last Funding Request closes. If you reach your Campaign Goal by your Campaign Deadline, Indiegogo will pay you a 5% rebate on all funds raised during the campaign. Payments will be included in a funds transfer that will be initiated within 5 business days of the campaign end date. It can then take up to 5 business days for the disbursed funds to arrive in your account.
6. If your Project receives Project Funding by using Indiegogo's platform and tools (including without limitation Project Funding paid into your Finding Account), you agree to acknowledge Indiegogo by including the Indiegogo logo in the "Special Thanks" section of the credits/acknowledgement section of your completed project as follows: using either the black or white Indiegogo logo available in the Press section of Indiegogo.com, the logo should appear on its own line (i.e., no other text or images on the left or right), sized so that the "Indiegogo" lettering in the logo is at least three times the size of the credits' normal text.
7. You may offer non-monetary rewards for Contributions ("Perks"), provided that the offering of such Perks is lawful under all applicable laws, including without limitation state and federal securities laws, and otherwise complies with the terms and conditions of this Agreement. Any Project Funding payments may be subject to verification of the identity of you and the Project Entity, the use of funds, and the timeline of the project. The verification procedure may involve an interview and/or document review if deemed necessary and may vary from time to time in our sole discretion. You and the Project Entity agree that Project Funding may only be used on behalf of the Project, and that Project Funding will not be used for any other purpose. You agree that if at any time during while a Funding Request is open or within thirty (30) days of the close of a Funding Request, Indiegogo makes a good faith determination that the identity of you or the Project Entity or the timeline of the Project are not as identified in the Project Posting, or that the Project Funding has not been used solely on behalf of the Project, you will promptly refund the entire amount of Project Funding from such Funding Request to the Contributors. We may change the Fundraising Rules at any time upon notice to you. If you do not accept a change we make to the Fundraising Rules, your sole remedy shall be to terminate your Project Posting.

You shall have full responsibility for applicable taxes for all Project Funding paid to you under this Agreement, and for compliance with all applicable labor and employment requirements with respect to your self-employment, sole proprietorship or other form of business organization, and with respect to your employees and contractors, including state worker's compensation insurance coverage requirements and any U.S. immigration visa requirements. You agree to indemnify, defend and hold Indiegogo harmless from any liability for, or assessment of, any claims or penalties with respect to such withholding taxes, labor or employment requirements, including any liability for, or assessment of, withholding taxes imposed on Indiegogo by the relevant taxing authorities with respect to any Project Funding paid to you.

Indiegogo makes no guarantee regarding the number or amount of Contributions, or the amount of any Project Funding payment to be made to you or the Project Entity under this Agreement.

## Contributing to Projects

Indiegogo may provide you the opportunity to make Contributions to Project Postings on the Service. You may contribute to any Project with an open Funding Request in any amount you choose. You may contribute to as many Projects as you like.

It is solely your choice to contribute to a Project. You understand that making a Contribution to a Project does not give you any rights in or to that Project, including without limitation any ownership, control, or distribution rights, and that the Project Entity shall be free to solicit other funding for the Project, enter into contracts for the Project, allocate rights in or to the Project, and otherwise direct the Project in its sole discretion. You further understand that nothing in this Agreement or otherwise limits Indiegogo's right to enter into agreements or business relationships relating to Projects. Indiegogo does not guarantee that any Project's Campaign Goal will be met. Any Perks offered to you are between you and the Project Entity only, and Indiegogo does not guarantee that Perks will be delivered or satisfactory to you. Indiegogo does not warrant the use of any Project Funding or the outcome of any Project.

Contributions to Projects are nonrefundable. Under certain circumstances Indiegogo may, but is under no obligation to, seek the refund of Project Funding if the Project Entity misrepresents the Project or misuses the funds. You acknowledge and agree that all your Contributions are between

you, the Project Entity, and the Processor only, and that Indiegogo is not responsible for Contribution transactions, including without limitation any personal or payment information you provide to the Processor.

Indiegogo makes no representations regarding the deductibility of any Contribution for tax purposes. Please consult your tax advisor for more information.

## User Content

Some areas of the Service may allow Users to post feedback, comments, questions, and other information. Any such postings, together with Project Postings, constitute "User Content." You are solely responsible for your User Content that you upload, publish, display, link to or otherwise make available (hereinafter, "post") on the Service, and you agree that we are only acting as a passive conduit for your online distribution and publication of your User Content. You must be the owner of all the Intellectual Property Rights (as defined below) in the User Content you post, or have explicit permission from the owner(s) of all such rights to post the User Content on Indiegogo.

