CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel:  520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney Pro Se for Plaintiff Charles Carreon

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES CARREON<br><br>　　　　Plaintiff,<br><br>vs.<br><br>MATTHEW INMAN, INDIEGOGO, INC., NATIONAL WILDLIFE FEDERATION, AND AMERICAN CANCER SOCIETY, and Does 1 – 100,<br><br>　　　　Defendants,<br><br>and<br><br>KAMALA HARRIS, Attorney General of the State of California,<br><br>　　　　A Person To Be Joined If Feasible Under F.R.Civ.P. 19. | Case No.: CV-12-3112-EMC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor<br>Date:  To be set<br>Time:  To be set |

## MEMORANDUM OF POINTS AND AUTHORITIES

### ISSUES

**1.** Is this Court likely to find that the Charitable Fund is subject to a charitable trust because it was gathered by unregistered charitable fundraisers, representing that the Bear Love campaign was endorsed by the National Wildlife Federation and the American Cancer Society, and that the entire proceeds would be donated exclusively to those two charities?

**2.** Are the rights of the 14,406 Bear Love campaign donors who intended to benefit the National Wildlife Federation and the American Cancer Society likely to be irreparably harmed if Indiegogo transfers $211,223.04 of the Charitable Fund to Inman?

**3.** Are the rights of the 14,406 donors and the intended beneficiaries of their generosity, the National Wildlife Federation and the American Cancer Society, likely to be harmed if Indiegogo transfer $211,223.04 of the Charitable Fund to Inman?

**4.** If the 14,406 donors do not receive any tax deductions for donations that they intended to make to the National Wildlife Federation and the American Cancer Society, two tax-exempt entities, are their rights likely to be harmed?

**5.** If Inman donates some or all of the Charitable Fund to tax-exempt charities, is Inman likely to be unjustly enriched by receiving a tax write-off for $211,223.04?

**6.** Does the balance of the equities tip in favor of issuing a temporary restraining order?

**7.** Will it benefit the public interest to issue a temporary restraining order?

## I. FACTS

Indiegogo is a "worldwide crowdfunding system" that provided Inman with "global exposure" and "one-click social media integration, direct email and announcement features" that "make it easy to spread the word, raise awareness and increase funding." (Exhibit A; Carreon Dec. ¶ 4.) On or about June 11, 2012, Inman and Indiegogo each became the agents of the other, on the terms set forth in the Indiegogo Contract attached as Exhibit A. Paragraphs 3 – 5 of the Indiegogo Contract designate Inman as the "Project Entity" to receive all of the "Contributions" elicited through Indiegogo's "crowdfunding" mechanism, minus "a 9% marketplace processing fee retained by Indiegogo," of which 5% will be rebated back to Inman when he reaches the funding goal, for a net take of 96%. (Exhibit A.)

Although plainly acting as commercial fundraisers for charitable purposes, neither Inman nor Indiegogo complied with any of the requirements of California law applicable to commercial fundraisers for charitable purposes, as detailed *infra*. (Carreon Dec. ¶¶ 11 – 13.) Nevertheless, Inman and Indiegogo launched and marketed a campaign of charitable solicitation dubbed "BearLove Good – Cancer Bad" (the "Bear Love campaign"), in which they represented that the proceeds of the Bear Love campaign, or some portion thereof, would go to the National Wildlife Federation ("NWF") and the American Cancer Society ("ACS"). (Exhibit B.)

Plaintiff is a donor with standing to invoke the Court's injunctive authority to impose a charitable trust upon the proceeds of the "Bear Love" campaign, that concluded on June 26, 2012, with 14,406 donors contributing a total of $220,024.  (Carreon Dec. ¶10 and Exhibit C; Carreon Dec. ¶¶ 20 – 22 and Exhibit G.)  Inman stands to receive 96% of that amount, a total of $211,223.04, that he intends to turn into cash and photograph himself with as a publicity stunt.  "Once the money is moved, I still plan on withdrawing $211k in cash and taking a photo to send to Carreon …." (Exhibit G; Carreon Dec. ¶ 26.)

