CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel: 520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney Pro Se for Plaintiff Charles Carreon

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES CARREON,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW INMAN, INDIEGOGO, INC., NATIONAL WILDLIFE FEDERATION, AND AMERICAN CANCER SOCIETY, and Does 1 – 100,<br><br>Defendants,<br><br>and<br><br>KAMALA HARRIS, Attorney General of the State of California,<br><br>A Person To Be Joined If Feasible Under F.R.Civ.P. 19. | Case No.: CV-12-3112-EMC<br><br>**DECLARATION OF CHARLES CARREON IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor<br>Date: To be set<br>Time: To be set |

**DECLARATION OF CHARLES CARREON**

Charles Carreon declares:

**1.**  I am a member of the bar of the State of California, admitted to practice in all state and federal courts of the state, and attorney pro se for Plaintiff. I make this declaration in support of Plaintiff's Ex Parte Motion for Temporary Restraining Order and Order to Show Cause Re Permanent Injunction, based on personal knowledge and an informed review of relevant documents. If called as a witness I could and would so competently testify.

**BACKGROUND FACTS**

2.  I am an attorney, with a focus on Internet law, and often represent website owners. On or about June 2, 2012, on behalf of a client, I sent a demand letter to defendant Matthew Inman ("Inman"). The matter giving rise to my sending the demand letter is not relevant to this lawsuit, but it is helpful to know that the amount I demanded was $20,000.

3.  Inman's lawyer, Venkat Balasubramani, sent me a reply letter that discussed the legal issues I had raised, and at its conclusion stated that Inman had posted his own personal response on his website, TheOatmeal.com ("Inman's site").

4.  After reading the response at Inman's site, I clicked on a hyperlink there, that brought up a webpage at Indiegogo.com, a "crowdfunding" website run by defendant Indiegogo, Inc. ("Indiegogo"). Inman contracted with Indiegogo pursuant to the terms of the "clickwrap" contract posted on the Indiegogo website, a true copy of which is attached as **Exhibit A** (the "Indiegogo Contract"). The Indiegogo contract makes Inman and Indiegogo agents of each for purposes of operating and offering fundraising ventures. Pursuant to Paragraphs 3 – 5 of the Indiegogo, Inman designated himself as the "Project Entity" to receive all of the "Contributions" elicited through Indiegogo's crowdfunding mechanism, minus "a 9% marketplace processing fee retained by Indiegogo," of which 5% will be rebated back to Inman when he reaches the funding goal, for a net take of 96%.

5.  The Indiegogo Contract impose the following limitations on Inman's use of the website:

> **You agree not to post User Content that**: (i) **may create a risk of** harm, loss, physical or **mental injury, emotional distress**, death, disability, disfigurement, or physical or mental illness to you, to any other person, or to any animal; (ii) **may create a risk of any other loss or damage to any person or property**; (iii) <u>**may**</u> **constitute or contribute to a crime or tort**; (iv) **contains any information or content that we deem** to be unlawful, harmful, **abusive**, racially or ethnically offensive, defamatory, infringing, invasive of personal privacy or publicity rights, **harassing, humiliating to other people (publicly or otherwise), libelous, threatening, or otherwise objectionable**; ….

### THE BEAR LOVE CAMPAIGN

6.  Inman launched a fundraising campaign with a fundraising goal of $20,000, that appeared on a webpage on the Indiegogo.com website. A true and correct screencapture of the webpage is

attached hereto as page 1 of **Exhibit B** (the "Bear Love campaign"). Inman announced on the Bear Love campaign webpage that instead of paying the $20,000 demand, he was going to try to raise $20,000 for the National Wildlife Foundation ("NWF") and the American Cancer Society ("ACS"), take a photo of the money, and send it to me along with a picture of a woman "seducing a Kodiak bear."[1]  Quoting directly from page one of **Exhibit B** for the Court's convenience:

> "Instead of mailing the owner of FunnyJunk the money, I'm going to send the above drawing of his mother. ***I'm going to try and raise $20,000 and instead send it to the National Wildlife Federation and the American Cancer Society.***"
> (Emphasis added.)

