DURIE TANGRI LLP
RAGESH K. TANGRI (SBN 159477)
rtangri@durietangri.com
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
EUGENE NOVIKOV (SBN 251316)
enovikov@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:   415-362-6666
Facsimile:   415-236-6300

Attorneys for Defendant
INDIEGOGO, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHARLES CARREON,<br><br>                    Plaintiff,<br><br>        v.<br><br>MATTHEW INMAN; INDIEGOGO, INC.;<br>NATIONAL WILDLIFE FEDERATION;<br>AMERICAN CANCER SOCIETY; AND DOES<br>1-100,<br><br>                    Defendants. | Case No. 3:12-cv-03112-EMC<br><br>**DEFENDANT INDIEGOGO, INC'S<br>OPPOSITION TO PLAINTIFF'S REQUEST<br>FOR A TEMPORARY RESTRAINING<br>ORDER AND ORDER TO SHOW CAUSE RE<br>PRELIMINARY INJUNCTION**<br><br>Date:    To Be Set<br>Time:    To Be Set<br>Ctrm:    5 - 17th Floor<br>Judge:   Honorable Edward M. Chen |

# TABLE OF CONTENTS

**PAGE**

I.      STATEMENT OF THE ISSUES TO BE DECIDED.................................................................1

II.     INTRODUCTION .................................................................................................................1

III.    BACKGROUND ...................................................................................................................3

    A.      Indiegogo ..............................................................................................................3

    B.      Carreon's Complaint ............................................................................................4

    C.      The TRO Application ...........................................................................................6

IV.     ARGUMENT .........................................................................................................................8

    A.      Legal Standard for a TRO ....................................................................................8

    B.      No Irreparable Harm .............................................................................................8

    C.      No Likelihood of Success on the Merits .............................................................11

        1.      CDA Immunity .........................................................................................11

        2.      No Private Right of Action Under the California Supervision of Trustees
             and Fundraisers for Charitable Purposes Act...........................................13

    D.      The Balance of Equities Favors Indiegogo..........................................................17

    E.      The Public Interest Does Not Favor an Injunction. .............................................17

V.      CONCLUSION......................................................................................................................17

**TABLE OF AUTHORITIES**

PAGE(S)

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................................8

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ..............................................................................8

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ............................................................................11

*Boyd v. GMAC Mortgage LLC*,
  2011 WL 6025906 (N.D. Cal. Dec. 5, 2011) .......................................................8

*Brown v. Allstate Insurance Co.*,
  17 F.Supp.2d 1134 (S.D. Cal. 1998) .....................................................................8

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
  No. C-08-1278, 2011 WL 6813200 (N.D. Cal., Dec. 28, 2011)............................9

*Edge Games, Inc. v. Elec. Arts, Inc.*,
  745 F. Supp. 2d 1101 (N.D. Cal. 2010) ................................................................9

*Farmers Ins. Exch. v. Superior Court*,
  137 Cal. App. 4th 842 (2006) .............................................................................13

*Gentry v. eBay, Inc.*,
  99 Cal. App. 4th 816 (2002) ...............................................................................13

*Goddard v. Google, Inc.*,
  No. C 08-2738, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)....................12, 13

*Holt v. College of Osteopathic Physicians and Surgeons*,
  61 Cal.2d 750, 754 (1964) ..................................................................................15

*L.B. Research & Education v. UCLA Foundation*,
  130 Cal.App.4th 171 (2005) ..........................................................................15, 16

*Moradi-Shalal v. Fireman's Fund Ins. Cos.*,
  46 Cal.3d 287 (1988) ....................................................................................14, 15

*Numbers Licensing, LLC v. bVisual USA, Inc.*,
  643 F.Supp.2d 1245 (E.D. Wash. 2009) ...............................................................7

*Pail v. Wells Fargo Bank, N.A.*,
  2011 WL 109482 (N.D. Cal., Jan. 13, 2011) .......................................................9

*Qwest Communications Corp. v. City of Berkeley*,
  146 F. Supp. 2d 1081 (N.D. Cal. 2001) ................................................................9

*Richardson v. Robison*,
  No. 08CV902, 2008 WL 2338611 (S.D. Cal. June 5, 2008) ...............................11

*San Diego Etc. Boy Scouts of America v. City of Escondido*,
   14 Cal.App.3d 189 (1971) ..................................................................................15

*Sharp Healthcare v. Leavitt*,
   No. 08-CV-0170, 2008 WL 962628 (S.D. Cal. April 8, 2008) ...........................10

*Stansfield v. Starkey*,
   220 Cal. App. 3d 59 (1990) ...................................................................................5

*Windermere Holdings, LLC v. U.S. Wall Décor, LLC*,
   2011 WL 133023 (N.D. Cal. Jan. 14, 2011) ..........................................................7

**<u>Statutes</u>**

47 U.S.C. § 230....................................................................................................11

Cal. Business & Professions Code § 17535 ..........................................................5

Cal. Civil Code § 2224..........................................................................................5

Cal. Gov. Code § 12580.........................................................................................5

Cal. Gov. Code § 12599.......................................................................................12

Cal. Gov. Code § 12581.......................................................................................14

Cal. Business & Professions Code § 17500.....................................................8, 12

DEF INDIEGOGO, INC'S OPP TO PLTF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION / CASE NO. 3:12-CV-03112-EMC

Defendant Indiegogo, Inc. ("Indiegogo") hereby submits this opposition to Plaintiff Charles Carreon's ("Carreon") Ex Parte Application for a Temporary Restraining Order ("TRO") and Order to Show Cause Re Preliminary Injunction, providing certain injunctive relief against Indiegogo.

Indiegogo submits that the application is entirely moot, as explained below, but requests a hearing and oral argument should the Court be inclined to consider Carreon's ex parte application on the merits.

