Kurt Opsahl (SBN 191303)
*kurt@eff.org*
Matthew Zimmerman (SBN 212423)
*mattz@eff.org*
Corynne McSherry (SBN 221504)
*corynne@eff.org*
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Venkat Balasubramani (SBN 189192)
*venkat@focallaw.com*
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827
Facsimile: (206) 260-3966

Attorneys for Defendant Matthew Inman

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHARLES CARREON,<br><br>        Plaintiff,<br><br>    v.<br><br>MATTHEW INMAN, INDIEGOGO, INC., NATIONAL WILDLIFE FEDERATION, AND AMERICAN CANCER SOCIETY, and Does 1 – 100,<br>        Defendants,<br><br>    and<br><br>KAMALA HARRIS, Attorney General of the State of California,<br><br>    A Person To Be Joined If<br>    Feasible Under Fed. R. Civ. P. 19 | Case No.: 12-cv-3112-EMC<br><br>**DEFENDANT MATTHEW INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date: TBD<br>Time: TBD<br>Courtroom: 5 – 17th Floor<br>Judge: Hon. Edward M. Chen |

# TABLE OF CONTENTS

I.     INTRODUCTION...........................................................................................................1

II.    STATEMENT OF FACTS ...........................................................................................2

       A.    Background .......................................................................................................2

       B.    The Lawsuit ......................................................................................................6

III.   ARGUMENT .................................................................................................................7

       A.    Mr. Carreon is Not Likely to Succeed on the Merits. .................................7

             1.    The First Amendment Fully Protects Mr. Inman's Fundraising Campaign ...........8

                   (a)    Mr. Inman is Engaged in Non-Commercial Speech .......................................9

                   (b)    Mr. Inman's BLGCB Campaign is Protected Speech .................................9

             2.    Mr. Carreon's Section 17500 Claim Also Fails as a Matter of Law....................11

                   (a)    Mr. Inman is Not a Commercial Fundraiser .................................................11

                   (b)    Mr. Inman Did Not Make Any Misrepresentations .....................................12

                   (c)    Mr. Carreon's Donation Does Not Give Him an Injury in Fact Necessary
                          for a Section 17500 Claim .....................................................................15

             3.    Mr. Carreon Does Not Have Standing to Assert a Violation of Government
                   Code 12599. ..............................................................................................16

       B.    Mr. Carreon Is Not Likely To Suffer Irreparable Harm In The Absence Of
             Preliminary Relief ........................................................................................19

             1.    Possibility of Harm is Not Sufficient .............................................................20

             2.    Mr. Carreon Has Only a Financial Injury ........................................................21

             3.    An Injunction is Not an Available Remedy ......................................................21

       C.    The Balance of Equities Tips in Mr. Inman's Favor......................................22

       D.    An Injunction Is Not In The Public Interest...................................................23

       E.    Mr. Carreon is Required to Obtain a Bond....................................................23

IV.    CONCLUSION ............................................................................................................23

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 12

*Bridges v. California*,
   314 U.S. 252 (1941) ................................................................................................. 9

*Campbell Soup Co. v. ConAgra, Inc.*,
   977 F.2d 86 (3d Cir. 1992) .................................................................................... 21

*Cohen v. California*,
   403 U.S. 15 (1971) ................................................................................................ 10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) ................................................................................................. 9

*Dworkin v. Hustler Magazine*,
   867 F. 2d 1188 (9th Cir. 1989) .............................................................................. 10

*eBay, Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) .............................................................................................. 21

*Goldie's Bookstore, Inc. v. Superior Court*,
   739 F.2d 466 (9th Cir. 1984) ................................................................................. 21

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988) ............................................................................................ 10, 11

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003) .............................................................................................. 15

*Los Angeles Memorial Coliseum Comm'n v. NFL*,
   634 F.2d 1197 (9th Cir. 1980) ......................................................................... 21, 22

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) .......................................................................................... 10, 11

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ................................................................................. 21

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.*,
   487 U.S. 781 (1988) ............................................................................................ 9, 15

*Sammartano v. First Judicial Dist. Ct.*,
   303 F.3d 959 (9th Cir. 2002) ................................................................................. 22

ii

*United States v. Assoc'd Press*,
    52 F. Supp. 362 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1 (1945)................................. 11

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ................................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 7, 20, 23

**STATE CASES**

*Colgan v. Leatherman Tool Group, Inc.*,
    135 Cal. App. 4th 663 (2006)....................................................................... 22

*Farmers Ins. Exch. v. Superior Court*,
    137 Cal. App. 4th 842 (2006)....................................................................... 17

*Hardman v. Feinstein*,
    195 Cal. App. 3d 157 (1987) ........................................................................ 18

*Holt v. College of Osteopathic Physicians & Surgeons*,
    61 Cal. 2d 750 (1964).......................................................................... 17, 18

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ....................................................................... 16, 21

*Kasky v. Nike, Inc.*,
    45 P.3d 243 (Cal. 2002).............................................................................. 9

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011)............................................................................. 16

*L.B. Research & Education Foundation v. UCLA Foundation*,
    130 Cal. App. 4th 171 (2005)....................................................................... 18

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993).............................................................................. 16

*Patton v. Sherwood*,
    152 Cal. App. 4th 339 (2007)....................................................................... 18

*San Diego etc. Boy Scouts of America v. City of Escondido*,
    14 Cal. App. 3d 189 (1971) ......................................................................... 18

iii

1

**STATE STATUTES**

2
California Business & Professions Code § 17535 .................................................... 16, 21

3
California Business & Professions Code § 17500 .................................................... *passim*

4
California Civil Code § 3515 ....................................................................... 16

5
California Government Code §§ 12580, *et seq*. ............................................... 17

6
California Government Code § 12599 ........................................................ *passim*

7

**FEDERAL RULE**

8

9
Federal Rules of Civil Procedure, Rule 65 ................................................... 7, 23

10

**CONSTITUTIONAL PROVISION**

11

U.S. Const. amend I ...................................................................... *passim*

12

**LEGISLATIVE MATERIAL**

13

California Bill Analysis, Senate Floor, 1997-1998 Regular Session, California Bill Analysis,
14    A.B. 1810 Sen., 7/28/1998 ..................................................... 17

15

**OTHER AUTHORITIES**

16

California Attorney General *Guide for Charities* (1999) ................................... 9

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiff Charles Carreon's application for a temporary restraining order ("Application") is notable as much for its lack of context as its lack of merit.  This case is not about false advertising or the laws regulating commercial fundraisers.  This case, and this Application, is nothing more than Mr. Carreon's blatant – and baseless – attempt to retaliate against a critic with whom he is engaged in a very public dispute.

The dispute can be summarized as follows: Defendant Matthew Inman creates and publishes a popular web-comic.  Last year, he publicly complained about some of his copyrighted works finding their way onto FunnyJunk, an online content aggregation website.  Earlier this month, Mr. Carreon, an attorney who represents FunnyJunk, served Mr. Inman with a cease and desist letter claiming that Mr. Inman's comments were "defamatory" and demanding $20,000 in damages.  Mr. Inman chose to resist that legal pressure.  He published a comic and blog post criticizing the letter and asked his online readers to help him raise the amount demanded, which he promised to give to charity rather than FunnyJunk.  His purpose was clear: to publicly challenge the legal threat against him and benefit two good causes along the way. He did not claim to be endorsed by the charities.  He did not assure readers their donations would be tax-deductible. He did not claim to be registered with any state body.

