# Exhibit H

# Exhibit H



**Venkat Balasubramani**
*venkat@focallaw.com*
Tel: 206.529.4827

June 11, 2012

**Sent Via First Class Mail & Email**

Charles Carreon
Attorney at Law

███████████████████████

**Re:      FunnyJunk – The Oatmeal**

Dear Mr. Carreon:

We represent Matthew Inman, who is also known online as "The Oatmeal".  I write in response
to your letter dated June 2, 2012, alleging that Mr. Inman defamed your client, FunnyJunk, LLC
("**FunnyJunk**"), and engaged in false advertising, through statements made on The Oatmeal's
blog located at www.theoatmeal.com/blog (the "**Blog Post**").

**Background**

Although we disagree with your characterization of the Blog Post, the material facts are not in
dispute. The Oatmeal creates and publishes comics that have gained a large following both on-
and off-line. The Oatmeal's comics receive wide distribution through his own website and social
media profiles, and coverage through media outlets. Your client is a website that hosts a
significant quantity of user submitted content.  At some point last year, The Oatmeal became
aware that a large number of his comics were available on FunnyJunk.  He had not authorized
FunnyJunk to publish these comics and FunnyJunk published them without his consent and
without attribution.  When faced with the problem that many content owners face, The Oatmeal
wrote a blog post speculating about possible courses of action, and inviting discussion about
this issue.  The Blog Post noted that, not only did FunnyJunk make available a significant
quantity of The Oatmeal's comics, it also made available third party content, including comics
published by third parties.  His post highlighted the fact that sending a takedown notice under
the Digital Millennium Copyright Act was not likely to solve the problem, given the quantity of
comics found on Funny Junk's site and the fact that users constantly upload new material.  The
Blog Post received media coverage in a variety of outlets—the coverage all focused on the key
dilemma that content owners face: how to police copyright infringement on third party sites.
This is the key point The Oatmeal made in the Blog Post:

> I realize that trying to police copyright infringement on the internet is like strolling into the
> Vietnamese jungle circa 1964 and politely asking everyone to use squirt guns.

*Charles Carreon, Esq.*
*June 11, 2012*
*Page 2*

In response to the Blog Post, FunnyJunk and The Oatmeal had a few (indirect) online exchanges.  FunnyJunk removed some, but not all, of The Oatmeal's comics, as detailed in a follow-up blog post by The Oatmeal.

The Oatmeal didn't hear from FunnyJunk or have further dealings with FunnyJunk until your June 2, 2012 letter.  The letter accuses The Oatmeal of defamation and false advertising, demands that he take down the Blog Post, and demands payment of $20,000.  As set forth below, FunnyJunk's claims are without merit.

**Defamation**

**A.      Nothing in the Blog Post is defamatory.**

A claim for defamation requires FunnyJunk to show that The Oatmeal made a false statement of material fact, and harbored the requisite mental state when the statement was made.  Your letter initially points to the following statements from the Blog Post:

> *Here's how FunnyJunk.com's business operates:*
>
> 1.     *Gather funny pictures from around the internet*
> 2.     *Host them on FunnyJunk.com*
> 3.     *Slather them in advertising*
> 4.     *If someone claims copyright infringement, throw your hands up in the air and exclaim "It was our users who uploaded your photos! We had nothing to do with it! We're innocent!"*
> 5.     *Cash six figure advertising checks from other artist's stolen material.*

There is no dispute that your client hosts user submitted content, and in response to copyright claims argues that the users of FunnyJunk and not FunnyJunk itself are legally responsible for any infringement.  The Blog Post did nothing more than describe the business model—that was and remains the subject of extensive ongoing litigation and commentary—employed by FunnyJunk and by numerous sites that host user submitted content, including, notably, YouTube.  There is nothing false about this statement; it merely raises an issue of ongoing public concern and does so in an accurate manner.

Your letter points to only one other statement which you claim is false: a statement that FunnyJunk has "practically stolen my entire website and mirrored it on FunnyJunk."  FunnyJunk claims that this statement, along with those above, amount to a "false accusation of willful copyright infringement."  However, this allegation plucks one statement out of context and ignores the overall tenor of The Oatmeal's blog and online discussions in general.  Courts have repeatedly held that context is key to a defamation claim, particularly a claim that is based on statements made online.