For the purposes of this Agreement, "Intellectual Property Rights" means all patent rights, copyright rights, mask work rights, moral rights, rights of publicity, trademark, trade dress and service mark rights, goodwill, trade secret rights and other intellectual property rights as may now exist or hereafter come into existence, and all applications therefore and registrations, renewals and extensions thereof, under the laws of any state, country, territory or other jurisdiction.

You agree not to post User Content that: (i) may create a risk of harm, loss, physical or mental injury, emotional distress, death, disability, disfigurement, or physical or mental illness to you, to any other person, or to any animal; (ii) may create a risk of any other loss or damage to any person or property; (iii) may constitute or contribute to a crime or tort; (iv) contains any information or content that we deem to be unlawful, harmful, abusive, racially or ethnically offensive, defamatory, infringing, invasive of personal privacy or publicity rights, harassing, humiliating to other people (publicly or otherwise), libelous, threatening, or otherwise objectionable; (v) contains any information or content that is illegal; (vi) contains any information or content that you do not have a right to make available under any law or under contractual or fiduciary relationships; or (vii) contains any information or content that you know is not correct and current. You agree that any User Content that you post does not and will not violate third-party rights of any kind, including without limitation any Intellectual Property Rights, rights of publicity and privacy. Indiegogo reserves the right, but is not obligated, to reject and/or remove any User Content that Indiegogo believes, in its sole discretion, violates these provisions. You understand that publishing your User Content on the Service is not a substitute for registering it with the U.S. Copyright, the Writer's Guild of America, or any other rights organization.

Indiegogo takes no responsibility and assumes no liability for any User Content that you or any other Users or third parties post or send over the Service. You understand and agree that any loss or damage of any kind that occurs as a result of the use of any User Content that you send, upload, download, stream, post, transmit, display, or otherwise make available or access through your use of the Service, is solely your responsibility. Indiegogo is not responsible for any public display or misuse of your User Content. You understand and acknowledge that you may be exposed to User Content that is inaccurate, offensive, indecent, or objectionable, and you agree that Indiegogo shall not be liable for any damages you allege to incur as a result of such User Content.

You are solely responsible for your interactions with other Indiegogo Users. We reserve the right, but have no obligation, to monitor disputes between you and other Users.

## License Grant

By posting any User Content on the Service, you expressly grant, and you represent and warrant that you have a right to grant, to Indiegogo a royalty-free, sublicensable, transferable, perpetual, irrevocable, non-exclusive, worldwide license to use, reproduce, modify, publish, list information regarding, edit, translate, distribute, publicly perform, publicly display, and make derivative works of all such User Content and your name, voice, and/or likeness as contained in your User Content, in whole or in part, and in any form, media or technology, whether now known or hereafter developed for use in connection with the Service.

Subject to the terms and conditions of this Agreement, you are hereby granted a non-exclusive, limited, personal license to use the Service. Indiegogo reserves all rights not expressly granted herein in the Service and the Indiegogo Content (as defined below). Indiegogo may terminate this license at any time for any reason or no reason.

## Assignment of Project-Related User Content

All User Content posted to a Project ("Project Feedback") shall be the sole and exclusive property of the Content Creator that posted that Project. You hereby assign to the Content Creator, or its designee, all your right, title and interest throughout the world in and to any and all Project Feedback you post to that Content Creator's Project. You hereby waive and irrevocably quitclaim to the Content Creator or its designee and Indiegogo any and all claims, of any nature whatsoever, that you now have or may hereafter have for infringement of any and all Project Feedback you post to that Content Creator's Project. If you post a Project, you acknowledge and agree that Indiegogo cannot take responsibility for your use of Project Feedback and you use Project Feedback at your own risk. You hereby agree to indemnify, defend and hold Indiegogo harmless from any liability arising from or relating to your use of Project Feedback.

## Use of Widgets

Indiegogo may give you the opportunity to post a "widget," or code that creates an Indiegogo graphic and a link to the Site, on your personal blog, social network profile, or other locations on the Internet. You agree that your use of Indiegogo widgets is subject to this Agreement, that you will not post any Indiegogo widget on a web page containing content that is prohibited under the "User Content" section of this Agreement, and that you will remove all Indiegogo widgets immediately upon termination of this Agreement.