Because no safeguards exist to prevent Inman from simply diverting this very substantial fund of money to his own use, and because even in the best case scenario, Inman will be unjustly enriched by securing an enormous tax-deduction that should properly be allocated pro-rata amongst all 14,406 donors, this Court should impose a constructive charitable trust upon the money.  Accordingly, pending a hearing on Plaintiff's motion for preliminary injunction, the Court is respectfully requested to enter a Temporary Restraining Order restraining Indiegogo from paying any of the money to Inman.

## II.     ARGUMENT

### A.     A Donor To A Charitable Fund Has Standing To Seek Injunctive Relief To Enforce a Constructive Charitable Trust

Plaintiff is a donor to the Bear Love campaign with standing to seek injunctive relief to restrain Indiegogo from transferring the money to Inman.  The California Supreme Court pronounced upon this issue in *Holt v. College of Osteopathic Physicians and Surgeons,* 61 Cal.2d 750 (1964):

> "***There is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity.***"
>
> *Holt v. College of Osteopathic Physicians and Surgeons,* 61 Cal.2d at 754 (emphasis added); *accord, L.B. Research & Education v. UCLA Foundation,* 130 Cal.App.4th 171, 176 (2005).
>
> *"[T]he right of the Attorney General to sue to enforce a charitable trust is not exclusive: other responsible individuals may be permitted to sue on behalf of the charity."*
>
> *San Diego Etc. Boy Scouts of America v. City of Escondido,* 14 Cal.App.3d 189, 194 (1971) (emphasis added).

### B. A Temporary Restraining Order Will Preserve The Status Quo

Preliminary relief is intended to preserve the status quo and prevent irreparable harm while the underlying action is resolved. *U.S. Philips Corp. v. KBC Bank N.V.,* 590 F.3d 1091, 1094 (9th Cir. 2010).

A request for a temporary restraining order is addressed to the Court's equitable authority. "The trial court may grant a temporary restraining order or preliminary injunction in the exercise of its equitable powers." *Napa Valley Publishing Company, v. City of Calistoga,* 225 F.Supp. 1176, 1183 (N.D.Cal. 2002).

The Court's "analysis is substantially identical for a temporary restraining order and a preliminary injunction." *Stuhlbarg International Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839, n. 7 (9th Cir. 2001). "A preliminary injunction is a provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss of rights prior to final disposition of the litigation." *Napa Valley Publishing, supra,* 225 F.Supp. at 1183.

"Generally, to obtain preliminary injunctive relief, a moving party must show a threat of irreparable injury and the inadequacy of legal remedies, the conventional requisites for equitable relief." *Napa Valley Publishing, supra,* 225 F.Supp. at *id., citing Arcamuzzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir. 1987*)* and *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir. 1996)

### C. Plaintiff's Application Establishes the Four Factors That Must Be Established to Warrant the Issuance of A Temporary Restraining Order

This Court recently restated the established law on granting injunctive relief, citing the United States Supreme Court's opinion in *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008):

> "The Supreme Court has held that '[a] plaintiff seeking a preliminary injunction must establish that he is ***likely to succeed on the merits***, that he is ***likely to suffer irreparable harm*** in the absence of preliminary relief, that ***the balance of equities tips in his favor***, and that ***an injunction is in the public interest***.'"
>
> *Tamburri v. Suntrust Mortgage, Inc.,* 2011 U.S. Dist. LEXIS 72202, Case No. C-11-2899 (July 6, 2011).

### D. Plaintiff Has Shown A Likelihood of Succeeding on The Merits.

#### i. Solicitations for A Charitable Purpose

A "*solicitation for charitable purposes*" within the meaning of Section 17510.2 of the Disclosure Law *is* "*any request … to give money … in the name of any … charitable organization*," or any "*statement … that the gift or any part thereof will go to or be used for any charitable purpose or organization*." Thus, the Bear Love campaign, that was made in the name of the NWF and ACS, and represented that the gift or some part thereof would go to these organizations, was clearly a "solicitation for charitable purposes."