**7.**  A hyperlink on the Bear Love campaign webpage on the Indiegogo site lead directly to a page on Inman's own website where he made the true intention of the Bear Love campaign unmistakably clear with this statement addressed to me and my client:  "Consider this my philanthropic, kind-spirited way of saying: F*ck off."  Page 2 of **Exhibit B**.

**8.**  Inman's Bear Love campaign grew in popularity very quickly, and within hours had raised much more than $20,000.

### CONTRIBUTION TO THE BEAR LOVE CAMPAIGN

**9.**  Based on what I saw on page one of **Exhibit B**, I understood that if I clicked to contribute, Indiegogo would give $5 to ACS and $5 to NWF.  When I clicked on the "contribution" button, I was not required to check off any box indicating my assent to any contractual terms whatsoever. It was a seamless transaction that provided me with no information to supplement what I could see on page one of **Exhibit B**.

**10.**  With the expectation that I would be making a tax-deductible donation to two widely-respected, trustworthy charities dedicated to the elimination of cancer the protection of wildlife, respectively, I donated $10 to the Bear Love campaign, and received the receipt attached as **Exhibit C**.

### UNREGISTERED STATUS OF DEFENDANTS INMAN AND INDIEGOGO

---

[1] Whether the woman depicted in Inman's picture is my mother or my client's mother is the subject of heated Internet debate.

**11.** After researching in California law, I concluded that Inman and Indiegogo were commercial fundraisers within the meaning of Cal. Gov. Code § 12599(a), so I searched for them in the California Attorney General's database of charitable fundraisers, with a null result, as recorded in **Exhibit D**, that are true and correct screencaptures from the Attorney General's website.

### PRE-FILING COMMUNICATIONS WITH THE CHARITABLE ORGANIZATIONS

**12.** I contacted the media representative for ACS, David Sampson, and asked him if Inman had ACS's permission to use ACS's name in the Bear Love campaign. He said that ACS had not given Inman permission. Mr. Sampson gave me his email address, and I sent him the email attached as **Exhibit E**, advising that I wanted to assist ACS to secure 50% of all the money raised. I did not receive a "bounce notice" from Gmail, and thus conclude that Mr. Sampson received the email. However, I never received a reply.

**13.** I sent an email to the General Counsel for NWF, Barbara McIntosh,[2] a copy of which is attached as **Exhibit F**, asking if NWF had given Inman permission to use its name in the Bear Love campaign. I did not receive a "bounce notice" from Gmail, so I conclude Ms. McIntosh received the email. However, I have never received a reply.

### THE INITIAL COMPLAINT

**14.** I sued Inman and Indiegogo, alleging they were not authorized to run the Bear Love campaign on behalf of NWF and ACS, because they were unregistered charitable fundraisers, lacked the necessary written contracts with NWF and ACS that are required by law, had failed to provide the 10-day statutory notice required before commencing a charitable fundraising campaign in California, and that for those and other reasons, (a) Indiegogo should be enjoined from disbursing any funds to Inman and (b) a charitable trust should be imposed upon the Charitable Fund.

**15.** I also alleged Inman was going to donate $10,000 to NWF and $10,000 to ACS and keep all amounts over $20,000. In the prayer for relief to the initial complaint, I requested that Inman

---

[2] Ms. McIntosh was identified as NWF General Counsel by a document authored by her on an NWF website at http://nwfaffiliates.org/ht/a/GetDocumentAction/i/103248. The document is of recent vintage, and concludes with the statement: "Please remember to submit the attached form by April 8, 2011. If you have any questions, please contact Barbara McIntosh, NWF General Counsel, at (703) 438-6284 or mcintoshb@nwf.org." I also called the telephone number listed and left her a detailed voicemail.

receive none of the money and that Indiegogo be compelled to pay all of the money gathered by the Bear Love campaign (the "Charitable Fund") to NWF and ACS.