## I.   STATEMENT OF THE ISSUES TO BE DECIDED.

The issues to be decided by the Court in ruling on Carreon's Application are these:

1. Is Carreon's Application moot in light of the fact that Inman's share of the proceeds from the BearLove campaign has been sent to the American Cancer Society and the National Wildlife Fund?

2. Has Carreon carried his burden to show that he is likely to succeed on the merits, that he will suffer irreparable harm if his application is not granted, that the balance of hardships tips in his favor, *and* that the public interest favors an injunction?

## II.   INTRODUCTION

Carreon filed his complaint in this case on June 15, 2012.  (Dkt. 1.)  On June 28, 2012, at 4:55 p.m., he served this last-minute application for a TRO, asking to enjoin the disbursement of certain funds from Indiegogo, a "crowdfunding" website, to co-defendant and Indiegogo user Matthew Inman, who has promised to donate the money to charity.  Declaration of Ragesh Tangri ("Tangri Decl."), ¶ 2. Carreon then served revised TRO papers shortly after 7:00 p.m. that evening.  *Id.* ¶ 3.

Carreon did not file his papers until June 30.  (Dkt. 20.)  By the time he filed them, he had been informed that the money already had been transferred.  (Tangri Decl., ¶ 6. & Ex. H.)  At Inman's request, his share of the money contributed to the BearLove campaign was sent by check to the American Cancer Society and the National Wildlife Fund, in equal amounts, on June 29.  (Declaration of Slava Rubin ("Rubin Decl."), ¶ 10.)  As explained below, Carreon was aware at least as early as June 15 that the money was liable to be transferred at any time beginning June 26 and at all events no later than Monday July 2.  He nevertheless made no effort even to file for a TRO until the close of business on June 28. And, while he notes that the ECF system was down at that time, he offers no explanation for not having sought to file his TRO application well before June 26 – which he knew to be the earliest date the money

could have been transferred – so that the Court could have adjudicated it before the time period during which the money was due to be transferred began.  Nor does he offer an explanation for having failed at least to bring the application to the Court's attention by means other than ECF on Friday June 29.[1]

The simple reason for that is that there never was an emergency here, or any serious threat to anyone or anything.  Carreon's application is gamesmanship.  When Carreon filed his original complaint on June 15, he knew that funds would be disbursed within five business days of the close of the fundraising campaign, which was set for June 25.  Indeed, on June 26, in conversation with Indiegogo's counsel, he admitted that he was aware that the funds could be disbursed at any time between the time of that conversation and Monday July 2.  (Tangri Decl., ¶ 4.)  Yet Carreon waited nearly two weeks after filing his complaint to present the court with his TRO request at the eleventh hour.  Had there been any threat of real harm, Carreon would have made this application with more than hours to spare.

In any event, the application is substantively meritless.  *First*, Carreon cannot demonstrate irreparable harm to anyone, and certainly not to himself.  A temporary restraining order is a drastic remedy, intended to prevent the grave and irreversible consequences of some imminent event.  Here, the *only* imminent event was the disbursement of just over $95,000 to the National Wildlife Fund and the American Cancer Society (not $200,000 as Carreon's application mistakenly states), fulfilling Inman's promise to donate the money to those organizations – the very outcome that Carreon claims to desire.  Indiegogo will retain roughly $8,800 as a processing fee.  Carreon's total contribution was $10.  Should it later be determined that any harm flowed from these events, that harm would be readily compensable with an award of monetary damages or restitution.

*Second*, Carreon has not demonstrated and cannot demonstrate a likelihood of success on the merits.  His claims against Indiegogo are barred by section 230(c)(1) of the Communications Decency Act ("CDA"), which protects from liability a provider of an interactive computer service that merely publishes information provided by another information content provider.  And his claims under the

---

[1]  For those same reasons, Carreon's additional request to have his papers "deemed filed" on June 28 (Dkt. 21) should be denied.   He cites General Order 45.VI(E), but that section refers to filing "deadlines" and authorizes the filing of a document after a deadline where the late filing is the result of a technical failure.  But June 28 was not a "deadline" – it was simply the date Carreon chose to seek relief, and nothing in General Order 45 authorizes or requires a Court to deem the filing of a document not subject to a deadline (or, indeed, any other document) to have been filed retroactively or nunc pro tunc.

1   Supervision of Trustees and Fundraisers for Charitable Purposes Act, Cal. Government Code sections
2   12580 *et seq.*, are likewise barred because that statute does not create a private right of action that would
3   afford Carreon standing to sue for its violation.

4        Carreon's application should be denied as moot.  As explained further below, it would have had
5   no merit and entitled him to no relief even had he filed it in sufficient time for the Court to have
6   considered it before the money was due to be transferred.

7   **III.    BACKGROUND**

8        **A.    Indiegogo**

9        Indiegogo is an online service billed as "[t]he world's funding platform."  It allows users to
10  "crowdfund" projects of their choosing by soliciting donations from the world at large. Any user can post
11  a description of his project, along with videos and pictures; set a funding goal; and permit other users to
12  contribute money to the project through the website.  All of the content on the project description page is
13  user-generated, not approved by Indiegogo, and not reviewed by Indiegogo unless the user requests it.
14  (Rubin Decl., ¶ 7.)  Typical projects on the site include independent films, small businesses wanting to
15  fund an expansion or improvement, and individuals in need.  (*Id.* at ¶ 2.)  Donations can be made in two
16  ways:  by credit card payment to Indiegogo, or through a third-party payment processor called PayPal.  In
17  the former case, Indiegogo collects the money and disburses it to the user after the completion of the
18  campaign.  In the latter case, PayPal transfers the money directly to the user's PayPal account.  (*Id.* at ¶
19  4.)  This is consistent with Indiegogo's terms and conditions, which state that the user's "Funding
20  Account will be governed by [the user's] agreement with the [Payment] Processor," and that "[a]ll
21  *necessary* fund transfers will be initiated within 5 business days of the campaign end date."  (Rubin
22  Decl., Ex. A, at 3-4 (emphasis added).)