The campaign was enormously successful, meeting its goal in just over an hour and then wildly surpassing it. When the campaign closed, thousands of contributors had provided over $220,000. Much of that money has already been sent to the American Cancer Society and the National Wildlife Federation.  If Mr. Inman is not enjoined from proceeding, the remaining funds will be promptly delivered to the charities, as Mr. Inman has always intended.

The only thing standing in the way of completing the donation is Mr. Carreon.  But rather than responding appropriately to Mr. Inman's criticism – *e.g.*, speaking out himself  – he has decided to punish Mr. Inman by hauling him into court, no matter the consequences for the two charities that could doubtless put the funds to good use.  Having donated a nominal amount ($10 out of the $220,024 raised by Mr. Inman's campaign), Mr. Carreon seeks to unnecessarily inject himself into the donation process, wasting the resources of this Court and the parties, and claim

1

INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER

control over the destiny of the funds. In the process, Mr. Carreon seeks to interfere with Mr. Inman's core First Amendment-protected speech.

The Court should put a stop to such gamesmanship, beginning with the instant Application. As explained in detail below, Mr. Carreon has not met and cannot meet the exacting standard for a temporary restraining order. His claims are meritless, he faces no irreparable harm, the balance of equities favors Mr. Inman and the public interest and Mr. Inman's First Amendment rights would be thwarted by an injunction. Mr. Carreon's application should be denied.

## II.     STATEMENT OF FACTS

### A.     Background

Matthew Inman is the creator and cartoonist of *The Oatmeal*, a popular and well reviewed web-comic that comments on issues of current public interest as well as an eclectic mix of topics, such as cats, grammar, food, animals and technology. (Inman Decl., ¶¶ 2-10 and Exs. A-E; *see generally* The Oatmeal, http://theoatmeal.com; *see also* Wikipedia, The Oatmeal, http://en.wikipedia.org/ wiki/The_Oatmeal (last visited June 28, 2012)).

On or about May 25th, 2011, *The Oatmeal* published a blog post expressing Mr. Inman's concerns about a website called FunnyJunk (http://funnyjunk.com). (Inman Decl. ¶ 11) Mr. Inman was upset because he "found a handful of [his] comics uploaded on their site with no credit or link back to [him]." (Inman Decl. Ex. F). Mr. Inman's post included examples and screenshots showing that his comics had been posted on the FunnyJunk site. *Id.* ¶¶ 12-13. In the blog post, he noted the option of sending a cease and desist letter, but decided instead to use his blog as a bully pulpit to criticize FunnyJunk, its apparent business model, and that of other "aggregation" sites. *Id.* ¶ 14. The post received a response from FunnyJunk and some media attention, and then the dispute appeared to be over. *Id.* ¶ 15-16; *see also*, Nate Anderson, *The Oatmeal vs. FunnyJunk: webcomic copyright fight gets personal*, Ars Technica (June 6, 2011) (Opsahl Decl., Exhibit Ex. B).

It was not. On the evening of Sunday June 3, 2012, around dinner time, Mr. Inman answered the door of his Seattle apartment to find a process server with a cease and desist letter from Funnyjunk LLC, the owner of the FunnyJunk website, written by their attorney, Plaintiff Charles Carreon. (Inman Decl. ¶ 17-18 and Ex. G); *see also The Oatmeal* blog, FunnyJunk Letter,

2

1   available at http://theoatmeal.com/blog/funnyjunk_letter.  (*Id*. Ex. I).  FunnyJunk accused Mr.

2   Inman of defamation and false advertising under the Lanham Act because he had (correctly) said

3   his comics were on the FunnyJunk site. (*Id*. Ex. G).  Indeed, hundreds of *The Oatmeal* comics were

4   still on the FunnyJunk site—without authorization, credit or a link—at the time Mr. Carreon had

5   the letter served on Mr. Inman. (*Id*. ¶ 21).[1]

6        Relying upon false statements of fact and aggressive misinterpretations of the law, Mr.

7   Carreon's initial letter demanded that Mr. Inman remove all mention of FunnyJunk from his

8   website and pay FunnyJunk $20,000.  (Inman Decl. ¶ 19 and Ex. G).  If he were to abide by the

9   FunnyJunk letter's demands, Mr. Inman could not even write "I received a letter from FunnyJunk

10  today" or "FunnyJunk isn't nice."  While Mr. Inman was not intimidated by this legal threat, he

11  was understandably outraged by the baseless attempt to censor his speech and extract monetary

12  damages.  (*Id*. ¶¶ 20-24).

13       Instead of acceding to the improper legal threat, Mr. Inman used his comic forum to publish

14  a humorous and creative response.[2]  (*Id*. ¶¶ 25–27, Ex. I).[3]  Specifically, Mr. Inman stated that he

15  would try to turn a negative situation into a positive one by (1) encouraging readers who agreed the

16  demand was frivolous to help him raise $20,000 in donations; (2) photographing the money

17  collected; (3) sending the photograph to FunnyJunk along with a comic; and (4) donating the

18  money collected to the National Wildlife Federation and the American Cancer Society.  (*Id*. ¶ 28).

19  Mr. Inman called the campaign "Operation BearLove Good, Cancer Bad" (BLGCB).  *Id*.  Mr.

20

21  1 Mr. Carreon later admitted in an interview with a Seattle newspaper that "If I had known [that all
    The Oatmeal comics had not been taken off the FunnyJunk site] no demand would have gone out."
22  Danny Bradbury, *Win, Lose or Draw*, The Stranger (June 19, 2012) (Opsahl Decl. Ex. D); *see also*
    Danny Bradbury, *The Oatmeal beat Funnyjunk, but other cartoonists aren't so lucky*, The Guardian
23  (June 21, 2012) (Opsahl Decl., Exhibit E) ("Carreon has now effectively abandoned the threat of a
    FunnyJunk lawsuit, stating that he was misinformed by his client.").
24
25  2 In addition, Mr. Inman's counsel responded to FunnyJunk with a letter explaining the deficiencies
    in the FunnyJunk cease and desist letter. (Inman Decl. ¶ 23, Ex. H).

26  3 While Mr. Carreon included Mr. Inman's full response to his cease and desist letter in the original
    complaint (Compl. Ex. A (Dkt. 1-1), starting at p. 4), it is omitted from the First Amended
27  Complaint (Dkt. 12), and a partial version of it is misleadingly inserted into his declaration's
    (Dkt. 20-2) exhibits.  (Carreon Decl. Ex. B (Dkt. 20-3), pp. 2-3).
28

No.: 12-cv-3112-EMC      INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER

1  Inman's response to the cease and desist generated thousands of comments, and was wildly popular

2  on social media, with over 9,000 Tweets on the Twitter social media service, almost 3,000 "Plus

3  Ones" on Google's G+ social media service and over 56,000 "Likes" on Facebook.  Compl. Ex. A

4  at 13.