A threshold question in any defamation claim is "whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact."  Gardner v. Martino, 563 F.3d 981, 987 (9th Cir. 2009).  In making this determination, courts do not simply consider the contested statement in isolation, but use a three-part test that assesses (1) whether in the broad context, the general tenor of the entire work, including the setting and the format, negates the impression that the speaker was asserting an objective fact; (2) whether the context and content of the specific statements, including the use of figurative and hyperbolic language, and the

*Charles Carreon, Esq.*
*June 11, 2012*
*Page 3*

reasonable expectations of the audience, negate that impression; and (3) whether the statement is sufficiently factual to be susceptible of being proved true or false.  Gardner, 563 F.3d at 987.

The Blog Post contains much more than just the statements referred to in your letter.  It captures a spirited debate (as reflected, among other things, in the comments section) about the user submitted content on the internet, and the challenges associated with policing copyright infringement.  The comments include posts from supporters of The Oatmeal and FunnyJunk alike.  Additionally, the Blog Post contains an "update" link to a subsequent blog post by The Oatmeal that describes FunnyJunk's actions following the Blog Post.  This post also contains comments from users that continue the debate stirred by the original Blog Post.  (Interestingly, the subsequent blog post contains a screenshot of a statement by FunnyJunk that, under FunnyJunk's own logic, would constitute defamation: "[t]he Oatmeal wants to sue funnyjunk and shut it down!"  The Oatmeal never threatened to sue FunnyJunk, nor did he ever indicate that he wanted to shut down FunnyJunk's website.)

Courts have found that the context of a heated debate negates the impression that a defendant was asserting a verifiable fact, as opposed to a statement of opinion.  *See*, *e.g.*, Gardner, 563 F.3d at 988 (radio talk show program that included drama, hyperbolic language, opinionated and arrogant host, and heated controversy reduced audience's expectation of learning an objective fact); Underwager, 69 F.3d at 366-67 (fact that statements were made at workshop which included speakers on opposite sides of the "heated debate" over child witness reliability, relevant to analysis); Art of Living Found. v. Does 1-10, No. 10-CV-05022-LHK, 2011 U.S. Dist. LEXIS 63507, 2011 WL 2441898, at *7 (N.D. Cal. June 15, 2011) (readers less likely to view statements made on blogs with "heated discussion and criticism," as assertions of fact); Nicosia v. De Rooy, 72 F. Supp. 2d 1093, 1101 (N.D. Cal. 1999) (readers less likely to view statements made as part of debate concerning a "bitter legal dispute" as assertions of fact); Washburn v. Lavoie, 357 F. Supp. 2d 210, 215 (D.D.C. 2004) (in the context of an ongoing dispute between the parties who were neighbors, no reasonable person would view defendants' statement that plaintiff "illegally" tape recorded them as defamatory).  There is no doubt that this dispute specifically, and the topic of user submitted content and copyright enforcement generally, is a topic of ongoing debate, not only between the parties, but also by the online community at large.  Indeed, the interactions between The Oatmeal and FunnyJunk drew attention to the topic from many of the internet's most recognized media outlets, including ArsTechnica, BuzzFeed, MetaFilter, GeekWire, and others. These are exactly the type of circumstances that have led courts to conclude that a statement underlying a claim for defamation would be viewed as opinion or mere hyperbole rather than an assertion of an objective fact.

Furthermore, courts have acknowledged that online forums such as blogs generally create a more relaxed communication environment where statements are less likely to be understood as containing assertions of fact.  *See*, *e.g.*, Sandals Resorts Int'l, Ltd v. Google, Inc., 925 N.Y.S.2d 407, 415-16 (N.Y. App. Div. 2011) (observing that readers give less deference to allegedly defamatory remarks published on online forums such as blogs than to similar remarks made in other contexts); Art of Living Found., 2011 U.S. Dist. LEXIS 63507, 2011 WL 2441898, at *7 (statements made on obviously critical blog with "heated" discussion and criticism less likely to be viewed as assertions of fact). The Oatmeal's site and blog are paradigmatic examples of a relaxed communication environment where readers can expect to encounter hyperbole, sarcasm, and other elements commonly associated with online humor. Indeed, this is the essence of The Oatmeal.