## Our Proprietary Rights

Except for your User Content, the Service and all materials therein or transferred thereby, including, without limitation, software, images, text, graphics, illustrations, logos, patents, trademarks, service marks, copyrights, photographs, audio, videos, music, and User Content (the "Indiegogo Content"), and all Intellectual Property Rights related thereto, are the exclusive property of Indiegogo and its licensors. Except as explicitly provided herein, nothing in this Agreement shall be deemed to create a license in or under any such Intellectual Property Rights, and you agree not to sell, license, rent, modify, distribute, copy, reproduce, transmit, publicly display, publicly perform, publish, adapt, edit or create derivative works from any materials or content accessible on the Service. Use of the Indiegogo Content or materials on the Service for any purpose not expressly permitted by this Agreement is strictly prohibited.

## Eligibility

This Service is intended solely for Users who are thirteen (13) years of age or older, and any registration, use or access to the Service by anyone under 13 is unauthorized, unlicensed, and in violation of this Agreement. Indiegogo may terminate your account, delete any content or information that you have posted on the Service, and/or prohibit you from using or accessing the Service (or any portion, aspect or feature of the Service) for any reason, at any time in its sole discretion, with or without notice, including without limitation if it believes that you are under 13. If you are under 18 years of age you may use the Service only if you either are an emancipated minor, or possess legal parental or guardian consent, and are fully able and competent to enter into the terms, conditions, obligations, affirmations, representations, and warranties set forth in this Agreement, and to abide by and comply with this Agreement.

### Privacy

We care about the privacy of our Users. Click here to view our Privacy Policy. By using the Service, you are consenting to have your personal data transferred to and processed in the United States.

### Security

We have implemented commercially reasonable technical and organizational measures designed to secure your personal information from accidental loss and from unauthorized access, use, alteration or disclosure. However, we cannot guarantee that unauthorized third parties will never be able to defeat those measures or use your personal information for improper purposes. You acknowledge that you provide your personal information at your own risk.

### DMCA Notice

If you believe that your copyrighted work has been copied in a way that constitutes copyright infringement and is accessible via the Service, please notify Indiegogo's copyright agent, as set forth in the Digital Millennium Copyright Act of 1998 ("DMCA"). For your complaint to be valid under the DMCA, you must provide the following information in writing:

1. An electronic or physical signature of a person authorized to act on behalf of the copyright owner;
2. Identification of the copyrighted work that you claim has been infringed;
3. Identification of the material that is claimed to be infringing and where it is located on the Service;
4. Information reasonably sufficient to permit Indiegogo to contact you, such as your address, telephone number, and e-mail address;
5. A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or law; and
6. A statement, made under penalty of perjury, that the above information is accurate, and that you are the copyright owner or are authorized to act on behalf of the owner.

The above information must be submitted to the following DMCA Agent:

Name: Danae Ringelmann
Attn: DMCA Notice
Company: Indiegogo, Inc.
Address: 301 8th Street, Suite 225
San Francisco, CA 94103
Telephone & Fax: 866-641-4646
Email: copyright@indiegogo.com

UNDER FEDERAL LAW, IF YOU KNOWINGLY MISREPRESENT THAT ONLINE MATERIAL IS INFRINGING, YOU MAY BE SUBJECT TO CRIMINAL PROSECUTION FOR PERJURY AND CIVIL PENALTIES, INCLUDING MONETARY DAMAGES, COURT COSTS, AND ATTORNEYS' FEES.

Please note that this procedure is exclusively for notifying Indiegogo and its affiliates that your copyrighted material has been infringed. The preceding requirements are intended to comply with Indiegogo's rights and obligations under the DMCA, including 17 U.S.C. 512(c), but do not constitute legal advice. It may be advisable to contact an attorney regarding your rights and obligations under the DMCA and other applicable laws.

In accordance with the DMCA and other applicable law, Indiegogo has adopted a policy of terminating, in appropriate circumstances and at Indiegogo's sole discretion, members who are deemed to be repeat infringers. Indiegogo may also at its sole discretion limit access to the Service and/or terminate the accounts of any Users who infringe any intellectual property rights of others, whether or not there is any repeat infringement.