#### ii. Inman and Indiegogo Are Fiduciaries With Respect to the Charitable Fund and the Donors

A fiduciary relationship exists between any person soliciting on behalf of a charity, and the person from whom a charitable contribution is being solicited. Cal. B. & P. Code § 17510.8.

#### iii. The Charitable Fund Accumulated By the Bear Love Campaign Is A Charitable Trust

> "A charitable trust is defined as: '… a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.'"
>
> *L.B. Research & Education v. UCLA Foundation,* 130 Cal.App.4th 171, 176 (2005), *quoting Hardman v. Feinstein,* 195 Cal.App.3d 157, 161 (1987).

The Disclosure Law makes it absolutely clear that soliciting in the name of a charity subjects the proceeds to a charitable trust exclusively dedicated to the purposes for which the donations were solicited. This is a mere codification of "existing trust law principles."

> "***The acceptance of charitable contributions by … any person soliciting on behalf of a charity establishes a charitable trust and a duty*** on the part of … the person soliciting on behalf of the charity ***to use those charitable contributions for the declared charitable purposes for which they are sought. This section is declarative of existing trust law principles.***"
>
> Cal. B. & P. Code § 17510.8. (Emphasis added.)

Inman's and Indiegogo's solicitation on behalf of NWF and ACS established a charitable trust. They have no right to possession of the money raised from the Bear Love campaign. The Court must enjoin payment of the money to Inman, and compel its payment to NWF and ACS.

### iv. Inman and Indiegogo Are Unregistered Fundraisers Who Violated The "Supervision of Trustees and Fundraisers for Charitable Purposes Act"

In 1959, the California legislature enacted Calif. Gov. Code § 12580 *et seq*., the Supervision of Trustees and Fundraisers for Charitable Purposes Act (the "Act"). Inman and Indiegogo are "commercial fundraisers," as defined by the Act:

> "'Commercial fundraiser for charitable purposes' means any individual, corporation, unincorporated association, or other legal entity who for compensation does any of the following:
>
> (1) Solicits funds, assets, or property in this state for charitable purposes.
>
> (2) As a result of a solicitation of funds, assets, or property in this state for charitable purposes, receives or controls the funds, assets, or property solicited for charitable purposes.
>
> (3) Employs, procures, or engages any compensated person to solicit, receive, or control funds, assets, or property for charitable purposes."
>
> Cal. Govt. Code § 12599(a).

Before starting the Bear Love campaign, Inman and Indiegogo should have registered with the Attorney General to act as commercial fundraisers:

> "A commercial fundraiser for charitable purposes shall, prior to soliciting any funds … in California for charitable purposes, or prior to receiving and controlling any funds … as a result of a solicitation in this state for charitable purposes, register with the Attorney General's Registry of Charitable Trusts on a registration form provided by the Attorney General."
>
> Section 12599(b).

As unregistered fundraisers, Inman and Indiegogo acted unlawfully in conducting the Bear Love campaign:

> "A commercial fundraiser for charitable purposes shall not solicit in the state on behalf of a charitable organization unless that charitable organization is registered or is exempt from registration with the Attorney General's Registry of Charitable Trusts."
>
> Section 12599(m).

Their failure to comply registration and reporting requirements may be cured by entry of an injunction against solicitation by Inman and Indiegogo in California:

> ***"Failure to comply with these registration or annual renewal and financial reporting requirements shall be grounds for***

*injunction against solicitation in this state for charitable purposes and other civil remedies provided by law.*"

Section 12599(f). (Emphasis added.)