## THE FIRST AMENDED COMPLAINT

**16.** After I filed the complaint, a reporter called me and asked why I had alleged Inman was going to keep all of the Bear Love campaign money in excess of $20,000. I replied that Inman was not legally committed to do otherwise, whereupon the reporter told me that somewhere on the Internet, Inman had said all the money was going to charity, and he was going to add two additional charities to the list. Accordingly, I researched online, and eventually discovered a blog post that directed me back to the Indiegogo website, where for the first time, I discovered that on or about June 13th, Inman had posted just what the reporter had attributed to him on the "Updates" tab of the Bear Love campaign:

> *"On another note: a lot of people have been asking what I plan to do with the extra money we raised over the initial $20,000. 100% of it is going to charity. I'm going to add 2 more charities to the list, in addition to the ACS and the NWF."*

(**Exhibit B, page 4.**)

**17.** At that point I thought: "This is a bait and switch campaign." Bear Love campaign donors didn't simply designate Inman to receive and disburse donations according to his liking. We had donated to two charities -- ACS and NWF – and no others. Thus, I further asked myself: "I wonder who those other two charities are that he is talking about? Perhaps they are affiliated with Inman?"

## EFFORTS TO REACH A NEGOTIATED RESOLUTION TO AVOID FILING THIS APPLICATION FOR TEMPORARY RESTRAINING ORDER

**18.** It was clear to me that quite aside from the requirements of charitable fundraising law, Inman could not acquire a fund for one purpose and then dispose of it according to his discretion. I and the other donors had a right to have our donations go to ACS and NWF, and nowhere else. The simple answer seemed to be for Inman to simply relinquish any authority over the Charitable Fund, and allow Indiegogo to direct the money to ACS and NWF. Accordingly, on Friday June 22nd, I sent a letter to Mr. Balasubramani as an email attachment, asking him if Inman would disclaim all interest in the Charitable Fund as part of a settlement.

**19.** Mr. Balasubramani declined my proposal in writing on Monday June 26th.

**THE CHARITABLE FUND AND INMAN'S ACTIONS WITH RESPECT THERETO**

**20.** The Bear Love campaign concluded on June 26, 2012, with 14,406 donors contributing a total of $220,024.

**21.** At 2:19 a.m. June 27, 2012, using the Indiegogo email system, Inman sent an email to all donors with a link to a webpage entitled "Operation BearLove Good, Cancer Bad has ended. Now what?" (**Exhibit G**.)

**22.** On the **Exhibit G** webpage, Inman announced he had decided to stick with his original plan to give the money exclusively to ACS and NWF, but blamed me for spoiling his plan to divide the Charitable Fund among "four charities instead of two":

> *"Previously I stated that because the amount raised was so much larger than expected I was going to divide the money into four charities instead of two, but unfortunately Carreon's lawsuit claims that I'm holding an 'illicit fundraiser' and not donating money where I said I would. To avoid further litigation with him, I decided to split the money between the original two charities."*

**23.** While Inman accurately states that I allege he acted unlawfully by gathering funds in the name of two charities with the intention of passing the money to four entities, the remainder of the statement is false. Inman has not relinquished his claim of ownership over the Charitable Fund, and has reached no compromise with me "to avoid further litigation."

**24.** Inman thus informed 14,406 donors to the Bear Love campaign that his decision not to divide the money four ways was the result of a compromise that I forced upon him. This is not true. There has been no compromise, for if there had been, Inman would have relinquished his assertion of control over the Charitable Fund, and Indiegogo would be directing the funds to the putative beneficiaries of the Bear Love campaign -- ACS and NWF. Instead, Inman is insisting upon retaining his role as the intermediary.

**25.** Inman claims that:

> *"Carreon has provided notice that he intends to ask the court for a restraining order which will stop the transfer of funds from Indiegogo. If we can't get that silly bullshit dismissed, the money could be held up for days, weeks or months. Assuming we can, I should have the money in about a week."*

**26.** However, the only thing that will slow down the process of getting the money to NWF and ACS is allowing Indiegogo to send the check to Inman, so he can cash it and pose for his photograph alongside a stack of U.S. currency:

> *"Once the money is moved, I still plan on withdrawing $211k in*
> *cash and taking a photo to send to Carreon…"*

**27.** Inman's desire to exercise ownership and possession of the Charitable Fund for purposes of a publicity stunt is the only thing delaying the transfer of the funds to NWF and ACS.