23       Indiegogo charges a fee for use of its service.  Indiegogo retains a platform fee equivalent to 9%
24  of all contributions to the project, with a 5% rebate if the project hits its funding goal, for a net of 4% in
25  that circumstance.  (Rubin Decl., ¶ 5.)  An additional 3% payment processing fee is also charged for
26  credit card contributions.[2]  (*Id.*)

27

28  _____
    [2] PayPal sets its own processing fee for contributions made through its service.  (*Id.*)

B.      **Carreon's Complaint**

This case involves Indiegogo only peripherally.  The dispute at its center is between the Plaintiff, Charles Carreon, and Indiegogo's co-defendant, an individual named Matthew Inman.  It concerns a sum of money raised by Inman through the Indiegogo website.

Matthew Inman operates a popular website and internet comic strip called The Oatmeal.  *The Oatmeal*, http://www.theoatmeal.com (last visited June 29, 2012).  In June 2011, Inman wrote and published on his website two blog posts, the first entitled "What should I do about FunnyJunk.com?," and the second entitled "An update on the FunnyJunk situation."  (Tangri Decl., Exs. C and D. )  The posts complained that the content aggregator site FunnyJunk.com was republishing Inman's "Oatmeal" comics without permission or attribution, in order to generate advertising revenue.  *Id.*  A year later, Inman received a demand letter from Carreon, writing as the attorney for FunnyJunk, LLC, the operator of FunnyJunk.com.  (Tangri Decl., Ex. E.)  The letter accused Inman's year-old blog posts of "maliciously accusing FunnyJunk of criminal conduct to injure its business reputation," and "engag[ing] in false advertising in violation of the Lanham Trademark Act."  (*Id.*)  The letter demanded that Inman remove all mention of FunnyJunk from the Oatmeal website, and pay FunnyJunk $20,000, care of Mr. Carreon.  (*Id.*)

Inman responded to the demand by publishing and ridiculing the text of the letter in another blog post on The Oatmeal.  (Tangri Decl., Ex. F.)  He ended the post by declaring his intention to do the following:  rather than pay FunnyJunk $20,000, he would raise $20,000 from his readers, take a photo of the money, mail FunnyJunk the photo along with a "drawing of your mom seducing a Kodiak bear," and then donate the actual money to the National Wildlife Federation and the American Cancer Society.  (*Id.*)  Inman christened this effort "BearLove Good.  Cancer Bad."  (*Id.*)

Only here does Indiegogo enter the picture.  The sum total the allegations in Carreon's First Amended Complaint concerning Indiegogo is the following:

(a) Inman used the Indiegogo website to set up his "BearLove" fundraising campaign, and agreed to Indiegogo's terms and conditions.  (Dkt. 12, ¶¶ 7-10, 15, 53.)

(b) Pursuant to the terms and conditions, Inman received access to Indiegogo's standard set of Analytics tools to help track the progress of his campaign.  (*Id.*, ¶ 14.)

(c) Indiegogo subsequently published the contents of the BearLove campaign webpage provided by Inman.  (*Id.*, ¶¶ 37-40, 54.)

(d) Plaintiff subsequently requested that Indiegogo suspend Inman's BearLove campaign "on the grounds that it violated [Indiegogo's] terms of service," which Indiegogo declined to do.  (*Id.*, ¶ 44.)

(e) Almost two weeks after the campaign began, Indiegogo reported the amount of money thus far pledged to the BearLove campaign.  (*Id.*, ¶ 48.)

(f) Inman subsequently posted an "update" to the Indiegogo BearLove campaign webpage, stating his intention to add two more charities to the list of recipients of the funds collected by the campaign.  (*Id.*, ¶¶ 56-57.)

Carreon does not allege that Indiegogo authored, created, developed, or approved any of the BearLove campaign's content.  Indeed, Carreon admits that the BearLove campaign was "initiated by Inman and published by Indiegogo."  (*Id.*, ¶ 49.)  And Carreon does not allege any participation by Indiegogo in the alleged harassment of Carreon that followed the campaign's publication.  His attempt to impose liability upon Indiegogo rests solely on Inman's use of the Indiegogo online service to raise money for his project.

The First Amended Complaint names Indiegogo in a single claim for relief:  "For Imposition of a Charitable Trust Upon the Proceeds of the BearLove Campaign Solicited by Violations of the [California Supervision of Trustees and Fundraisers for Charitable Purposes] Act and False Advertising in Violation of B. & P. Code § 17500."  (*Id.*, ¶¶ 51-71.)  The contours of the claim are not clear.  The imposition of a constructive trust is an equitable remedy, not a cause of action.  *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 76 (1990).  The First Amended Complaint cites a number of different statutes under which Carreon thinks a cause of action might arise.  First, Carreon alleges that "[t]he Bear Love campaign was conceived and operated in violation of California Business & Professions Code § 17500," the false advertising statute.  (Dkt. 12, ¶ 52.)  Carreon then alleges that a statement published on the Indiegogo website was a "misrepresentation" in violation of section 12599(f) of the California Supervision of Trustees and Fundraisers for Charitable Purposes Act, and more generally that the BearLove campaign was conducted "in defiance of the comprehensive regulatory scheme set forth at  Cal. Gov. Code §§

5

DEF INDIEGOGO, INC'S OPP TO PLTF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION / CASE NO. 3:12-CV-03112-EMC

1    12580-12599.7." (*Id.*, ¶¶ 54, 61, 66.)  He concludes by citing two statutes that relate to the types of