5      To put the plan into action, Inman turned to Indiegogo, a crowd-funding website. (Inman

6  Decl. ¶ 30); *see generally* Indiegogo, *About: Our Story*, http://www.indiegogo.com/about/our-story

7  (last visited June 28, 2012).  On the BLGCB campaign page, Mr. Inman explained the background,

8  and invited people to donate as an expression of their criticism of the FunnyJunk cease and desist,

9  writing "I'm hoping that philanthropy trumps douchebaggery and greed." (Compl. Ex. A at 2;

10  Carreon Decl., Ex. B).

11      The BLGCB campaign, celebrating that a target of a frivolous cease and desist threat stood

12  up to its bully despite the prospect of expensive litigation, apparently touched a nerve online. The

13  campaign page shows twelve thousand "Likes" on Facebook, almost two thousand tweets on

14  Twitter, and almost a thousand "Plus Ones" on Google's G-Plus social networking service. First

15  Am. Compl. (Dkt. 12) Ex. B at 1. The original goal of $20,000 was reached in 64 minutes.  (Inman

16  Decl. ¶ 32); *see also* BLGCB Campaign Updates (First Am. Compl., Ex. C). The campaign was

17  widely covered in the media, and recognized as a poignant and effective criticism of the use of

18  abusive and censorious cease and desist letters and the legal system as a whole.  Indeed, many saw

19  the BLGCB campaign as a way to express their disdain for a system that allows companies like

20  FunnyJunk to hire attorneys and threaten others into silence with bogus legal threats, backed by the

21  prospect of an expensive defense. *See, e.g.*, Nate Anderson, *Lawyer demands $20,000, so*

22  *webcomic raises $100,000 from the Internet*, Ars Technica (June 12, 2012) (Opsahl Decl., Ex. H);

23  Mary Elizabeth Williams, *Internet shocker: Kindness wins; When an online feud turned into a*

24  *demand for money, something amazing happened – generosity,* Salon (June 12, 2012) (*id*., Ex. I)

25  (opining "[b]ut Inman really jumped into online sainthood territory this week when he threw it

26  down against FunnyJunk and its ridiculous attempt to extract a cool 20 grand from him"); *Rosa*

27  *Golijan, Cartoonist turns lawsuit threat into $100K charity fundraiser, MSNBC Digital Life on*

28  *Today* (June 12, 2012) (*id.* at Ex. J); Chris Matyszczyk, *Can charity squash frivolous lawsuits?,*

4

CNET News (June 12, 2012) (*id*. at Ex. K) (using Inman's example to ask "What if the law suddenly declared that if an amount was raised for charity, such lawsuits could not proceed? Yes, I know I am dreaming, but it's a pleasantly fanciful alternative for justice. Currently, it does seem that those with money and power often prevail."); Ken White, *Hey, Did Somebody Say Something Was Going On With The Oatmeal?,* Popehat Blog (June 12, 2012) (*id*. at Ex. L) (opining that "The Oatmeal has responded to the legal threat in stand-up-and-cheer fashion. Go read it" and collecting others' opinions)).

Although many saw the BLGCB campaign as a triumph for philanthropy and an important critique of the problem of abusive legal threats, Mr. Carreon did not. While the campaign was running, Mr. Carreon made public statements to the effect that he believed the campaign was improper, and that he would try to put a stop to it. While he never made his motivations fully clear, he intimated in an interview that he believed the campaign's method of poking fun at the demand letter somehow violated his rights. David Their, *Funnyjunk Lawyer Charles Carreon Isn't Afraid of The Oatmeal*, Forbes (June 15, 2012) (Opsahl Decl. Ex. G; Inman Decl. Ex. K). This news report had the following summary of Mr. Carreon's comments:

> He compares Inman's charity campaign to when people would sell tickets to throw balls at women being accused of witches in a dunking tank. Money for charity is raised, of course, but the witches aren't in on it.

*Id.*

Mr. Carreon then attempted to shut down Mr. Inman's criticism campaign, by complaining to Indiegogo. (First Am. Compl. ¶ 44); *see also* Casey Johnston, *Lawyer tries and fails to shut down The Oatmeal's charitable fundraiser,* Ars Technica, (June 15, 2012) (Opsahl Decl. Ex. M). That effort backfired, prompting more media attention. First Am. Compl. ¶ 44 (alleging "Indeed, as news of [Mr. Carreon's] efforts to 'block charity' hit the Internet, the negative spin went wild, and [Mr. Carreon] was excoriated . . ."); *see generally* Cyrus Farivar, *The Internet's most hated man*, Ars Technica (June 21, 2012) (Opsahl Decl. Ex. N).

He was not successful. By the time the campaign ended on June 25, 2012, a total of 14,407 people had participated in the campaign, raising $220,024. (Inman Decl. ¶¶ 39–41); *see also* Operation BLGCB, http://www.indiegogo.com/bearlovegood (last visited June 28, 2012) (Carreon

5

1   Decl. Ex. B).  In addition, BLGCB generated almost 7,000 comments.  (Inman Decl. ¶ 42).  Most

2   of these comments expressed support for the expressive elements of the BLGCB campaign.  *Id.*

3   Minus the four percent retained by Indiegogo ($8,000.96), and an estimated three percent

4   processing fee paid to third parties ($6,600.72), the total money going to charity became

5   $204,622.32.  Email from Indiegogo to Matthew Inman (June 27, 2012) (Inman Decl. Ex. M). Of

6   this amount, Indiegogo held $95,675.68 and the remainder ($108,946.64) remained in Mr. Inman's

7   PayPal account.  *Id*. Mr. Inman has asked Indiegogo to send the funds held by them directly to the

8   American Cancer Society and the National Wildlife Federation (divided in equal parts), and

9   understands that they have already done so.  Inman Decl., ¶ 40. For the funds processed by PayPal,

10  Mr. Inman has written a check to each charity ($54,473.32 each), and given these checks to his

11  counsel to forward to the American Cancer Society and the National Wildlife Federation.

12  Unwilling to allow Mr. Carreon to thwart his expressive activity, Mr. Inman photographed the

13  appropriate amount using his own money.  (Inman Decl., ¶ 38).

14  **B.      The Lawsuit**

15  On June 15, 2012, Mr. Carreon filed a lawsuit seeking to seize control over the fate of the

16  money raised  (placing the money in a charitable trust) and accusing Mr. Inman of orchestrating a

17  series of perceived attacks on Mr. Carreon and his personal website.  *See* Complaint (Dkt. 1).  On

18  June 25, 2012, he amended his Complaint, removing his spurious claims for "incitement to

19  cybervandalism" against Mr. Inman, as well as some of the false allegations that he leveled against

20  Mr. Inman without any factual basis or reasonable investigation.  *See* First. Am. Compl. (Dkt. 12).

21  FunnyJunk has not filed a lawsuit over its original dispute with Mr. Inman, and has not appeared or

22  indicated that it has any interest in this case.

23  On Tuesday, June 26, 2012, Mr. Carreon provided email notice of his intent to file an

24  application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary

25  Injunction.  Mr. Carreon emailed a copy of the Application and accompanying documents to Mr.

26

27

28

6

1    Inman's counsel on the evening of Thursday June 28, 2012, and a revised version a few hours later.

2    The Application (Dkt. 20) was filed on June 30, 2012.[4]

3    **III.     ARGUMENT**

4        A temporary restraining order may be issued only if "immediate and irreparable injury,

5    loss, or damage will result to the applicant" if the order does not issue.  Fed. R. Civ. P. 65(b).  To

6    obtain a temporary restraining order, Mr. Carreon "must establish [1] that he is likely to succeed on

7    the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

8    [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

9    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

10       As explained in detail below, Mr. Carreon's Application fails on each count.  He is not

11   likely to succeed on the merits, he is not likely to suffer irreparable harm, the balance of equities

12   tips in favor of Mr. Inman, and the injunction is not in the public interest.  Accordingly, his

13   Application for a TRO must be denied.

14       **A.     Mr. Carreon is Not Likely to Succeed on the Merits**

15       Mr. Carreon is not likely to succeed on the merits because Mr. Inman's fundraising

16   campaign is fully protected by the First Amendment, and because Mr. Carreon's false advertising

17   claim under Section 17500 of the California Business & Professions Code fails as a matter of law.