Given the larger context of the Blog Post, such as the debate among readers in the comments sections, The Oatmeal's subsequent blog post (linked as an "update" in the Blog Post), your

*Charles Carreon, Esq.*
*June 11, 2012*
*Page 4*

client's own site (both sites contain links to each other furthering the cross-debate), as well as the fact that the statements appear in an online forum, no reasonable person would view the statements made by The Oatmeal as factual accusations of criminal activity by FunnyJunk. Indeed, the media coverage following the Blog Post easily confirms this.

**B.      No reasonable person would think the statements contained in the Blog Post represented the "present state of affairs."**

Your letter also alleges that The Oatmeal "grossly misrepresents the current state of affairs" by not having gone back and changed screen-captures and links that were part of the original post. This argument is frivolous, at best.

Hundreds of The Oatmeal's comics are still available on FunnyJunk.  (*See, e.g.,* [http://www.funnyjunk.com/funny_pictures/1106070/The+Oatlmeal+Pterodactyl+Song/]; [http://www.funnyjunk.com/funny_pictures/545537/irony/]; [http://funnyjunk.com/funny_pictures/2609728/What/].)  The Blog Post thus does not "grossly misrepresent" the current state of affairs. In any event, even assuming FunnyJunk removed all of The Oatmeal's comics from FunnyJunk's site, it is clear that the Blog Post was published in the past.  Every reasonable reader knows that a blog is a compilation of posts over time, and a cursory review of the Blog Post will make obvious that the Blog Post was posted approximately a year ago.  (As clearly noted in the comments section, the first comment was posted "10 months ago".  Logically, then, the Blog Post must have occurred at some time before that.)  Just as a reader of an old magazine or newspaper article would not necessarily assume that circumstances mentioned in an article have remained unchanged since initial publication, a reader of the Blog Post would not come to the conclusion that the Blog Post necessarily represents "the current state of affairs." The Oatmeal is not under any obligation to return to old blog posts and update them to reflect events that occur following the blog post. Readers on the internet know better, and no court will impose such an obligation on The Oatmeal.

**C.      Mr. Inman did not act maliciously.**

FunnyJunk further alleges that Mr. Inman's acts were malicious, and that such malice establishes defamation *per se*, relieving FunnyJunk of the burden of proving actual damages. This is similarly a frivolous argument.

In sole support of this proposition, your letter states that The Oatmeal's allegedly "false statements were made with the explicit, malicious purpose [The Oatmeal] announced in the source code of [The Oatmeal's] webpage."  You then provide a screen-capture of the referenced source code, which displays a picture of a pterodactyl rendered from standard alpha-numeric characters, along with a quote.  Apart from the fact that the excerpted portion of the "source code" in no way demonstrates any malicious intent towards FunnyJunk, the pterodactyl is in fact a comic character created by The Oatmeal that predates the online interactions between The Oatmeal and FunnyJunk, and the quote is from that comic.  The comic can be viewed at: http://theoatmeal.com/comics/ptero.  Elements of the pterodactyl—that FunnyJunk claims reflect The Oatmeal's malicious intent—are available on *every single page* of The Oatmeal's website.

**Claims Under the Lanham Act**

FunnyJunk also alleges The Oatmeal's statements constitute false advertising under the Lanham Act.  However, the statements made by The Oatmeal do not constitute commercial

*Charles Carreon, Esq.*
*June 11, 2012*
*Page 5*

advertising or promotion, and therefore section 1125(a)(1)(B) of the Lanham Act is inapplicable. Rather, those statements constitute speech entitled to the full protections of the First Amendment.

The Lanham Act proscribes misrepresentation of another's goods or services in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B); Podiatrist Association, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003) ("The relevant statutory language prohibits misrepresentations only in 'commercial advertising or promotion.'") Sanderson v. Culligan Intern, Co., 415 F.3d 620, 624 (7th Cir. 2005) ("Section 43(a) covers only "commercial advertising or promotion."). A statement constitutes commercial advertising or promotion and is covered by the Lanham Act when it is (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. Rice v. Fox Broad. Co., 330 F.3d 1170, 1181 (9th Cir. 2003). In general, "negative commentary ... does more than propose a commercial transaction and is, therefore, non-commercial." Nissan Motor Co., 378 F.3d at 1017 (finding that links on the website nissan.com, which was owned by Nissan Computer, to disparaging content about Nissan Motor Company were not commercial speech and therefore entitled to full protection under the First Amendment).