### Additional Representations and Warranties

You shall be solely responsible for your own User Content and the consequences of posting or publishing it. In connection with User Content, you affirm, represent and warrant, in addition to the other representations and warranties in this Agreement, the following:

a. You are at least 18 years of age, and that if you are under 18 years of age you are either an emancipated minor, or possess legal parental or guardian consent, and are fully able and competent to enter into the terms, conditions, obligations, affirmations, representations, and warranties set forth in this Agreement, and to abide by and comply with this Agreement.

b. You have the written consent of each and every identifiable natural person in the User Content to use such person's name or likeness in the manner contemplated by the Service and this Agreement, and each such person has released you from any liability that may arise in relation to such use.

c. Your User Content and Indiegogo's use thereof as contemplated by this Agreement and the Service will not infringe any rights of any third party, including but not limited to any Intellectual Property Rights, privacy rights and rights of publicity.

### Third-Party Websites, Advertisers or Services

Indiegogo may contain links to third-party websites, advertisers, or services that are not owned or controlled by Indiegogo. Indiegogo has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third party websites or services. If you access a third party website from Indiegogo, you do so at your own risk, and you understand that this Agreement and Indiegogo's Privacy Policy do not apply to your use of such sites. You expressly relieve Indiegogo from any and all liability arising from your use of any third-party website or

services or third party owned content. Additionally, your dealings with or participation in promotions of advertisers found on Indiegogo, including payment and delivery of goods, and any other terms (such as warranties) are solely between you and such advertisers. You agree that Indiegogo shall not be responsible for any loss or damage of any sort relating to your dealings with such advertisers.

We encourage you to be aware of when you leave the Service, and to read the terms and conditions and privacy policy of any third-party website or service that you visit.

### Indemnity

You agree to defend, indemnify and hold harmless Indiegogo and its subsidiaries, agents, managers, and other affiliated companies, and their employees, contractors, agents, officers and directors, from and against any and all claims, damages, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorney's fees) arising from: (i) your use of and access to the Service, including any data or work transmitted or received by you; (ii) your violation of any term of this Agreement, including without limitation, your breach of any of the representations and warranties above; (iii) your violation of any third-party right, including without limitation any right of privacy, publicity rights or Intellectual Property Rights; (iv) your violation of any law, rule or regulation of the United States or any other country; (v) any claim or damages that arise as a result of any of your User Content or any that are submitted via your account; or (vi) any other party's access and use of the Service with your unique username, password or other appropriate security code.

### No Warranty

THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. USE OF THE SERVICE IS AT YOUR OWN RISK. THE SERVICE IS PROVIDED WITHOUT WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO: IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WITHOUT LIMITING THE FOREGOING, INDIEGOGO, ITS SUBSIDIARIES, AND ITS LICENSORS DO NOT WARRANT THAT THE CONTENT IS ACCURATE, RELIABLE OR CORRECT; THAT THE SERVICE WILL MEET YOUR REQUIREMENTS; THAT THE SERVICE WILL BE AVAILABLE AT ANY PARTICULAR TIME OR LOCATION, UNINTERRUPTED OR SECURE; THAT ANY DEFECTS OR ERRORS WILL BE CORRECTED; OR THAT THE SERVICE IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. ANY CONTENT DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SERVICE IS DOWNLOADED AT YOUR OWN RISK AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM SUCH DOWNLOAD.

INDIEGOGO DOES NOT WARRANT, ENDORSE, GUARANTEE, OR ASSUME RESPONSIBILITY FOR ANY PRODUCT OR SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH THE INDIEGOGO SERVICE OR ANY HYPERLINKED WEBSITE OR SERVICE, OR FEATURED IN ANY BANNER OR OTHER ADVERTISING, AND INDIEGOGO WILL NOT BE A PARTY TO OR IN ANY WAY MONITOR ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF PRODUCTS OR SERVICES.

### Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL INDIEGOGO, ITS AFFILIATES, DIRECTORS, EMPLOYEES OR ITS LICENSORS BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA OR OTHER INTANGIBLE LOSSES, THAT RESULT FROM THE USE OF, OR INABILITY TO USE, THIS SERVICE. UNDER NO CIRCUMSTANCES WILL INDIEGOGO BE RESPONSIBLE FOR ANY DAMAGE, LOSS OR INJURY RESULTING FROM HACKING, TAMPERING OR OTHER UNAUTHORIZED ACCESS OR USE OF THE SERVICE OR YOUR ACCOUNT OR THE INFORMATION CONTAINED THEREIN.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, INDIEGOGO ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT; (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SERVICE; (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION STORED THEREIN; (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM THE SERVICE; (V) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE THAT MAY BE TRANSMITTED TO OR THROUGH OUR SERVICE BY ANY THIRD PARTY; (VI) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE INCURRED AS A RESULT OF THE USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE THROUGH THE SERVICE; AND/OR (VII) USER CONTENT OR THE DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT OF ANY THIRD PARTY. IN NO EVENT SHALL INDIEGOGO, ITS AFFILIATES, DIRECTORS, EMPLOYEES, OR LICENSORS BE LIABLE TO YOU FOR ANY CLAIMS, PROCEEDINGS, LIABILITIES, OBLIGATIONS, DAMAGES, LOSSES OR COSTS IN AN AMOUNT EXCEEDING THE AMOUNT YOU PAID TO INDIEGOGO HEREUNDER.

THIS LIMITATION OF LIABILITY SECTION APPLIES WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF INDIEGOGO HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

The Service is controlled and operated from its facilities in the United States. Indiegogo makes no representations that the Service is appropriate or available for use in other locations. Those who access or use the Service from other jurisdictions do so at their own volition and are entirely responsible for compliance with local law, including but not limited to export and import regulations. Unless otherwise explicitly stated, all materials found on the Service are solely directed to individuals, companies, or other entities located in the U.S.

### Assignment

This Agreement, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by Indiegogo without restriction.

### General

A. Governing Law. You agree that: (i) the Service shall be deemed solely based in California; and (ii) the Service shall be deemed a passive one that does not give rise to personal jurisdiction over Indiegogo, either specific or general, in jurisdictions other than California. This Agreement shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles. Any claim or dispute between you and Indiegogo that arises in whole or in part from the Service shall be decided exclusively by a court of competent jurisdiction located in Santa Clara County, California.

B. Notification Procedures. Indiegogo may provide notifications, whether such notifications are required by law or are for marketing or other business related purposes, to you via email notice, written or hard copy notice, or through conspicuous posting of such notice on our website, as

determined by Indiegogo in our sole discretion. Indiegogo reserves the right to determine the form and means of providing notifications to our Users, provided that you may opt out of certain means of notification as described in this Agreement.

C. Entire Agreement/Severability. This Agreement, together with any other legal notices and agreements published by Indiegogo via the Service, shall constitute the entire agreement between you and Indiegogo concerning the Service. If any provision of this Agreement is deemed invalid by a court of competent jurisdiction. the invalidity of such provision shall not affect the validity of the remaining provisions of this Agreement, which shall remain in full force and effect.

D. No waiver of any term of this Agreement shall be deemed a further or continuing waiver of such term or any other term, and Indiegogo's failure to assert any right or provision under this Agreement shall not constitute a waiver of such right or provision.

Please contact us at terms@indiegogo.com with any questions regarding this Agreement.

UPDATES TO THIS AGREEMENT:

January 18, 2008: We added prohibitions on false Project information in "Posting a Project," expanded and clarified the Fundraising Rules in "Project Fundraising," added the section "Funding Accounts," explained that Indiegogo is not responsible for Perks and modified the language relating to tax treatment of Contributions in "Contributing to a Project," and stated again that you must have the rights to post User Content in "User Content."

February 6, 2008: We added the following clarification to the section titled "Contributing to Projects": "You understand that making a Contribution to a Project does not give you any rights in or to that Project, including without limitation any ownership, control, or distribution rights, and that the Project Entity shall be free to solicit other funding for the Project, enter into contracts for the Project, allocate rights in or to the Project, and otherwise direct the Project in its sole discretion. You further understand that nothing in this Agreement or otherwise limits Indiegogo's right to enter into agreements or business relationships relating to Projects."

October 6, 2008: We revised the "Project Fundraising" and "Contributing to Projects" sections to state that when a Project does not meet its Campaign Goal, a contributor's options are to make the Contribution to the Project anyway, or have the Contribution returned to the contributor's Funding Account, and to include an acknowledgment requirement for funded projects.

November 21, 2008: We revised the "Project Fundraising" and "Contributing to Projects" sections to reflect the use of a third-party payment processor to handle Contribution transactions.