### E. Inman and Indiegogo Made Actionable Misrepresentations In The Conduct and Execution of the Bear Love Campaign

Various misrepresentations in the conduct and execution of charitable solicitations are prohibited by the Act, "regardless of injury," including, *inter alia*:

- *Using any unfair or deceptive acts* or practices or engaging in any fraudulent conduct *that creates a likelihood of confusion or misunderstanding*.
- *Using any name … suggesting, or implying to a reasonable person that the contribution is to or for the benefit of a particular charitable organization when that is not the fact.*
- *Misrepresenting* or misleading anyone in any manner to believe *that any other person sponsors, endorses, or approves a charitable solicitation … when that person has not given consent in writing* to the use of the person's name for these purposes*.*
- *Misrepresenting* or misleading anyone in any manner to believe *that … a person has endorsement, sponsorship, approval, status, or affiliation that the person does not have.*

Cal. Gov. Code § 12599.6(f), subsections (2), (3), (5) and (6). (Emphasis added.)

As is set forth in detail in Plaintiff's declaration supporting this application, Inman and Indiegogo committed several actionable misrepresentations in the conduct and execution of the Bear Love campaign. *First,* they misrepresented that NWF and ACS sponsored, endorsed, or approved the Bear Love campaign, when NWF and ACS had not granted their permission at all, much less consent in writing. (Carreon Dec. ¶¶ 12 – 13.) *Second,* by using the names of NWF and ACS without permission, both of which are tax-exempt organizations, they led donors to believe that contributions would be tax-exempt, when in fact they would be going to Inman, and he himself would therefore garner any tax exemption. (Exhibit B.) *Third,* for several days, until he published his first "Update" to the Bear Love campaign, while well over a hundred thousand dollars streamed into the Charitable Fund from thousands of donors, he represented that the money would all go to NWF and ACS; however, he then altered his plan and said he would split the money four ways, giving some undesignated portion to "two new charities." (Page 2 of Exhibit B.) *Fourth,* they did not disclose Indiegogo's fees at any time, since there is no

"clickwrap" agreement to be signed digitally by donors at the time of contribution. (Carreon Dec. ¶ 9.)   *Fifth,* they did not make any of the disclosures required by the Disclosure law, including the fact that they were unregistered fundraisers violating California law by even running the fundraiser in the name of NWF and ACS.  (Exhibit B.)

### F.   Inman and Indiegogo Violated The California Solicitation Disclosure Law

When the legislature enacted the Charitable Solicitations Disclosure Law in 1972 (the "Disclosure Law"), it established new remedies to deal with an identified problem:

> "The Legislature finds that *there exists in the area of solicitations and sales solicitations for charitable purposes a condition which has worked fraud, deceit and imposition upon the people of the state which existing legal remedies are inadequate to correct.* \*\*\*
> The Legislature declares that *the purpose of this article is to … encourage fair solicitations and sales solicitations for charitable purposes, wherein the person from whom the money is being solicited will know what portion of the money will actually be utilized for charitable purposes*."

Cal. Business & Professions Code § 17510. (Emphasis added).

### G.   Inman and Indiegogo Unlawfully Failed To Disclose Their Non-Tax-Exempt Status When Soliciting for The Bear Love Campaign

#### i.   The Requirement To Disclose Non-Tax Exempt Status

The Disclosure Law expressly applies to solicitations over the Internet, and requires the same disclosures made in printed material:

> "*If the initial solicitation* or sales solicitation *is made* by radio, television, letter, telephone, or any other means not involving direct personal contact with the person solicited, including *over the Internet, this solicitation shall clearly disclose the information required by Section 17510.3*."

Cal. B. & P. Code § 17510.4. (Emphasis added.)

Section 17510.3(a) of the Disclosure Law requires that "prior to any solicitation … for charitable purposes, the solicitor … shall exhibit to the prospective donor" documentation that states, *inter alia*:

> "*The non-tax-exempt status of the organization or fund, if the organization or fund for which the money or funds are being solicited does not have a charitable tax exemption under both federal and state law*."

Cal. B. & P. Code § 17510.3(a). (Emphasis added.)