### FACTS ESTABLISHING THE RISK OF IRREPARABLE HARM

**28.** If Indiegogo pays Inman the money in the Charitable Fund, and Inman personally donates the money to NWF and ACS, he will be unjustly enriched by receiving a large tax write-off that should properly be allocated pro-rata to the 14,406 small donors who contributed to the Charitable Fund.  Indiegogo has a system for accepting donations on behalf of 501(c)(3) non-profit entities and issuing the appropriate receipt for tax.  A true copy of the webpage describing the functioning of that system, provided through PayPal, is attached as **Exhibit H** hereto. However, as **Exhibit H** makes clear, because Inman is not a non-profit corporation, and was misappropriating the apparent endorsement the NWF and ACS, he could not use the PayPal nonprofit donation system for the Bear Love campaign donors, and when I and other Bear Love campaign donors made our donation, we did not receive receipts evidencing a donation to a tax-exempt organization, even though the intended recipients of our donations, NWF and ACS, were tax-exempt entities.

**29.** I reasonably believe that I am typical of the other donors to the Bear Love campaign, in that I give small amounts to various charitable organizations on the Internet, often in the range of $5 - $20, using my credit card.  I keep the receipts as PDF documents in a folder on my computer to be forwarded to my accountant at tax time so I can claim the charitable contribution write-off.  I believe that I, and all of the other donors, are entitled to receive the tax write-off for our donations to NWF and ACS.

**30.** Making charitable donations over the Internet is convenient, and over the course of the year, I find that all the small donations add up to some measurable tax benefit. The same is certainly true of the other donors to the Bear Love fund.

**31.** Pilfering very small amounts of money from very large numbers of people is a stock mechanism for conducting computer and Internet fraud. Preventing Inman from exploiting the giving public in such a fashion is in the public interest.

## COMMUNICATIONS WITH COUNSEL FOR DEFENDANTS AND THE ATTORNEY GENERAL AND SERVICE OF PROCESS

**32.** I spoke with Kelvin Gong of the Attorney General's office this morning. He had already received the First Amended Complaint that I had delivered to one of his colleagues in the AG's office. I then sent a copy of all ex parte papers at his email address at kelvin.gong@doj.ca.gov. Mr. Gong told me that he had reviewed the papers, and was accepting of service of process on behalf of the Attorney General. We agreed that I will provide him with notice if the Court sets a hearing in the matter.

**33.** I provided written notice of my intention to file this ex parte application to Inman, Indiegogo, the American Cancer Society, the National Wildlife Federation, and the California Attorney General, by sending the emails and fax letters attached hereto jointly as **Exhibit I** to their respective offices.

**34.** I proposed a stipulated resolution of this matter with the attorneys for Indiegogo in a teleconference on which three attorneys were present, and I explained as much of the substance of the matters as was necessary to convey the rationale for the relief sought by this application. I then sent them the letter attached as **Exhibit J**.

**35.** The attorneys for Inman and Indiegogo have appeared in the action and thus will be served via ECF.

**36.** I spoke with the attorney for ACS, Sarah Grilli of Kilpatrick Townsend, and advised her that I would send her all of the papers supporting this ex parte application via email at rgrossman@kilpatricktownsend.com immediately after filing. Ms. Grilli agreed to accept service

of process of the ex parte papers on behalf of ACS, as set forth in the email attached as **Exhibit K**.

**37.** With respect to counsel for NWF, I have not yet established communications with them. I am endeavoring to establish communications with them to arrange for service via email. If I am unable to establish contact with the NWF attorneys, I will serve the NWF agent for service of process and submit a proof of service so establishing.

### REQUEST TO ATTEND ORAL HEARING TELEPHONICALLY

**38.** My office is at 2165 S. Avenida Planeta, Tucson, Arizona 85710. Based on my past experience in litigating actions in San Francisco, which I have often done, it would cost in the neighborhood of $1,000 in plane fare and lodging to attend a hearing in San Francisco, and entail approximately 36 hours of travel time to personally attend an oral hearing in San Francisco. As a pro se plaintiff and sole practicioner paying all the costs of this action, this would impose a substantial hardship upon me. Accordingly, I respectfully request the Court to permit me to appear telephonically at any hearing the Court wishes to schedule in this matter.

     I hereby declare, pursuant to the provisions of 28 U.S.C. § 1746 (2), under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on this 28th day of June, 2012 at Tucson, Arizona.

Charles Carreon