2    remedies generally available in state court (Cal. Civil Code § 2224 and Cal. Business & Professions

3    Code § 17535), and – though he filed his complaint *pro se* – requesting an award of attorneys fees "as a

4    public attorney general benefitting the public interest in enforcement of the [California Supervision of

5    Trustees and Fundraisers for Charitable Purposes] Act." (*Id.*, ¶ 71.)

6        **C.    The TRO Application**

7        When it ended at the close of business on June 25, 2012, Inman's BearLove campaign had

8    collected a total of $220,024.  (Rubin Decl., ¶ 10.)  Of that amount, $123,803 was contributed through

9    PayPal.  Inman's share of that money – believed to be roughly $108,946.64[3] – is not and has never been

10   in Indiegogo's possession.  (*Id.*)  The remaining $96,221.00 was contributed by credit card.  (*Id.*)

11   Inman's share of *that* money is $84,674.48.[4]  (*Id.*)  To that amount, Indiegogo adds the 5% fee rebate for

12   reaching the project's funding goal -- $11,001.20[5] -- for a total of $95,675,68.  (*Id.*)  Indiegogo's terms

13   and conditions set forth that any necessary fund transfers will occur *within* five business days of the end

14   of the campaign.  (Rubin Decl., Ex. A, at 4.)  At Inman's request, his share of the money contributed by

15   credit card, along with the 5% rebate, was sent by check to the American Cancer Society and the

16   National Wildlife Fund on Friday, June 29th.  Indiegogo will retain a total of $8,800.96 in fees.[6]

17       The timeframe for disbursement and the percentage amount of Indiegogo's fee are publicly set

18   forth on the Indiegogo website, on the "terms and conditions" page which Carreon's original and

19   amended complaints both cited.  (Rubin Decl., ¶ 3 and ex. A; Dkt. 1, ¶ 7; Dkt. 12, ¶¶ 8-10 and Ex. A.)

20   Carreon filed his original complaint on June 15, 2012.  (Dkt. 1.)  He then waited until June 28, 2012 –

21   two business days before the deadline for disbursement under the terms and conditions, three business

22   days *after* he knew the money could have been disbursed pursuant to Indiegogo's Terms of Service, and

23   one business day before the money was in fact scheduled to be disbursed – even to serve (though not file)

---

[3] **$123,803.00** - **$11,142.27** (Indiegogo's 9% platform fee, transferred to Indiegogo at the time of contribution) - **$3,714.09** (PayPal's processing fee, estimated at 3%) **= $108,946.64**.

[4] **$96,221.00** - **$8,659.89** (Indiegogo's 9% platform fee) - **$2,886.63** (3% payment processing fee) = **$84,674.48**.

[5] **$220,024.00** (total amount contributed to the BearLove campaign) * **5% = $11,001.20**.

[6] Four percent of $220,024.00 of the total amount collected – i.e., the 9% initially withheld, minus the 5% rebate.

1   this application for a TRO.  The application provides no justification for the delay.

2          The application is accompanied by a declaration from Carreon, which in many cases purports to

3   give testimony that Carreon is not remotely qualified to give.  For example, the declaration states that

4   "[i]f Indiegogo pays Inman the money in the Charitable Fund, and Inman personally donates the money

5   to NWF and ACS, he will be unjustly enriched by receiving a large tax write-off that should properly be

6   allocated pro-rata to the 14,406 small donors who contributed to the Charitable Fund."  (Declaration of

7   Charles Carreon ("Carreon Decl.") at ¶ 28.)  Carreon does not present himself as an expert on tax law, or

8   cite to any authority in the tax code for either of the assertions in that statement.  Even under the less

9   formal procedural and evidentiary standards applicable a motion for preliminary injunction, this cannot

10  be considered competent evidence.  *See, e.g., Numbers Licensing, LLC v. bVisual USA, Inc.*, 643

11  F.Supp.2d 1245, 1248-49 (E.D. Wash. 2009) (striking paragraphs of supporting declaration to a motion

12  for a preliminary injunction because the declarant lacked personal knowledge).  The same is true of

13  various other parts in Carreon's declaration, such as his statement that small charitable donations

14  "certainly" "add up to some measurable tax benefit" for "the other donors to the Bear Love fund"

15  (Carreon Decl., ¶ 30), and that "[p]ilfering very small amounts of money from very large numbers of

16  people is a stock mechanism for conducting computer and Internet fraud." [7]  (Carreon Decl. ¶ 31.)

17         The application requests that Indiegogo be enjoined "from transferring the proceeds of the

18  BearLove campaign in the amount of not less than $220,014 (the "Charitable Fund"), or any amount at

19  all, to Matthew Inman . . . and requiring that the Charitable Fund be held as segregated funds by

20  Indiegogo . . . ."  This is impossible, since Indiegogo does not have $220,014 worth of proceeds from the

21  BearLove campaign.  Indiegogo never had control of the money contributed via PayPal.  And at Inman's

22  request, his share of the proceeds in Indiegogo's possession has been sent to the charities directly, so

23  Carreon's application is moot as to that money.  In any event, Indiegogo should not be enjoined from

24  transferring or retaining any amount.  Carreon's application is meritless, and the transfer of the money to

25  the charities (and Indiegogo's retention of its fee) should proceed as scheduled.

26

27

28
_____
[7]  Indiegogo objects to the incompetent portions of Carreon's declaration and respectfully requests that they be stricken.