18       The Application is based upon the First Cause of Action in the First Amended Complaint–

19   a false advertising claim under Section 17500.  In his Application, Mr. Carreon focuses primarily

20   on his incorrect contention that Mr. Inman is a commercial fundraiser, and therefore subject to

21   various regulations.  But the Court need not ignore what is truly at issue in this lawsuit: whether a

22   meritless Section 17500 claim may be used to interfere with protected speech.  The answer, of

23   course, must be no.

24

25

26

27   _____

     [4] Mr. Carreon has moved to have the Application deemed filed as of June 28, 2012 (*see* Dkt. 21),

28   due to ECF being offline in the interim.

No.: 12-cv-3112-EMC     INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
                        A TEMPORARY RESTRAINING ORDER

1

### 1.   The First Amendment Fully Protects Mr. Inman's Fundraising Campaign

2      The gravamen of Mr. Carreon's First Cause of Action is that the BLGCB fundraising

3  campaign is unlawful based on its content, both because of what was said (expressive speech

4  criticizing FunnyJunk and Mr. Carreon) (First Am. Compl. ¶¶ 38, 40, 42-46, 50; *see also* Carreon

5  Decl. ¶ 7) and what was not (the alleged implied misrepresentations to prospective donors) (*id.*

6  ¶¶ 53-56; *see also* Mem. P&A (Dkt. 20-1) at 7).  Mr. Carreon contends that the BLGCB campaign

7  is unlawful because Mr. Inman allegedly (1) "is not a fit person to design and administer charity

8  fundraising" (due to some of his prior statements) (*id.* ¶ 34), (2) wanted to "induce donors to make

9  donations to the NWF and ACS to express in approval [sic] of Inman's hate campaign against

10  Plaintiff" (*id.* ¶ 40), (3) launched the campaign to "utilize Indiegogo's Internet mass-

11  communication tools to revile Inman's legal adversaries" (*id.* ¶ 41) and (4) has a "wrongful,

12  uncharitable motive" (*id.* ¶ 43). The Application echoes these aspersions, claiming, for example,

13  that Mr. Inman's "desire to engage in showboating with the proceeds does not demonstrate the

14  sober, responsible attitude appropriate to the trustee of a charitable fund."  Mem. P&A at 9.

15      In his Application for a TRO, Mr. Carreon attempts to disguise his attack on free speech by

16  focusing on various (inapplicable) regulations.  But his true intent is clear.  For example, he rails

17  against Mr. Inman's plan to take a photo of the money raised.  (*See* Mem. P&A at 3, 9, 10).

18  Showing a photo of a huge pile of money going to charity in lieu of paying off a bogus threat was a

19  key part of the expressive First Amendment protected activity that was a core part of the plan, and

20  something that Mr. Inman made clear to all the funders.  Yet if Mr. Carreon had his way, he would

21  prevent the "publicity stunt," which Mr. Inman said he planned from the beginning of the

22  campaign, from occurring.[5]  This is a curious thing to seek when purporting to act for the interests

23  of the other funders.

24

25

26

_____

27  [5] Mr. Inman refuses to be thwarted, and has taken a photo of the appropriate amount of his own
money.  (Inman Decl. at ¶ 38).  Nevertheless, the demand shows the true nature of Mr. Carreon's

28  Application for a TRO.

8

### (a)   Mr. Inman is Engaged in Non-Commercial Speech

Mr. Carreon's reliance on Section 17500 of the California Business and Professions Code is misplaced, because—for constitutional reasons—the false advertising law is focused on commercial speech: advertisements to "dispose of real or personal property or to perform services, professional or otherwise." Calif. Bus. & Prof. Code § 17500. As the Supreme Court has recognized, "charitable appeals for funds . . . involve a variety of speech interests – communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes – that are within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) ("Charitable solicitation of funds has been recognized by this Court as a form of protected speech."). Moreover, the Supreme Court noted that raising funds for charity "has not been dealt with in our cases as a variety of purely commercial speech." *Vill. of Schaumburg,* 444 U.S. at 632. According to the California Supreme Court, "charitable solicitations [are] a category of speech that does not fit within our limited-purpose definition of commercial speech because [they do] *not involve factual representations about a product or service* that is offered for sale." *Kasky v. Nike, Inc.,* 45 P.3d 243, 317 (Cal. 2002) (emphasis added) (citing *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 788 (1988)).

*Riley,* 487 U.S. at 788 is instructive. In *Riley,* the Supreme Court held that "charitable solicitations 'involve a variety of speech interests . . . that are within the protection of the First Amendment,' and therefore are not properly dealt with as 'purely commercial speech.'" *Riley,* 487 U.S. at 788 (quoting *Vill. of Schaumburg*, 444 U.S. at 632 (1980)). *Riley* struck down a North Carolina regulation of fundraisers, which required them to make certain disclosures.[6]

### (b)   Mr. Inman's BLGCB Campaign is Protected Speech

"[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste . . . ." *Bridges v. California*, 314 U.S. 252, 270 (1941). Mr. Inman's expression of his

---

[6] Gov. Code 12599, which is limited to fundraising for compensation, was passed in the wake of *Riley. See* California Attorney General *Guide for Charities* (1999) at 9, available at http://oag.ca.gov/sites/all/files/pdfs/charities/publications/99char1.pdf.

INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER

opinion of Mr. Carreon is protected speech, even if Mr. Inman communicates it in the form of a cartoon that is offensive and a fundraising campaign that is embarrassing (from Mr. Carreon's subjective viewpoint), because criticism may come in the form of "'vehement, caustic, and sometimes unpleasantly sharp attacks.'" *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988) (citation omitted) (holding that parody advertisement falsely implying that Reverend Jerry Falwell's 'first time' was incest with his mother in an outhouse was protected speech).

In particular, it does not change the analysis if the speech is designed to "revile Inman's legal adversaries" (First Am. Compl. ¶ 41; *see also* Carreon Decl. ¶ 7), because "threats of vilification or social ostracism" are protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 921 (1982) (citations omitted). Indeed, interpreting charitable contribution regulations to forbid "messages that, as alleged infra, are unsuitable vehicles for marketing charitable campaigns," (First Am. Compl. ¶ 12), as Mr. Carreon urges, would transform them into unconstitutional content-based speech restrictions. *See Dworkin v. Hustler Magazine*, 867 F. 2d 1188, 1199 (9th Cir. 1989) (collecting "[n]umerous cases" that "establish that speech may not be suppressed simply because it is offensive").

Likewise, the First Amendment does not permit the law to hold, as Mr. Carreon claims, that the phrase "Fuck Off" "cannot be lawfully associated with tax-exempt charitable solicitation in the State of California." (First Am. Compl. ¶ 43; *see also* Carreon Decl. ¶ 7). As Justice Harlan explained in *Cohen v. California*, 403 U.S. 15 (1971), "while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Id*. at 25 (holding that a man wearing a jacket bearing the phrase "Fuck the Draft" was engaged in protected speech).