There are two simple reasons why FunnyJunk's claims under the Lanham Act are untenable. First, the Blog Post is not commercial advertising or promotion. *See* New.Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1111 (C.D. Cal. 2004); Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1017 (9th Cir. 2004). Rather, the Blog Post expresses The Oatmeal's legitimate concerns about vast quantities of his content being misappropriated, and the frustration and difficulty in policing online copyright infringement. Second, the parties are not in competition with each other. FunnyJunk runs a site that reproduces user generated content. The Oatmeal, on the other hand, publishes his own, originally produced content.

Rather than forming the basis of a claim under the Lanham Act, The Oatmeal's Blog Post is a commentary on copyright issues and FunnyJunk's business model, and is entitled to "full First Amendment protection." Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir. 2002). Given The Oatmeal's status as an artist and a commentator, courts will be particularly sensitive to First Amendment concerns in this context.

*****

As your client should know, the internet does not like censorship, and does not react kindly to it. Bringing a lawsuit against The Oatmeal is ill advised. Not only are FunnyJunk's claims meritless, FunnyJunk will surely lose in the court of public opinion and cause itself reputational harm. We are also deeply skeptical that a nameless, faceless, business that hosts third party content will be able to demonstrate much if anything by way of damages as a result of The Oatmeal's allegedly defamatory statements. At the end of the day, a lawsuit against The Oatmeal in this situation is just a really bad idea.

This letter largely assumes (without conceding) that FunnyJunk would be entitled to claim DMCA immunity against claims of copyright infringement, but to the extent FunnyJunk decides to sue The Oatmeal, you can rest assured that The Oatmeal will explore the possibility of asserting claims for copyright infringement against FunnyJunk (third party content creators may be interested as well). Even assuming that all of the content on FunnyJunk is uploaded by users and FunnyJunk otherwise qualifies for DMCA immunity, it's possible that The Oatmeal

*Charles Carreon, Esq.*
*June 11, 2012*
*Page 6*

may be able to satisfy the "red flag" exception for DMCA immunity. *See* <u>Viacom Int'l, Inc. v. YouTube, Inc.</u>, 676 F.3d 19, 41 (2d Cir. 2012) (discussing "red flag" test and reversing grant of summary judgment in favor of YouTube). It is also possible that FunnyJunk hasn't complied with the requirements of the DMCA and thus cannot take advantage of its protections.  Among other things, the DMCA requires a service provider to designate an agent, provide contact information, and file a notice of designation with the Copyright Office.  Without taking a position on the other issues, I'll note simply that FunnyJunk does not appear to have a notice of designation on file with the Copyright Office. This alone would be enough to undermine any defense of immunity to claims of infringement that The Oatmeal (or third parties) may assert.

The Oatmeal wrote a blog post complaining about his content being made available on FunnyJunk.  There is no dispute that large quantities of his content were indeed available via FunnyJunk.  To the extent FunnyJunk wishes to make clear that it has removed The Oatmeal's content and that it should not be held responsible for the availability of this content on its site, it has an easy avenue to do so: FunnyJunk can publish a statement or a blog post to this effect. This would be the appropriate and First Amendment-friendly course of action for a website (that presumably shares the free speech concerns of the internet at large).  In any event, FunnyJunk's claims are meritless, and The Oatmeal will prevail in any litigation involving FunnyJunk's threatened claims.

To be clear, The Oatmeal will not cave in to FunnyJunk's attempts to censor him through legal threats and bullying.  He has posted a response separately.  See http://theoatmeal.com/blog/funnyjunk_letter.

If you wish to discuss this matter further, please contact me via email at venkat@focallaw.com or by telephone at (206) 529-4827.

Sincerely,

**Focal PLLC**

*/s/ Venkat Balasubramani*
Venkat Balasubramani