May 7, 2009: We added the following clarification to "Project Fundraising" section: "Unless automated by the Processor, Project Funding will be disbursed from the Funding Account to the Project Entity's bank account according to the Project's disbursement details (set in the Funding section of the Project Profile). All necessary fund transfers will take place on the Friday immediately following the point the disbursement preference criteria are met."

August 3, 2009: We revised "Project Fundraising section to clarify that the funding goal did not have to be the amount of contributions the project owner is looking to raise by the service in total but rather the amount needed to cover a specific phase of the project. We also clarified that 3rd party processing fees are removed from Project Funding upon disbursement.

September 9, 2009: We revised the "Use of Our Service" section to include content creators as well as the "Project Fundraising" section to clarify a project's acknowledgement requirements if it's successful with fundraising.

April 21, 2010: We revised the "Project Fundraising" section to reflect the introduction of cash rewards for achieving campaign goals and deadlines.

May 6, 2010: We added the "You may not use the Service for activities that" statement to the "Use of Our Service" section.

March 5, 2012: We revised the "Project Fundraising" section to reflect the latest processing times for fund transfers.

As seen in: The New York Times FAST COMPANY CNNMoney.com VARIETY Mashable PBS

© 2012 Indiegogo Inc.
All Rights Reserved

# Exhibit B



# Exhibit C



# Exhibit D

 **indiegogo**    browse ▾    learn    create

Sign Up    Log In    search



## My Kidney Transplant Fund

I'm raising money for an upcoming kidney transplant. I'm on the National Organ Transplant list and will need funds to cover my travel as well as hospital stay.

**Created by:** 

**Location:** Anchorage, Alaska, United States

**Category:** Health

| Campaign Home | Updates / 2 | Comments / 78 | Funders / 139 | Gallery / 23 |

All Updates | Campaign Announcements Only

 **Deborah Lestenkof** posted an announcement 14 days ago

Woohoo!! We're at the halfway point, I never thought we'd get this close to our goal!

Everyone has played such a huge role in this success, thank you to each and every one of you!

The encouragement, support and love from all of you is just mind-blowing. Thank you and God bless!



 **Deborah Lestenkof** posted an announcement 21 days ago

Wow, thank you for all of your kindness and encouragement! What wonderful friends we have, we are so moved by everyone's generosity! An outpour of of love and compassion, I cannot put into words how grateful we are for everyone's help. Thank you so much!



---

# $3,570

*Raised of $5,000 Goal*

⏱ **51** *days left*

**Flexible Funding campaign**
This campaign will receive all of the funds contributed by Tue Aug 14 at 11:59PM PT.

**CONTRIBUTE NOW ▸**

## Perks *for your contribution*

### $50
**A small handmade item**

I can make any small sized craft for you, whether a small crochet animal, stuffie or hairband or sewn small sized tote or bag. Let me know what you'd like and I'll do my best to make something you enjoy.

CLAIM THIS PERK ▸    **1 Claimed**

### $100
**A medium handmade item**

I can make any medium sized craft, whether a medium sized crochet animal, stuffie, headband or hat. Sewn medium sized tote or bag. Let me know what you'd like and I'll do my best to make something you enjoy. See my flickr http://www.flickr.com/photos/61075286@N04/ or etsy shop http://www.etsy.com/shop/bobogrl or email me to see what I can offer :)

CLAIM THIS PERK ▸    **0 Claimed**

### $1,000
**Any homemade item**

For such a generous donation, I'm willing to make anything you like!

CLAIM THIS PERK ▸    **0 Claimed**

# Exhibit E







**Charles carreon** @Charles_Carreon                                     34m
@KTrambley Because I deal mostly with court cases involving the
Internets.

🌟 Hide conversation    ← Reply    ⇄ Retweet    ★ Favorite

3:56 PM - 14 Jun 12 via web · Details

**Charles carreon** @Charles_Carreon                                      3h
@philmichaelson @oatmeal should stop being a hypocrite and respect
the policies of other websites. This is clearly against indigogo's terms.

🌟 View conversation

**Pter McLean** @ptermclean                                              11 Jun
Charles Carreon Charles Carreon Charles Carreon Charles Carreon
Charles Carreon Charles Carreon Charles Carreon Charles Carreon
Charles ...