### ii. Inman's False Claims of Endorsement by the NWF and ACS, His Failure to Disclose The Bear Love Campaign's Non-Tax-Exempt Status, and Taking Delivery of Cash to Pull A Publicity Stunt, Demonstrate That He Is Not A Proper Fiduciary of A Charitable Trust

The unprofessional manner in which Inman conducted the Bear Love campaign has led to exactly the type of situation that the Act and the Disclosure Law are meant to prevent.  A large fund of money has been collected from 14,046 people, each of whom have contributed very modest amounts of money, and only one of whom has been sufficiently motivated to investigate and initiate judicial action to make sure that the money raised is used in a manner consistent with the promises that were made during the course of the Bear Love campaign.  Indeed, the objectives of the Bear Love campaign have been a moving target.  Inman started out saying he would try to raise $20,000 for the NWF and ACS, but when the campaign proved surprisingly successful, he announced he would add two new "charities."  (Carreon Dec. ¶ 16.)  Then, at the close of the campaign, he reverted to his original plain, announcing that "unfortunately," in order to avoid litigation, the Charitable Fund would not be split four ways, and all the money would go to NWF and ACS after all. (Carreon Dec. ¶ 22; Exhibit G.)  Finally, while maintaining that "100%" of the money will go to charity, he has refused Plaintiff's request to simply relinquish all his claim, title and interest in the money (Carreon Dec. ¶ 19), and insists upon having it all paid to himself, so he can turn it into U.S. currency and photograph himself with the cash as a publicity stunt. (Carreon Dec. ¶ 26; Exhibit G.)

Inman's mishandling of the Bear Love campaign illustrates the wisdom of the statutory scheme adopted by the legislature a half-century ago.  His enthusiasm for the project caused him to claim the endorsement of non-profit entities without their permission, and when the fund grew larger than he expected, he decided to expand the number of beneficiaries, not thinking that this would violate basic principles of charitable giving.  Although he induced many donors to donate, his desire to engage in showboating with the proceeds does not demonstrate the sober, responsible attitude appropriate to the trustee of a charitable fund.  Finally, Inman fails to see that in order to avoid taking improper advantage of his misappropriation of the names of NWF and ACS, by means of which he led Bear Love donors to believe they were making tax deductible

donations, he cannot lawfully accept payment of the donations to himself, that must be paid directly to NWF and ACS, who alone are capable of issuing the appropriate tax-deductible-donation receipts to the 14,046 donors.

### H.   The Balance of the Equities Tips Sharply Against The Non-Moving Parties

Balancing the equities requires this Court to "look to the possible harm that could befall the various parties." *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024, 1036 (2009), *citing Cytosport, Inc. v. Vital Pharm., Inc.,* 617 F.Supp. 2d 1051, 1081-1082 (E.D.Cal. 2009). Denying a preliminary injunction to Plaintiff will result in irreparable harm, because once the money is transferred to Inman, there will no way to be sure it reaches the NWF and the ACS, no way to get it back and return it to the donors, and no way to re-apportion the tax-write-off to the donors. Inman, on the other hand, has disclaimed any interest in the fund, except for wanting to use it in a publicity stunt. The intended beneficiaries of the fund, ACS and NWF, clearly will benefit from receiving the money without using Inman as an unneeded intermediary, avoiding the risk that he may attempt to extract an unlawful *post-hoc* fundraising fee. Thus, the balance of the equities clearly tips in favor of granting the injunctive relief to preserve the status quo pending adjudication of the issues.

### I.   Public Policy

The last factor a court must consider is whether an injunction will favor the public interest in not being deceived or confused. *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d at 1036, *citing Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008). Where the injunction will preserve a fund for a charitable purpose, and prevent it from being diverted to private purposes, issuing the injunction clearly favors public policy.

### III.   CONCLUSION

For all of the above reasons, the Court is respectfully requested to issue a Temporary Restraining Order and Order to Show Cause re Injunction in the form submitted herewith.

Dated:  June 28, 2012                                            CHARLES CARREON, ESQ.

By: s/Charles Carreon
CHARLES CARREON (127139)
Attorney for Pro Se for Plaintiff