7

DEF INDIEGOGO, INC'S OPP TO PLTF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION / CASE NO. 3:12-CV-03112-EMC

1  **IV.    ARGUMENT**

2      **A.    Legal Standard for a TRO**

3          A temporary restraining order is "an extraordinary remedy that the court should award only when

4  a plaintiff makes a clear showing that it is entitled to such relief." *Windermere Holdings, LLC v. U.S.*

5  *Wall Décor, LLC*, No. C 10–03955, 2011 WL 133023, at *1 (N.D. Cal. Jan. 14, 2011) (internal quotation

6  marks omitted).  The standards for a TRO are the same as those for a preliminary injunction.  *Id.*  In

7  order to obtain a TRO, a plaintiff must establish that: (1) he is likely to succeed on the merits; (2) that he

8  is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities

9  tips in his favor; and (4) that an injunction is in the public interest.  *American Trucking Ass'ns, Inc. v.*

10  *City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

11          All four factors must weigh in the plaintiff's favor in order to establish the right to preliminary

12  injunctive relief.  *Boyd v. GMAC Mortgage LLC*, No. C 11–5018, 2011 WL 6025906, at *5 (N.D. Cal.

13  Dec. 5, 2011).  With respect to likelihood of success, the plaintiff must show either a probability of

14  success, or both "serious questions going to the merits" of his allegations *and* a balance of hardships that

15  tips sharply towards the plaintiff.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th

16  Cir. 2011).  In this case, all four factors weigh against a temporary restraining order and preliminary

17  injunction.

18      **B.    No Irreparable Harm**

19          The *only* imminent threat alleged in Carreon's request is that Indiegogo could disburse a portion

20  of the money raised through the BearLove campaign to Inman, who has promised to donate that money

21  to the National Wildlife Fund and the American Cancer Society – precisely what that Carreon's

22  application ultimately seeks to have happen.  ("Memorandum of Points and Authorities in Support of

23  Motion for Temporary Restraining Order and Preliminary Injunction," Dkt. 17 (hereafter "TRO"), at 3,

24  10.)  In fact, Indiegogo did not disburse any money to Inman, but instead sent it directly to the National

25  Wildlife Fund and the American Cancer Society, at Inman's request.  Leaving aside the question whether

26  Carreon's self-serving ten-dollar donation to the BearLove campaign, made solely in an attempt to

27  contrive a standing argument for this lawsuit, permits Carreon to claim *any* sort of harm flowing from

28  these events, there certainly isn't and never was any *irreparable* harm.  The only thing at stake here was

8

DEF INDIEGOGO, INC'S OPP TO PLTF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION / CASE NO. 3:12-CV-03112-EMC

1  a sum of money, and any harm therefore would be readily compensable through an award of damages or

2  restitution to Carreon of his $10.[8]

3    "In the context of preliminary injunctive relief, irreparable harm is established when a plaintiff is

4  unlikely to be made whole by an award of monetary damages or some other legal remedy at a later date,

5  in the ordinary course of litigation."  *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1117

6  (N.D. Cal. 2010).  Types of harm considered irreparable by this Court have included homelessness, *Pail*

7  *v. Wells Fargo Bank, N.A.*, No. C 10–04016, 2011 WL 109482, at *4 (N.D. Cal., Jan. 13, 2011),

8  environmental damage, *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, No. C-08-1278,

9  2011 WL 6813200, at *5-6 (N.D. Cal., Dec. 28, 2011), and serious injury to a business's goodwill and

10 reputation.  *Qwest Communications Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1103 (N.D. Cal.

11 2001).

12   By contrast, the *only* thing at stake here was $104,476.64.  Indiegogo's share of that money is

13 $8,800.96, and Carreon's donation was $10.  Inman had promised to donate his portion of the money to

14 the American Cancer Society and the National Wildlife Fund, who are both defendants in this case, and

15 instructed Indiegogo to send his portion of the money to those charities directly.  Carreon presents no

16 evidence that Inman intended to do anything else.  Nor does Carreon make any substantive argument that

17 Indiegogo is not entitled to its customary fee.[9]

18   Carreon writes that "[d]enying a preliminary injunction . . . will result in irreparable harm,

19 because once the money is transferred to Inman, there will be no way to be sure it reaches the NWF and

20 the ACS, no way to get it back and return it to the donors, and no way to re-apportion the tax-write-off to

21 the donors."  (TRO at 10.)  But none of these things is true.  Even if Inman were to have misappropriated

22 any amount of money (which he cannot, since Indiegogo sent it to the charities instead of to him, at his

23 own request), he would have been theoretically susceptible to a lawsuit for damages.  The National

24 Wildlife Fund and American Cancer Society are major national charity organizations who are parties to

---

[8] To the extent Carreon's claim is based on California Business & Professions Code § 17500, he may not
seek money damages at all.  *Brown v. Allstate Insurance Co.*, 17 F.Supp.2d 1134, 1140 (S.D. Cal. 1998).

[9] Carreon does write that Inman and Indiegogo "did not disclose Indiegogo's fees at any time."  (TRO at
7-8.)  This is untrue, since Indiegogo's fees are set forth in the publicly available terms and conditions on
the Indiegogo website.  (Rubin Decl., Ex. A.)

9

1    this lawsuit, and Carreon has not suggested that they are incapable of refunding the money were that to

2    prove necessary.  Likewise, Indiegogo is perfectly capable of refunding $8,800 at the conclusion of this

3    litigation, and has maintained records of the BearLove campaign's donors.  (Rubin Decl., ¶ 11.)   As for

4    the tax write-off, Carreon's assertions are pure speculation.  They are unsupported by any citation to the

5    tax code, any declaration of a competent tax professional, or anything else.  On a motion for

6    extraordinary relief on which Carreon bears the burden, they should be disregarded entirely.  In any

7    event, the contention that Inman would be unjustly enriched by a $200,000 tax deduction appears

8    frivolous on its face.  Any deduction Inman may have been able to take as a result of this campaign

9    would be offset by at least an equivalent increase in income, thus leaving Inman at break-even or worse.