The law must not interfere with Mr. Inman's choice of style or substance for his criticism of the FunnyJunk cease and desist letter, even if it is offensive to Mr. Carreon, because, as Judge Learned Hand wrote in 1943, "the First Amendment . . . presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative

10

1   selection.  To many this is, and always will be, folly; but we have staked upon it our all."  *United*

2   *States v. Assoc'd Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1 (1945).

3           Mr. Carreon's speculation that "Inman's methods of fundraising . . . will supplant the

4   wholesome impulse to benefit others," (First Am. Compl. ¶ 50) and incentivize charities to support

5   unpopular speech instead of his vision of pure motives (*id.* at ¶ 49(b)-(c)), also does not change the

6   analysis.  "Speech does not lose its protected character . . . simply because it may embarrass others

7   or coerce them into action."  *Hustler v. Falwell*, 485 U.S. at 55 (quoting *Claiborne Hardware Co.*,

8   458 U.S. at 910).

9           Accordingly, this attempt to penalize Mr. Inman for his criticism of FunnyJunk or Mr.

10  Carreon through the means of fundraising for charity is impermissible under the First Amendment.

11          **2.      Mr. Carreon's Section 17500 Claim Also Fails as a Matter of Law**

12          Even if Mr. Carreon's suit were not an obviously improper attack on free speech – which it

13  is – his claim still fails as a matter of law.

14                  **(a)      Mr. Inman is Not a Commercial Fundraiser**

15          Mr. Carreon's claim under Section 17500 suffers from a simple but fundamental flaw: Mr.

16  Inman is not a commercial fundraiser.  Without this foundation, Mr. Carreon's contrived claim

17  crumbles.

18          The false advertising claim does not identify a single specific false statement; rather it relies

19  upon a series of alleged implicit misrepresentations.  Mr. Carreon conjures up speculation of what

20  donors might think, and then claims these hypothetical expectations of funders are the result of

21  some misrepresentation on Mr. Inman's part.  These imagined misrepresentations flow in turn from

22  a central concept – that Mr. Inman was supposed to comply with California's law on commercial

23  charitable solicitations.  (Mem. P&A. 6; *see also* First Am. Compl. ¶¶ 18-33, 53, 60-62.)

24          Specifically, Mr. Carreon's claim in his First Cause of Action, and his legal basis for his

25  Application for a TRO, is premised on the notion that Mr. Inman implicitly represented that he

26  fulfilled obligations required of commercial fundraisers, or maintained the relationships that

27  fulfilling those obligations might imply, and yet did not.  (Mem. P&A 7; *see also* First Am. Compl.

28

11

¶ 53).  Thus, for Mr. Carreon's Application to prevail, he must show that Mr. Inman is a commercial fundraiser, subject to these regulations in the first place.

He cannot. The definition of a commercial fundraiser is limited to a person who acts "for compensation."  Calif. Gov. Code § 12599(a).  As the California Attorney General has explained, "[a] commercial fundraiser generally is a person or corporation *who is paid by a charity* to raise money on the charity's behalf."  State of California, *Charities > Commercial Fundraiser*, Department of Justice: Office of the Attorney General, http://oag.ca.gov/charities/cfr (last visited June 28, 2012); *see also* Edmund G. Brown Jr., California Attorney General's Guide for Charities, 26 (2005), *available at* http://ag.ca.gov/charities/publications/guide_for_charities.pdf  ("A few charities hire outside businesses to raise funds in the charity's name.  These businesses are called 'commercial fundraisers for charitable purposes.'").

Mr. Carreon has not and cannot allege, much less prove, that any charity hired Mr. Inman, paid him, or otherwise provided compensation to him.  Instead, Mr. Carreon simply alleges this bare conclusion in the First Amended Complaint, without supporting facts.  (First Am. Compl. ¶ 27; *see also* Mem. P&A 6).  As an initial matter, conclusory allegations may be ignored.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions . . . .").  Further, the Application does no more than assert, without citation to facts or law, that Mr. Inman and Indiegogo are "plainly acting as commercial fundraisers for charitable purposes."  Mem. P&A at 2; *see also id*. at 6 (quoting definition without analysis). Finally, Mr. Inman has stated, under oath, that he is not in fact receiving compensation, and was not hired or paid by any charity.  (Inman Decl. ¶ 43-45).

Because Mr. Inman is not a commercial fundraiser, Mr. Carreon loses the keystone that supports his claim to control the destiny of the funds raised, and his application for a TRO falls with it.

### (b)    Mr. Inman Did Not Make Any Misrepresentations

Mr. Carreon's Application does not point to a single statement in which Mr. Inman claimed the endorsement of the American Cancer Society or the National Wildlife Federation.

12

That is because he has never done so.  *See* BLGCB Campaign page (Carreon Decl. Ex. B).  Indeed, Mr. Carreon does not explain where this supposed representation comes from; he merely offers this as a conclusion. (Mem. P&A 7).  The First Amended Complaint provides a little more illumination: Mr. Carreon's argument is that the endorsement is implied by the purported representation that Mr. Inman complied with California Government Code § 12599.  (First Am. Compl. § 53-55; *see also* Mem. P&A 7).  As discussed above, this has no foundation.

Nor did Mr. Inman misrepresent the tax deductibility of BLGCB campaign donations. First, Mr. Carreon has not and cannot identify any affirmative statement that contributors would be entitled to a tax deduction, as there was none. Rather, the alleged misrepresentation is again based on a supposed inference from the fact that Mr. Inman allegedly "us[ed] the names of NWF and ACS without permission."  (Mem. P&A 7).  Mr. Carreon does not cite a single case for the proposition that the nominative use of a charity's name – "I'm going to try and raise $20,000 and instead send it to the National Wildlife Federation and the American Cancer Society"– creates such a representation.  *See* BLGCB Campaign page (Carreon Decl. Ex. B); *see also* First Am. Compl. ¶ 38. Second, Mr. Carreon points to no section of the tax code, no IRS rules or regulations, no authority whatsoever by which tax deductibility is determined or otherwise affected by the endorsement of a charity, for there are none.  Third, the Indiegogo Terms of Use, which Mr. Carreon admits to reviewing (Carreon Decl. ¶ 4) clearly apprises funders "Indiegogo makes no representations regarding the deductibility of any Contribution for tax purposes.  Please consult your tax advisor for more information."[7]  (Carreon Decl. Ex. A).

Mr. Inman has not misrepresented his intentions on dispersing the funds raised. As Mr. Inman explained, the BLGCB campaign was designed to "to try and raise $20,000 and instead [of paying FunnyJunk] send it to the National Wildlife Federation and the American Cancer Society."

---

[7] Mr. Carreon's claim that Mr. Inman would be unjustly enriched by a tax deduction is specious. Should Mr. Inman claim the money raised from the BLGCB campaign as income, this would increase his tax burden as well; and to the extent that Mr. Inman *could* deduct the money raised, he would merely be in the same situation he was in before obtaining the money.  There can be no enrichment from tax consequences of the money raised, let alone an unjust one.

13

(Carreon Decl. Ex. B; *see also* First Am. Compl. ¶ 38). It is undisputed that the Mr. Inman planed to "send it" ($20,000) to the NWF and ACS.

However, events quickly overcame this plan—the $20,000 goal was reached in the first 64 minutes, and the numbers climbed quickly. (*See* First Am. Compl. ¶ 44) (noting that over $100,000 was donated in the first day of fundraising). Everyone who donated after the first $20,000 knew the goal had been met, and donated anyway. Because the amount raised was so much larger than expected, Mr. Inman was going to divide the money into four charities instead of two. (Inman Decl. ¶ 36, Ex. L). This does not make the prior statement a misrepresentation, because Mr. Inman had not made a promise about what to do with the amount over $20,000. (*See also* Carreon Decl. ¶ 16 ("Inman was not legally committed to do otherwise . . . .").) Indeed, Mr. Inman had no idea that more than $20,000 would be raised.