Expand

**Charles carreon** @Charles_Carreon                                      3h
@ptermclean May I help you?

🌟 Hide conversation    ← Reply    ⇄ Retweet    ★ Favorite

12:39 PM - 14 Jun 12 via web · Details

**charlescarreon** @charlescarreon                                       56m
@charlescarreon @ptermclean I'm not "@Charles_Carreon" Please
do not spread false Net-rumors. Thank you, the real Charles Carreon.

Expand

**Androcles** @shellscape                                                11 Jun
Charles Carreon, right up there with Joseph Kony. + @Oatmeal

Expand



**Charles carreon** @Charles_Carreon                                    3h
@shellscape This comparison makes complete sense. Idiot.
⊘ Hide conversation   ← Reply   ⇄ Retweet   ★ Favorite
12:39 PM - 14 Jun 12 via web · Details

**Androcles** @shellscape                                               3h
@Charles_Carreon awww someone is sad panda about being the
latest pariah.
Expand

**Julie** @SamuraiKnitter                                              4h
The idiot lawyer who went after The Oatmeal? Uh, he's still an idiot.
techdirt.com/articles/20120...
Expand

**Charles carreon** @Charles_Carreon                                    3h
@SamuraiKnitter I have backtraced the attack to Matt Inman's Internet
Address. He needs to stop the attack or I will need to escalate this.
⊘ Hide conversation   ← Reply   ⇄ Retweet   ★ Favorite
12:38 PM - 14 Jun 12 via web · Details

**Christopher Spence** @crspence                                        2h
@Charles_Carreon bullshit, if you did you would sue not troll Twitter. I
thought only smart people were lawyers. @Oatmeal #guessnot
Collapse   ← Reply   ⇄ Retweet   ★ Favorite
2:17 PM - 14 Jun 12 via Tweetbot for iOS · Details

**Julie** @SamuraiKnitter                                              2h
@Charles_Carreon And by the way? The Oatmeal didn't tell me to do
any of this. I just can't stand bullies. Which is what you are.
Collapse   ← Reply   ⇄ Retweet   ★ Favorite



**Julie** @SamuraiKnitter · 2h
@Charles_Carreon I'm not talking about rules or your web site. I'm talking public image over your attack on charity donations.
Expand     ← Reply     ⇄ Retweet     ★ Favorite

**Charles carreon** @Charles_Carreon · 3h
The contact form has been disabled: charlescarreon.com/temporarily-un… Please contact me at chas@charlescarreon.com instead.
Collapse     ← Reply     ⇄ Retweet     ★ Favorite
12:33 PM · 14 Jun 12 via web · Details

**john andrews** @johnandrews · 4h
I think lawyer Charles Carreon is acting like a real dumbass. I don't understand why.
Expand

**Charles carreon** @Charles_Carreon · 4h
@johnandrews You sir, are a dumbass. I am doing what any sane individual would do.
💬 Hide conversation     ← Reply     ⇄ Retweet     ★ Favorite
12:30 PM · 14 Jun 12 via web · Details

**john andrews** @johnandrews · 4h
@Charles_Carreon Seriously? You've redefined "sane". And you've ignored how 49% of us live together as a society, despite your half.
Expand

**Matthew Inman** @Oatmeal · 4h
It's interesting to watch a man with his dick in a hornet's nest try to solve the problem by tossing his balls in as well.
Expand



Expand

**Matthew Inman** @Oatmeal                                        4h
It's interesting to watch a man with his dick in a hornet's nest try to
solve the problem by tossing his balls in as well.

Expand   ← Reply   ⇄ Retweet   ★ Favorite

**Charles carreon** @Charles_Carreon                            4h
@Oatmeal Stop attacking my site or I will report you to the cyber
police.

💬 Hide conversation   ← Reply   ⇄ Retweet   ★ Favorite

2
RETWEETS

12:26 PM - 14 Jun 12 via web · Details

**robsc** @robsc                                                3h
@Charles_Carreon @Oatmeal Whats their number?

Collapse   ← Reply   ⇄ Retweet   ★ Favorite

1:25 PM - 14 Jun 12 via web · Details

**john andrews** @johnandrews                                   3h
@Charles_Carreon we're all waiting for the second half of that tweet...
"or pay me $$$" . Come on dude it's 2012. I still have faith in you.

Collapse   ← Reply   ⇄ Retweet   ★ Favorite

12:53 PM - 14 Jun 12 via web · Details