10       Carreon suggests that the *other donors* to the BearLove campaign will be irreparably harmed by

11   the fact that their contribution may not be tax-deductible if the money goes through Inman.  (TRO at 7-

12   8.)  As discussed above, the money collected by Indiegogo did not go through Inman.  In any event,

13   Carreon's contention is again unsupported by any legal or factual basis that could serve to discharge

14   Carreon's burden of proof.  And Carreon cites no evidence that any donor to the BearLove campaign

15   (including himself) was under the impression that his donation would be going directly to the charities

16   and thus would be tax-deductible.  Indeed, Inman's description of the BearLove campaign on the

17   Indiegogo website accurately states:  "I'm going to try and raise $20,000 and instead send it to the

18   National Wildlife Federation and the American Cancer Society."  (Ex. B to TRO.)  It says that he

19   intended temporarily to take possession of the money (to photograph it) before turning it over to the

20   charities.  (*Id.*)  And Indiegogo's terms and conditions tell funders that "Indiegogo makes no

21   representations regarding the deductibility of any Contribution for tax purposes.  Please consult your tax

22   advisor for more information."  (Rubin Decl., Ex. A, at 5.)

23       Furthermore, this is not a class-action lawsuit.  The irreparable harm must be to Carreon, not to

24   third parties.  *See Sharp Healthcare v. Leavitt*, No. 08-CV-0170, 2008 WL 962628, at *3 (S.D. Cal. April

25   8, 2008) (noting that injuries to third parties are "generally not relevant" to the irreparable harm analysis,

26   with narrow exceptions not applicable here).  Again, Carreon has not suggested, much less carried the

27   burden of proving, that any defendant is incapable of refunding the amounts of money at issue here, and

28   Indiegogo has records of who donated to the BearLove campaign.  (Rubin Decl., ¶ 11.)

Finally, the timing of Carreon's application demonstrates that there is no irreparable harm here. Carreon's complaint was filed over two weeks ago.  At that point, both the end date of the BearLove campaign and the timeframe for disbursement of the money to Inman after the end date (within five business days) were known to Carreon.  Indeed, Carreon's original complaint *cites* the campaign end date *and* the same set of Indiegogo terms and conditions that contain the timeframe for disbursement.  (Dkt. 1, ¶¶ 7, 35)  Carreon could have applied for a TRO immediately.  Instead, he waited to serve his papers until the middle of the period of time in which disbursement was to occur, presumably in an effort to manufacture an emergency.  The Court should not countenance this gamesmanship.  *See Richardson v. Robison*, No. 08CV902, 2008 WL 2338611, at *4 (S.D. Cal. June 5, 2008) (denying TRO application in part on the basis of the plaintiffs' "delay and lack of diligence" in filing the application, which prejudiced Defendants' ability to defend).

### C.    No Likelihood of Success on the Merits

Carreon cannot demonstrate a likelihood of success on the merits with respect to his substantive claim against Indiegogo – or even raise serious questions going to the merits of that claim.  This is so for two reasons.  *First*, to the extent the claim is intelligible, it appears to be based *solely* on Indiegogo's publication of content generated and provided by Inman.  As such, Indiegogo is immune from liability under section 230(c)(1) of the Communications Decency Act ("CDA").  *Second*, to the extent Carreon's claim is based on the Supervision of Trustees and Fundraisers for Charitable Purposes Act, Cal. Government Code sections 12580 *et seq.*, the claim fails because that statute does not create a private right of action.  Instead, it creates a registration, compliance, and enforcement scheme to be implemented by the Attorney General, with a prescribed schedule of civil penalties, and contains no provision that states or implies that a private plaintiff may sue to enforce it.

### 1.    CDA Immunity

Carreon's claim against Indiegogo is barred under section 230(c)(1) of the CDA.  Section 230 was passed in order to "encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services."  47 U.S.C. § 230(b)(3).  Accordingly, section 230(c)(1) reads, in relevant part:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker

1   of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).

2       The Ninth Circuit has held that subsection (c)(1) protects from liability:  "(1) a provider or user of

3   an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a

4   publisher or speaker (3) of information provided by another information content provider."  *Barnes v.*

5   *Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  The court further explained that in considering

6   whether a cause of action seeks to treat the defendant as a publisher or speaker of information provided

7   by another, "what matters is not the name of the cause of action – defamation versus negligence versus

8   intentional infliction of emotional distress – what matters is whether the cause of action inherently

9   requires the court to treat the defendant as the 'publisher or speaker' of content provided by another.  To

10  put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated

11  derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1)

12  precludes liability."  *Id.* at 1101-02.

13      Carreon's claim against Indiegogo easily falls within section 230(c)(1) immunity.  Indiegogo

14  operates a service that "provid[es] third parties with neutral tools to create web content," which is

15  "squarely within the protections of § 230."  *Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490,

16  at *3 (N.D. Cal. Dec. 17, 2008).  And *all* of Carreon's allegations treat Indiegogo *solely* as the neutral

17  publisher or speaker of content provided by Inman.  The First Amended Complaint admits that the

18  BearLove campaign was "initiated" by Inman and published by Indiegogo.  (Dkt. 12, ¶ 49.)  There is no

19  allegation that Indiegogo contributed in any way to the content or substance of the BearLove campaign,

20  or that Indiegogo did *anything* but publish Inman's campaign (as it would any other user's) and then

21  decline to remove it.