Moreover, pursuant to the Indiegogo Terms of Use, donors "understand that making a Contribution to a Project does not give [donors] any rights in or to that Project, including without limitation any ownership, control, or distribution rights, and that the Project Entity shall be free . . . otherwise direct the Project in its sole discretion." (Carreon Decl. Ex. A; *see also* First Am Compl. ¶ 58 (admitting the Terms "permit[] Inman to dispose of the money in any manner he saw fit.").) Nevertheless, Mr. Inman plans, and has already taken steps to, send all of the money raised to the National Wildlife Federation and the American Cancer Society. (Inman Decl. ¶¶ 37, 40, 41). Thus Mr. Carreon's misrepresentation claim fails because the alleged representation was not untrue.

Next, the Application claims that the failure to disclose Indiegogo's fees was somehow a misrepresentation. Mr. Carreon's claim that Mr. Inman and Indiegogo did not disclose the fees that Indiegogo would charge for hosting the BLGCB campaign is belied by Indiegogo's Terms of Use, which explain its fee structure for all fundraising projects. Moreover, Mr. Carreon has admitted in his declaration that he read (and understood) these Terms of Use, fatally undermining the argument that he has been deceived in any way. (Mem. P&A 7-8).[8]

---

[8] Indiegogo's Terms of Use state that "[a]ll Contributions made to a Project will be directed to the Project Entity's Funding Account, less a 9% marketplace processing fee retained by Indiegogo," except where a fundraising campaign reaches its goal by its deadline, in which case "Indiegogo will pay you a 5% rebate on all fund[s] raised during the campaign," thereby charging only a 4%
*(footnote continued on following page)*

14

Yet, even if these disclosures had not been made – which they were – Mr. Carreon would still not have a cause of action.  As the Supreme Court held in *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, a "[m]ere failure to volunteer the fundraiser's fee when contacting a potential donee, without more, is insufficient to state a claim for fraud."  538 U.S. 600, 624 (2003).  If this were not the case, fundraisers would face the kind of mandatory disclosure requirements that the Supreme Court struck down in *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988).  There, the Supreme Court overturned a North Carolina statute requiring fundraisers to disclose fees before asking for donations, finding the requirement "unduly burdensome and not narrowly tailored." *Riley*, 487 U.S. at 798.

Finally, the Application claims a misrepresentation based on alleged failures to make disclosures required by California's charitable solicitations law.  As discussed above, Mr. Inman is not a commercial fundraiser, and is not regulated by this law.

Accordingly, the Section 17500 claim also fails because Mr. Inman did not make any statements that were untrue or misleading.

### (c)   Mr. Carreon's Donation Does Not Give Him an Injury in Fact Necessary for a Section 17500 Claim

Mr. Carreon claims to be a donor to the BLGCB campaign, asserting unpersuasively that he did so purely to benefit the charities.  (Carreon Decl. ¶¶ 9-10).  It is obvious that Mr. Carreon made his nominal $10 donation for the primary purpose of fostering his legal argument and attempting to seize control over the fate of the fund, and not out of any genuine support for the BLGCB campaign.  His attempt to interfere with the campaign to raise funds in the name of criticizing the cease and desist letter he wrote for FunnyJunk does not mean he lost money or suffered any legally cognizable injury.

This is fatal to Mr. Carreon's claim because a claim under Section 17500 requires an individual suing under the statute to have "suffered injury in fact" and to have "lost money or

*(footnote continued from preceding page)*
fee.  (Carreon Decl. Ex. A).  The Terms of Use also explain that "3rd party processing fees" may be assessed, here accounting for 3% of the total raised.  These fees were fully disclosed on the Indiegogo website and should come as no surprise to Mr. Carreon or any other donor.

15

property as a result" of the false statements. Cal. Bus. & Prof. Code § 17535. However, when he donated, Mr. Carreon knew full well it was to a campaign critical of his letter, and that, as he admits, the Terms of Use "permit[ed] Inman to dispose of the money in any manner he saw fit." (First. Am. Compl. ¶ 58; *see also* Carreon Decl. Ex. A). As explained in the California Maxims of Jurisprudence, "[h]e who consents to an act is not wronged by it." California Civil Code § 3515.

As the California Supreme Court has held, "plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have 'lost money or property' within the meaning of Proposition 64 and have standing to sue." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 317 (2011). Mr. Carreon, however, cannot claim such a deception. He voluntarily donated to the BLGCB campaign, with full awareness that it was hosted by Indiegogo (with its attendant transactions costs); that the $20,000 level had been reached (and well surpassed—when Mr. Carreon made his donation on June 14, the night before he filed this lawsuit, more than $170,000 had already been raised, *see* Carreon Decl., Ex. C); that the campaign was criticizing him and his client; that the contribution would not necessarily be tax deductible; and that Mr. Inman had not registered as a commercial fundraiser. Thus, under the circumstances here, Mr. Carreon cannot manufacture an injury in fact, nor show that his choice to donate caused him to lose money or property.

Moreover, plaintiffs "must plead and prove actual reliance to satisfy the standing requirement" of the UCL and FAL. *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). Reliance is established by pleading that "the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct" but for defendants' misrepresentations or omissions. *Id*. at 326 (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1110–11 (1993)). Here, Mr. Carreon has not contended that he relied upon the alleged misrepresentation, or that he would not have donated otherwise.

### 3.   Mr. Carreon Does Not Have Standing to Assert a Violation of Government Code 12599

While Mr. Carreon's First Cause of Action is couched in terms of a false advertising claim under Section 17500, the Application asserts more directly a claim under California's Supervision

16

of Trustees and Fundraisers for Charitable Purposes Act ("the Act").  Cal. Gov't Code §§ 12580, *et seq*.; (Mem. P&A 6; *see also* First Am. Compl. ¶¶ 61, 66, 71).  This claim fails because neither the Act itself nor any preexisting common law rights confer standing to Mr. Carreon.

As an initial matter, the Act only applies to entities "over which the state or the Attorney General has enforcement or supervisory powers."  Cal. Gov't Code § 12581.  As explained above, Mr. Inman is not such an entity, because he is not a commercial fundraiser.

Assuming for the sake of argument that Mr. Inman was a commercial fundraiser—which he is not—it is true that the failure of a commercial fundraiser for charitable purposes to comply with the registration and reporting requirements of the Act "shall be grounds for injunction against solicitation in this state for charitable purposes and other civil remedies provided by law."  Cal. Govt. Code § 12599(f).  However, California vests in its Attorney General "primary responsibility" for prosecuting "charitable trust enforcement actions" under the Act, *id*. § 12598, as well as the authority to "institute appropriate proceedings to secure compliance" with the Act.  *Id*. § 12591.  Moreover, the statute offers no alternate method of enforcement: under California caselaw, a statute creates a private right of action "only if the statutory language or legislative history affirmatively indicates such an intent."  *Farmers Ins. Exch. v. Superior Court*, 137 Cal. App. 4th 842, 851 (2006).  Nothing in the statutory language affirmatively indicates an intent to create a private right of action, and the legislative history of the Act is also devoid of any such intent.  *See, e.g.*, California Bill Analysis, Senate Floor, 1997-1998 Regular Session, California Bill Analysis, A.B. 1810 Sen., 7/28/1998.  Without a private right of action, Mr. Carreon does not have standing to sue under the Act.