22      Moreover, each of Carreon's purported statutory rights of action depends on Indiegogo's status as

23  the publisher or speaker of content provided by Inman.  Carreon's claim under California Business &

24  Professions Code § 17500 (the false advertising statute) is that Indiegogo "ma[de] or disseminate[d] . . .

25  over the Internet, [a] statement . . .which . . . by the exercise of reasonable care should be known, to be

26  untrue or misleading . . . with the intent not to sell . . . those services . . . as so advertised."  (*Id.*, ¶ 52.)

27  The statement in question is indisputably Inman's; Indiegogo only published it.  The statement that

28  allegedly "represented to all prospective donors that the NWF and the ACS would be recipients of the

1   Charitable Fund," supposedly made in violation of Cal. Government Code § 12599(f), was likewise

2   authored by Inman.  (*Id.*, ¶¶ 54, 61.)  And Carreon's allegations that Indiegogo failed to register or make

3   disclosures under other sections of § 12599 likewise treat Indiegogo as the publisher of information

4   provided by Inman, since they arise out of *Inman*'s statements that he was soliciting money for charity.

5   (*Id.*, ¶¶ 28-30.)

6        Carreon may not avoid § 230 by recharacterizing Indiegogo's conduct as a breach of some

7   independent statutory duty.  So long as his claim *ultimately seeks to hold Indiegogo responsible for*

8   *publishing content originating with Inman*, it is barred.  *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816,

9   831 (2002) (declining to hold eBay liable under a statute regulating the sale of collectible memorabilia

10  because the allegations "ultimately seek to hold eBay responsible for . . . dissemination of representations

11  made by the individual defendants" who posted eBay auctions, placing the case within the ambit of

12  section 230); *Goddard*, 2008 WL 5245490, at *3, 5 (dismissing claims against Google's AdWords

13  program for various statutory and common law violations because "Plaintiff claim[ed] in essence that she

14  was harmed because Google hosted certain online content.").  And that is precisely what Carreon is

15  attempting to do.

16        Because the nature of Carreon's allegations against Indiegogo make this a clear case for § 230

17  immunity, Carreon cannot demonstrate the likelihood of success on the merits – or even serious

18  questions going to the merits – and his application for a TRO should be denied.

19              **2.    No Private Right of Action Under the California Supervision of Trustees and**
                 **Fundraisers for Charitable Purposes Act.**
20

21        To the extent Carreon's claim against Indiegogo is based on the Supervision of Trustees and

22  Fundraisers for Charitable Purposes Act, Cal. Government Code sections 12580 *et seq.*, that claim is

23  barred because the statute does not create a private right of action, and Carreon has no standing to sue for

24  its violation.  The statute establishes a scheme for supervision of charitable fundraisers *by the Attorney*

25  *General*, and prescribes penalties that it envisions will be sought by the Attorney General – not by a

26  private party.  For this additional reason, Carreon cannot demonstrate a likelihood of success on the

27  merits, and his TRO application should be denied.

28        "[A] statute creates a private right of action only if the statutory language or legislative history

affirmatively indicates such an intent" – either explicitly expressed, or strongly implied.  *Farmers Ins. Exch. v. Superior Court*, 137 Cal. App. 4th 842, 851 (2006).  If a statute provides a comprehensive scheme for enforcement by an administrative agency, and does not mention a private right of action, that is a strong indication that the legislature did not intend to create a private right to sue for its violation.  *Id.* For example, the California Supreme Court has held that section 790.03 of the insurance code, which prohibits various unfair practices by insurers (including misrepresentations to the public), did not create a private right of action, despite a provision stating that actions by the Insurance Commissioner did not "relieve or absolve" an insurer from "any civil liability or criminal penalty under the laws of this State arising out of [the prohibited unfair practices]."  *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287, 294, 304-305 (1988).  The court found no indication of legislative intent to create a private right to sue under the statute, particularly in light of its extensive provisions for administrative enforcement, and noted that traditional common law tort remedies remained available to plaintiffs in the appropriate circumstances.  *Id.* at 304-05.

The California Supervision of Trustees and Fundraisers for Charitable Purposes Act is Article 7 in the chapter of the California Government Code entitled "Attorney General."  It applies to various charitable corporations, trustees, fundraisers, and other organizations "over which the state or the Attorney General has enforcement or supervisory powers."  Cal. Government Code § 12581.  The statute requires the Attorney General to "establish and maintain a register" of such organizations, § 12584, allows the Attorney General to make rules and regulations concerning registration and reporting by such organizations, *Id.* §§12585-86 and 12587, and prescribes a schedule of fines and penalties for violations "to be used by the Department of Justice solely for the administration of the Attorney General's charitable trust enforcement responsibilities."  *Id.*  §§ 12586.2, 12591.1.  The statute states that "[t]he *Attorney General* may institute appropriate proceedings to secure compliance with this article and to invoke the jurisdiction of the Court."  *Id.*  § 12591.1.  The statute further notes that "[t]he primary responsibility for supervising charitable trusts in California, for ensuring compliance with trusts and articles of incorporation, and for protection of assets held by charitable trusts and public benefit corporations, resides in the Attorney General," and goes on to discuss the Attorney General's right to file enforcement actions and recover fees and costs.  *Id.*  § 12598.  It references "any case where *the Attorney*

14

*General has authority to institute an action or proceeding under this article*," noting that the Attorney General may accept an assurance of voluntary compliance, and states that "[a]ny action brought *by the Attorney General* under the statute may be brought within 10 years of the cause of action having accrued. *Id.* § 12596.

*Nowhere* amidst the lengthy discussion of the Attorney General's regulatory and enforcement powers does the Supervision of Trustees and Fundraisers for Charitable Purposes Act mention a private right to sue. Nor is there any mention of such a right in the legislative history, which makes clear that the bill was discussed in the context of expanding the Attorney General's ability to oversee registered charities. *See, e.g.,* California Bill Analysis, Senate Floor, 1997-1998 Regular Session, A.B. 1810 Sen., (July 28, 1998).