In the context of charitable contributions and trusts, California courts have limited the availability of a private right of action to a narrow category of individuals who have some vested interest in a charitable trust.  In *Holt v. College of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750 (1964), for example, the Supreme Court of California held that the only persons other than the Attorney General who have standing to enforce a charitable trust are those who have "'a sufficient special interest'" in the trust, such as persons who are "a trustee, or *a cestui*," or who "have some reversionary interest in the trust property."  *Id*. at 753.  Accordingly, *Holt* found that the minority

17

1    trustees of a charitable corporation had standing, "since its indefinite class of beneficiaries is

2    ordinarily not able to protect its own interest by legal action." *Id*. at 757.

3        Likewise, *San Diego etc. Boy Scouts of America* does not provide a right to sue. There, the

4    California Court of Appeals found that the parent organization and governing board of all Boy

5    Scouts in the San Diego area had standing to bring suit on behalf of the San Diego Boy Scout

6    beneficiaries of a trust against a stranger to the original trust. *San Diego etc. Boy Scouts of

7    America v. City of Escondido*, 14 Cal.App.3d 189, 196 (1971) ("We can think of no more

8    responsive or responsible party to represent the boy scouts of the Palomar District in such

9    litigation.").

10       *L.B. Research & Education Foundation v. UCLA Foundation*, 130 Cal. App. 4th 171

11   (2005) is also instructive.  In *L.B. Research & Education Foundation*, the court held that the

12   plaintiff, which contributed $1 million to establish an endowed chair at the UCLA School of

13   Medicine, had standing to sue under Sections 12591 and 12598 because UCLA accepted the

14   donation *with certain conditions imposed by the donor*, including a provision which held that on

15   failure to meet the conditions the contribution would be transferred to another medical school. The

16   court found that the imposition of the conditions vested the donor with a sufficient special interest

17   in the trust to confer standing.  *Id*. at 180–81. Similarly, the settlor of a charitable trust was found

18   to have standing to sue for breach of the trust, but only because such power to sue was reserved in

19   the trust instrument.  *Patton v. Sherwood*, 152 Cal. App. 4th 339, 347 (2007).

20       In sum, the rule in California is only that "[o]ther than the Attorney General, only certain

21   parties who have a *special and definite interest* in a charitable trust . . . have standing to institute

22   legal action to enforce or protect the assets of the trust." *Hardman v. Feinstein*, 195 Cal. App. 3d

23   157, 161-62 (1987) (emphasis added).  As that court explained, "[t]his limitation on standing arises

24   from the need to protect the trustee from vexatious litigation, possibly based on an inadequate

25   investigation, by a large, changing, and uncertain class of the public to be benefitted."  *Id.* at 162.

26       Mr. Carreon falls well short of that standard. Mr. Carreon's $10 donation does not make

27   him a minority trustee, nor is he in the class of beneficiaries. Indeed, people upset by Mr. Carreon's

28   legal threat letter raised the money, and it is hard to think of a party less appropriate to sue on

18

behalf of the funders.  Finally, there are no special conditions that might give him a special interest in the funds. .

Moreover, Mr. Carreon has not even *alleged* that he has the requisite special interest in the fund.  Neither Mr. Carreon's Application nor the First Amended Complaint allege that he reserved any power to sue for breach of charitable trust, or that he retained a reversionary interest in his $10 donation when he contributed to the BLGCB campaign.  (*See* First Am. Compl. ¶ 59; *see also* Carreon Decl. ¶ 9).  Absent any such allegation, the FAC fails to allege sufficient facts to demonstrate standing to sue for injunctive relief under Section 12599(f) of the Act.  Even if Mr. Carreon were to make such an allegation, this allegation would be directly contradicted by the Indiegogo Terms of Use.  These terms – which Mr. Carreon is clearly familiar with, and on which he himself relies – state:

> You understand that making a Contribution to a Project does not give you any rights in or to that Project, including without limitation any ownership, control, or distribution rights, and that the Project Entity shall be free to solicit other funding for the Project, enter into contracts for the Project, allocate rights in or to the Project, and otherwise direct the project in its sole discretion.

(Carreon Decl. Ex. A).  Mr. Carreon's own allegations and his declaration conclusively demonstrate that Mr. Carreon could not have any rights or reversionary interests whatsoever in his nominal $10 donation to the BLGCB campaign and thus lacks standing.

**B.      Mr. Carreon Is Not Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief**

Mr. Inman has said that he is going to donate all of the proceeds of the BLGCB campaign to the American Cancer Society and the National Wildlife Federation.  (Inman Decl. ¶ 37).  Mr. Carreon offers no evidence to the contrary, only speculation.  Therefore, he has failed to show irreparable harm.

The specific reasons for Mr. Carreon's request for the extraordinary remedy of a temporary restraining order are not totally clear, but it appears that Mr. Carreon has some concerns that Mr. Inman intends to withdraw the money from the campaign in order to take a photograph of it and send the photo to FunnyJunk. A separate but equally peripheral concern raised by Mr. Carreon is

INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER

1    that the funds should not go to Mr. Inman but rather should directly go to the charities due to

2    alleged tax ramifications to the donors.

3           As argued above, the Indiegogo Terms of Use allow Mr. Inman discretion to proceed as he

4    chooses.  However, Mr. Inman has decided to not withdraw the funds in order to photograph them.

5    Instead (unwilling to allow Mr. Carreon to interfere further with his expressive activity) he decided

6    to photograph his own funds.  With respect to the money from the campaign, Mr. Inman's

7    declaration details the proceeds and the amounts remitted, and that Mr. Inman has directed

8    Indiegogo to pay the amounts it held directly to the National Wildlife Federation and the American

9    Cancer Society. (Inman Decl. ¶ 40). Mr. Inman has prepared checks for the two charities for the

10   remaining money processed by PayPal, and has asked his counsel to forward them. In short, the

11   specter of irreparable harm raised by Mr. Carreon's application has zero factual basis.

12                      **1.      Possibility of Harm is Not Sufficient**

13          Mr. Carreon must show more than just a possibility of irreparable harm.  "Issuing a

14   preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

15   characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

16   clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  "Our frequently

17   reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable

18   injury is *likely* in the absence of an injunction."  *Id*. at 22 (emphasis in original).

19          Mr. Carreon, however, merely speculates on the possibility of harm.  For example, he states

20   that "no safeguards exist to prevent Inman from simply diverting this very substantial fund of

21   money to his own use."  (Mem. P&A 3). Likewise, Mr. Carreon asserts that "there will no way to

22   be sure it reaches the NWF and the ACS, no way to get it back and return it to the donors."  (Mem.

23   P&A 10).  A lack of "safeguards" and "no way to be sure" does not amount to the *likelihood* that

24   Mr. Inman will be dishonest. Mr. Carreon further speculates, despite the funds that are in

25   Indiegogo's control being sent by Indiegogo directly to the two charities and Mr. Inman having

26   checks for the remaining amount to the two charities, that the money "*may be* lost, dissipated, and

27   diverted from the charities in the names of which they were solicited."  (Application for TRO

28

                                           20

1  (Dkt. 20) at 2) (emphasis added).  Lots of things "may" happen, but this does not mean they are

2  remotely *likely*.