From Carreon's First Amended Complaint, it appears that he relies on two portions of the statute to imply a private right of action. Carreon cites section 12591, which – *after* noting that "[t]he Attorney General may institute appropriate proceedings to secure compliance with this article and to invoke the jurisdiction of the Court" – states that:

> Nothing in this article shall impair or restrict the jurisdiction of any court with respect to any of the matters covered by it, except that no court shall have jurisdiction to modify or terminate any trust of property for charitable purposes unless the Attorney general is a party to the proceedings.

(Dkt. 12, ¶ 6.) This language addresses only jurisdiction and says nothing about a private right to sue. It is consistent with the California Supreme Court's holding in *Moradi-Shalal* that where a statute does not create a private right of action, traditional common law remedies for the underlying acts that violate the statute may still be available when their requirements are met. *Moradi-Shalal*, 46 Cal. 3d at 304-305. But it is not the expressed or strongly implied intent to create a private right of action that the law would require to enable Carreon to sue under the statute.

The First Amended Complaint also appears to rely on the portion of § 12599(f) that provides that "failure to comply with [the] registration or annual renewal and financial reporting requirements [prescribed for commercial fundraisers] shall be grounds for injunction against solicitation in this state for charitable purposes and other civil remedies provided by law." (Dkt. 12, ¶ 22.) This likewise cannot be read as intending to create a private right of action in light of the clear statements elsewhere in the

15

DEF INDIEGOGO, INC'S OPP TO PLTF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION / CASE NO. 3:12-CV-03112-EMC

statute that it is the *Attorney General* who is empowered to enforce this law in the courts.

Carreon cites three cases holding that a party with a "sufficient special interest" in a charitable trust may sue to enforce its terms. *Holt v. College of Osteopathic Physicians and Surgeons*, 61 Cal.2d 750, 754 (1964); *L.B. Research & Education v. UCLA Foundation*, 130 Cal.App.4th 171, 176 (2005); *San Diego Etc. Boy Scouts of America v. City of Escondido*, 14 Cal.App.3d 189, 194 (1971). This law is inapposite. In *Holt* and *San Diego Etc.*, the plaintiffs were trustees with claims to the property. *Holt*, 61 Cal. 2d at 752-53; *San Diego Etc. Boy Scouts of America*, 14 Cal.App.3d at 192. If those cases are relevant to this situation at all, they are relevant to the question whether the National Wildlife Fund or the American Cancer Society could sue for its share of the BearLove Campaign's proceeds; they do not support the contention that *Carreon* may do so. In *L.B. Research*, the Plaintiff donor was found to have standing to sue to enforce the terms of the trust because the recipient had accepted the funds subject to certain conditions. *L.B. Research & Education*, 130 Cal.App.4th at 179-81. Here, Carreon's only interest in the BearLove campaign is a $10 contribution, given free of any conditions whatsoever.

Even more to the point, the lawsuits in those cases were filed to *enforce the terms* of a charitable trust – not for purported violations of a regulatory statute by failing to register, make disclosures to the Attorney General, and the like. The Courts held that interested private parties as well as the Attorney General may bring a claim to enforce a charitable trust. The claim against Indiegogo recited in Carreon's amended complaint is not for enforcement of a charitable trust, however, but rather for the "imposition" of a charitable trust, on the ground that several sections of the California Supervision of Trustees and Fundraisers for Charitable Purposes Act had allegedly been violated. There is no support for the notion that a private party may bring such an action.[10]

In short, there is *no* indication that the California legislature intended to create a private right to sue for violations of the California Supervision of Trustees and Fundraisers for Charitable Purposes Act, which entrusts its enforcement to the Attorney General. Carreon thus has no standing to sue for any violations of that statute. This is another reason why Carreon cannot show a likelihood of success on the

---

[10] Indiegogo does not concede that the funds raised by Inman are in fact a "charitable trust," that Inman or Indiegogo are covered by charitable fundraising laws, or that any fiduciary duty is owed to the contributors to the BearLove campaign; these questions need not be answered to dispose of Inman's application.

merits here.

### D.     The Balance of Equities Favors Indiegogo.

As discussed above, the denial of a preliminary injunction in this case will not cause Carreon any harm, much less irreparable harm.  His $10 has been donated to charity, less his portion of Indiegogo's processing fee, under precisely those terms under which he made his contribution.  By contrast, should an injunction be granted, Indiegogo would be forced to violate its terms and conditions by not disbursing the campaign funds on the schedule set forth therein.  Indiegogo's reputation with its users and the public will also be put at risk. The balance of equities does not favor an injunction.

### E.     The Public Interest Does Not Favor an Injunction.

An injunction is not needed to "preserve a fund for a charitable purpose, and prevent it from being diverted to private purposes," as Carreon suggests.  (TRO at 10.)  This case has little to do with preserving anything for a charitable purpose.  Instead, it stems from a personal dispute between Carreon and Inman, and perhaps some ill-behaved readers of Inman's "Oatmeal" website.  Carreon is using that dispute to attempt to interfere with a charitable fundraiser that has raised over $200,000 for unquestionably good causes, in the process embroiling three innocent co-defendants – including two charities – in expensive litigation in federal court.  The public interest cannot favor expending judicial resources to issue and enforce and injunction in a case like this.  Carreon's application for a TRO should be denied.

## V.     CONCLUSION

Indiegogo respectfully requests that the Court deny Carreon's request for a TRO and an order to show cause re preliminary injunction.

Dated:  July 1, 2012                                    DURIE TANGRI LLP


                                                        By: */s/ Eugene Novikov*
                                                            EUGENE NOVIKOV

                                                        Attorneys for Defendant
                                                        INDIEGOGO, INC.