3      Mr. Carreon's Application also insists that, absent court intervention, Mr. Carreon and the

4  other donors would lose their ability to claim a tax deduction.  This is a red herring.  Mr. Carreon

5  does not cite to any law or authority to suggest that the funders' contributions to the BLGCB

6  campaign would become tax deductible if the injunction were to issue.  Additionally, as set forth

7  above, the Indiegogo Terms of Use make clear to prospective donors that any contributions would

8  not be tax deductible.  Mr. Carreon does not point to any statements by Mr. Inman to the contrary.

9  ## 2.      Mr. Carreon Has Only a Financial Injury

10      At best, Mr. Carreon's injury is financial – if Mr. Inman does not give the money to charity,

11  Mr. Carreon will be out the *de minimis* ten dollars he claims to have donated.  This is not enough.

12  "Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will

13  be available in the course of litigation."  *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466,

14  471 (9th Cir. 1984).

15      Moreover, in the highly unlikely event that Mr. Carreon were to prevail at trial, the Court

16  could order restitution, requiring Mr. Inman to transfer the money as appropriate.  Accordingly,

17  Mr. Carreon fails his obligation to "demonstrate potential harm which cannot be redressed by a

18  legal or equitable remedy following a trial."  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91

19  (3d Cir. 1992); *Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir.

20  1980) (monetary harm alone does not constitute irreparable harm); *see also eBay, Inc. v.*

21  *MercExchange, LLC*, 547 U.S. 388, 391 (2006) (plaintiffs must show "that remedies available at

22  law, such as monetary damages, are inadequate to compensate for that injury"); *Rent-A-Center,*

23  *Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)

24  ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can

25  be remedied by a damage award.").

26  ## 3.      An Injunction is Not an Available Remedy

27      The remedies available in a Section 17500 action are limited to injunctive relief and

28  restitution.  Cal. Bus. & Prof. Code § 17535; *In re Tobacco II*, 46 Cal. 4th at 312.  "[I]n order to

21

1    grant injunctive relief under section 17204 or section 17535, there must be a threat that the

2    wrongful conduct will continue." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663,

3    702 (2006). Mr. Carreon seeks an injunction, but neither alleges in his complaint nor argues in his

4    Application that the unlawful conduct is likely to recur. The alleged unlawful conduct subject to

5    the false advertising claim is running a fundraiser with an implicit representation of compliance

6    with California Government Code Section 12599. The fundraiser is over. Even to the extent Mr.

7    Carreon could, consistent with the First Amendment, argue for some sort of injunction against an

8    ongoing campaign similar to the BLGCB campaign, the First Amended Complaint alleges no facts,

9    for there are none, that Mr. Inman intends to run another fundraiser. Furthermore, the First

10   Amended Complaint alleges no facts that would show Inman does not plan to donate all of the

11   money he received from this fundraiser to charity. Nor does Mr. Carreon's Application or

12   accompanying Declaration asserts any such facts. As there exists no threat of continuing conduct

13   that is allegedly wrongful, injunctive relief is therefore inappropriate.

14          **C.      The Balance of Equities Tips in Mr. Inman's Favor**

15          When assessing whether to issue a TRO, a court should "balance the interests of all parties

16   and weigh the damage to each." *Los Angeles Memorial Coliseum Com'n*, 634 F. 2d at 1203.

17          If the requested TRO were to issue, Mr. Inman would face unnecessary hurdles in

18   completing his First Amendment activities: expressing his disapproval of the cease and desist letter

19   from FunnyJunk by raising money, giving a photo of the amount demanded to FunnyJunk (through

20   its lawyer, Mr. Carreon), and giving the money to charity instead. While most of these steps have

21   already occurred, an injunction preventing Mr. Inman from completing the campaign would still

22   constitute a prior restraint on Mr. Inman's speech. When First Amendment activities are at issue,

23   "at the very least the balance of hardships tips sharply in [favor of the party alleging First

24   Amendment injury]." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002)

25   (citations omitted). On the other hand, if the TRO was not issued, Mr. Inman would complete his

26   expressive activity, and, as a necessary part of those activities, the money would be quickly on its

27   way to charity – which is the result that Mr. Carreon claims to seek.

28

                                                    22

**D.     An Injunction Is Not In The Public Interest**

In exercising this Court's "sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal citation omitted).  Here, Mr. Carreon's proposed injunction would not only delay the distribution of substantial sums to charity, it would frustrate the goals of more than fourteen thousand people who donated as a method of expressing their displeasure against the FunnyJunk cease and desist letter.

These thousands of other donors are not parties to this litigation, and yet – even under Mr. Carreon's allegations – made "donations to the NWF and ACS to express disapproval" of the criticism of the FunnyJunk cease and desist letter, and to "revile Inman's legal adversaries," Mr. Carreon and his client FunnyJunk.  (First Am. Compl. ¶¶ 40, 41.)  Allowing Mr. Carreon to interfere with the BLGCB campaign would adversely affect the interests of these donors.

**E.     Mr. Carreon is Required to Obtain a Bond**

Pursuant to Federal Rule of Civil Procedure 65(c),

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

In his Application, Mr. Carreon does not address the bond issue at all.  If the injunction were to issue, this would delay the receipt of the full amount by the American Cancer Society and the National Wildlife Federation, and would implicate Mr. Inman's First Amendment rights.  Mr. Carreon should be required to put up a bond sufficient to pay those defendants the interest on the delayed money and otherwise compensate Mr. Inman for being prevented from exercising his First Amendment rights.

**IV.     CONCLUSION**

This case raises core First Amendment issues. Other trying to squelch Mr. Inman's speech and thwart the final steps of the BLGCB campaign, it is unclear why Mr. Carreon seeks the extraordinary remedy of court intervention. As set forth in his declaration, Mr. Inman has no intent to use the funds from the campaign for his own purposes.  One hundred percent of the funds available to Mr. Inman from the campaign will be disbursed to the American Cancer Society and

23

1  the National Wildlife Federation.  Mr. Carreon does not allege or put forth any credible evidence as

2  to why this will not occur, and why judicial intervention is necessary at this time.  Granting Mr.

3  Carreon's request would be contrary to the public interest and Mr. Inman's First Amendment

4  rights.

5       For the reasons stated above, Mr. Inman respectfully requests that the Application for a

6  Temporary Restraining Order and Order to Show Cause re Preliminary Injunction be denied.

7  Dated:  July 1, 2012                    By:   /s/ Kurt Opsahl
                                                Kurt Opsahl
8                                               Matthew Zimmerman
9                                               Corynne McSherry
                                                ELECTRONIC FRONTIER FOUNDATION
10                                              454 Shotwell Street
                                                San Francisco, CA 94110
11                                              Telephone: (415) 436-9333
                                                Facsimile: (415) 436-9993
12
13                                              Venkat Balasubramani
                                                Focal PLLC
14                                              800 Fifth Avenue, Suite 4100
                                                Seattle, WA 98104
15                                              Telephone: (206) 529-4827
                                                Facsimile: (206) 260-3966
16
17                                              Attorneys for Defendant Matthew Inman

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2012, I electronically filed the foregoing document with the

Clerk of the Court, using the CM/ECF system, which will send notification of such filing to the

counsel of record in this matter who are registered on the CM/ECF system.

Executed on July 1, 2012, in San Francisco, California.

*/s/ Kurt Opsahl*
Kurt Opsahl

No.: 12-cv-3112-EMC        INMAN'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER